UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| KENNETH H. KARSTEDT, Derivatively on Behalf of NABORS INDUSTRIES LTD., | § | Civil Action No. |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| EUGENE M. ISENBERG, ANTHONY G. PETRELLO, BRUCE P. KOCH, DANIEL McLACHLIN, MARTIN J. WHITMAN, HANS W. SCHMIDT, MYRON M. SHEINFELD, JAMES L. PAYNE, ALEXANDER M. KNASTER and JACK WEXLER, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| – and – | § | |
| | § | |
| NABORS INDUSTRIES LTD., a Bermuda corporation, | § | |
| | § | |
| Nominal Defendant. | § | |
| | § | <u>DEMAND FOR JURY TRIAL</u> |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, CORPORATE WASTE, GROSS MISMANAGEMENT, CONSTRUCTIVE FRAUD AND UNJUST ENRICHMENT**

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF Complete

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of Nabors Industries Ltd. ("Nabors" or the "Company") on behalf of the Company against its Board of Directors and certain of its senior executives (collectively, "Defendants").   This action seeks to remedy Defendants' violations of federal and state law, including breaches of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement, arising out of a scheme and wrongful course of business whereby Defendants allowed senior Nabors insiders to divert hundreds of millions of dollars of corporate assets to themselves and other employees via the manipulation of grant dates associated with hundreds of thousands of stock options granted to Nabors insiders.  Each of the Defendants also participated in the concealment of the backdating option scheme complained of herein and/or refused to take advantage of the Company's legal rights to require these senior insiders to disgorge the hundreds of millions in illicitly obtained incentive compensation and proceeds diverted to corporate employees since 1995.

2.      Between 1995 and 2006, Defendants also caused Nabors to file false and misleading statements with the Securities and Exchange Commission ("SEC"), including Proxy Statements filed with the SEC which stated that the options granted by Nabors carried with them an exercise price that was *not less than* the fair market value of Nabors stock on the date of grant and issuance.

3.      In fact, Defendants were aware that the practices employed by the Board allowed the stock option grants to be *backdated* to dates when the Company's shares were trading at or near the lowest price for that relevant period.  By December 2006, Defendants' backdating scheme had yielded stock option grants to the Company's executive officers worth millions of dollars.  These grants were included in more than $884 million in stock sale proceeds for Defendants.

4.      Defendants' misrepresentations and wrongful course of conduct violated the Securities Exchange Act of 1934 (the "Exchange Act"), as well as Texas law.  By authorizing and/or

acquiescing in the stock option backdating scheme, Defendants: (i) caused Nabors to issue false statements; (ii) diverted hundreds of millions of dollars of corporate assets to senior Nabors executives; and (iii) subjected Nabors to potential liability from regulators, including the SEC and the IRS.

5.     Defendants' gross mismanagement and malfeasance over the past decade has exposed Nabors and its senior executives to criminal and civil liability for issuing false and misleading financial statements.  Specifically, Defendants caused or allowed Nabors to issue statements that failed to disclose or misstated the following: (i) that the Company had problems with its internal controls that prevented it from issuing accurate financial reports and projections; (ii) that because of improperly recorded stock-based compensation expenses, the Company's financial results violated Generally Accepted Accounting Principles ("GAAP"); and (iii) that the Company's public disclosures presented an inflated view of Nabors' earnings and earnings per share.

6.     Defendants' malfeasance and mismanagement during the relevant period has wreaked hundreds of millions of dollars of damages on Nabors.  The Company's senior executives were incentivized to over-pay themselves, to profit from their misconduct by cashing in on under-priced stock options and to issue false financial statements to cover up their misdeeds.  Defendants' breaches of fiduciary duties in the administration of the Company's stock option plans so polluted the plans with grant date manipulations so as to void all grants made pursuant to the plans.  The Company has now been mentioned as one of several companies likely to have manipulated options. Meanwhile, certain of the Defendants, who received under-priced stock options and/or knew material non-public information regarding Nabors' internal control problems, abused their fiduciary relationship with the Company by selling over $884 million worth of their personally held shares at artificially inflated prices during the relevant period.  This action seeks recovery for Nabors against

these faithless fiduciaries, as Nabors' Board of Directors, as currently composed, is simply unable or unwilling to do so.

JURISDICTION AND VENUE

7.    The claims asserted herein arise under §14(a) of the Exchange Act, 15 U.S.C. §78n(a), and under state law for breach of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement.  In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

8.    This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1331.  This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

9.    This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

10.    Venue is proper in this district pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  Nabors is located in and conducts its business in this District.  Further, Defendants conduct business in this District, and certain of the Defendants are citizens of Texas and reside in this District.

PARTIES

11.    Plaintiff Kenneth H. Karstedt, is a shareholder of Nabors, and holds and has continually held Nabors stock since 1998.

- 3 -

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

12.     Nominal party Nabors is a Bermuda corporation with its corporate headquarters located in Hamilton, Bermuda and its executive and administrative office located at 515 West Greens Rd. Suite 1170, Houston, Texas 77067.

13.     Defendant Eugene M. Isenberg ("Isenberg") has been a director, Chairman of the Board, Chairman of the Executive Committee of the Board and Chief Executive Officer ("CEO") of Nabors since 1987.  Because of Isenberg's positions, he knew the adverse non-public information about the business of Nabors, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the relevant period, Isenberg participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, defendant Isenberg sold 28.2 million shares of Nabors stock for proceeds of $558.9 million during the relevant period.  Defendant Isenberg may be served at 2 North Breakers Row, Unit 525, Palm Beach, Florida 33480.

14.     Defendant Anthony G. Petrello ("Petrello") has served as President and Chief Operating Officer of Nabors since 1992.  Additionally, Petrello has been a director and member of the Executive Committee of the Board since 1991 and Deputy Chairman of the Company since 2003.  Because of Petrello's positions, he knew the adverse non-public information about the business of Nabors, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the relevant period, Petrello participated in the issuance of false and/or misleading statements, including the preparation

Click Here & Upgrade
Expanded Features
Unlimited Pages

PDF
Complete

of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, defendant Petrello sold 12.6 million shares of Nabors stock for proceeds of $244.2 million during the relevant period.  Defendant Petrello may be served at 10 Remington Lane, Houston, Texas 77005.

15.     Defendant Bruce P. Koch ("Koch") has been Chief Financial Officer ("CFO") and Vice President of Nabors since February 2003.  Previously Koch served as Corporate Controller of Nabors from March 1990 to 1995 and Vice President-Finance from January 1996 to February 2003. Because of Koch's positions, he knew the adverse non-public information about the business of Nabors, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  Defendant Koch, by his specialized financial expertise, was in a unique position to understand the business of Nabors as well as its finances, markets and present and future business prospects.  During the relevant period, Koch participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, defendant Koch sold 355,200 shares of Nabors stock for proceeds of $8.1 million during the relevant period.  Defendant Koch may be served at 35 Meadow Brook Place, The Woodlands, Texas 77382.

16.     Defendant Daniel McLachlin ("McLachlin") has served as Vice President, Administration and Secretary of Nabors since 1986.  Previously, McLachlin served as Vice President, Human Resources of Nabors Drilling Limited, a subsidiary of Nabors from 1979 to 1984 and Manager, Administration of the Company from 1984 to 1986.  Because of McLachlin's positions, he knew the adverse non-public information about the business of Nabors, as well as its

PDF Complete

Click Here & Upgrade
Expanded Features
Unlimited Pages

finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the relevant period, McLachlin participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, defendant McLachlin sold 130,826 shares of Nabors stock for proceeds of $2.5 million during the relevant period.  Defendant McLachlin may be served at 515 West Greens Rd., Suite 1170, Houston, Texas 77067.

17.    Defendant Martin J. Whitman ("Whitman") has been a director of Nabors since 1991 and currently serves as lead director.  Because of Whitman's position, he knew the adverse non-public information about the business of Nabors, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  As a member (Chair) of the Compensation Committee, defendant Whitman controlled the other Defendants' stock option awards.  As a member of the Audit and Governance and Nominating Committees, defendant Whitman caused or allowed the dissemination of the improper public statements described herein. In addition, defendant Whitman also serves as a member of the Executive Committee of Nabors. During the relevant period, Whitman participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Whitman sold 2.2 million shares of Nabors stock for proceeds of $37.4 million during the relevant

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

period.  Defendant Whitman may be served at 285 Central Park West, Unit 12S, New York, New York 10024.

18.     Defendant Hans W. Schmidt ("Schmidt") has been a director of Nabors since 1993. Because of Schmidt's position, he knew the adverse non-public information about the business of Nabors, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  As a member of the Audit and Governance and Nominating Committees, defendant Schmidt caused or allowed the dissemination of the improper public statements described herein.   As a member of the Compensation Committee, defendant Schmidt controlled the other Defendants' stock option awards.  During the relevant period, Schmidt participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, defendant Schmidt sold 186,000 shares of Nabors stock for proceeds of $3.5 million during the relevant period.  Defendant Schmidt may be served at 515 West Greens Road, Suite 1170, Houston, Texas 77067.

19.     Defendant Myron M. Sheinfeld ("Sheinfeld") has served as a director of Nabors since 1988.  Because of Sheinfeld's position, he knew the adverse non-public information about the business of Nabors, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  As a member (Chair) of the Audit Committee and member of the Governance and Nominating Committee, defendant Sheinfeld caused or allowed the dissemination of the improper public statements described herein.   As a member of the

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

Compensation Committee, defendant Sheinfeld controlled the other Defendants' stock option awards. During the relevant period, Sheinfeld participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Sheinfeld sold 248,000 shares of Nabors stock for proceeds of $5.6 million during the relevant period. Defendant Sheinfeld may be served at 2201 Robinhood Street, Houston, TX 77005.

20.     Defendant James L. Payne ("Payne") has been a director of Nabors since 1999. Because of Payne's position, he knew the adverse non-public information about the business of Nabors, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. As a member (Chair) of the Governance and Nominating Committee, defendant Payne caused or allowed the dissemination of the improper public statements described herein. As a member of the Compensation Committee, defendant Payne controlled the other Defendants' stock option awards. During the relevant period, Payne participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Payne sold 157,532 shares of Nabors stock for proceeds of $3.6 million during the relevant period. Defendant Payne may be served at 31 Pinewold Circle, Houston, TX 77056.

21.     Defendant Alexander M. Knaster ("Knaster") has been a director of Nabors since 2004. Because of Knaster's position, he knew the adverse non-public information about the business of Nabors, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and

employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. As a member of the Governance and Nominating Committee, defendant Knaster allowed the dissemination of the improper public statements described herein. As a member of the Compensation Committee, defendant Knaster controlled the other Defendants' stock option awards. During the relevant period, Knaster participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Knaster may be served at 800 Ocean Drive, Suite 1005, Juno Beach, Florida 33408.

22. Defendant Jack Wexler ("Wexler") has been a director of Nabors since 1987 and currently acts as Director Emeritus of the Company. Because of Wexler's position, he knew the adverse non-public information about the business of Nabors, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Wexler participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Wexler sold 1.08 million shares of Nabors stock for proceeds of $19.8 million during the relevant period. Defendant Wexler may be served at 800 Saint Ames Lane, Vero Beach, Florida 32697.

23. The defendants identified in ¶¶13-14 and 17-22 are referred to herein as the "Director Defendants." The defendants identified in ¶¶13-16 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶13-20 and 22 are referred to herein as the "Insider Selling Defendants."

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

**DEFENDANTS' DUTIES**

24.     Each officer and director of Nabors named herein owed the Company and Nabors shareholders the duty to exercise a high degree of care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Nabors' directors and officers complained of herein involves knowing, intentional and culpable violations of their obligations as officers and directors of Nabors.  Further, the misconduct of Nabors' officers has been ratified by Nabors' Board, which has failed to take any legal action on behalf of the Company against them.

25.     By reason of their positions as officers, directors and fiduciaries of Nabors and because of their ability to control the business and corporate affairs of the Company, the Defendants owed Nabors and its shareholders fiduciary obligations of candor, trust, loyalty and care, and were required to use their ability to control and manage Nabors in a fair, just, honest and equitable manner, and to act in furtherance of the best interests of Nabors and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  In addition, as officers and/or directors of a publicly held company, the Defendants had a duty to refrain from utilizing their control over Nabors to divert assets to themselves via improper and/or unlawful practices.  Defendants also had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, earnings and compensation practices.

26.     Because of their positions of control and authority as directors or officers of Nabors, each of the Defendants was able to and did, directly and indirectly, control the wrongful acts complained of herein.  As to the Director Defendants, these acts include: (i) agreement to and/or acquiescence in Defendants' option backdating scheme; (ii) willingness to cause Nabors to disseminate false Proxy Statements for 1995-2006, which Proxy Statements failed to disclose Defendants' option backdating scheme and omitted the fact that executive officers were allowed to

backdate their stock option grants in order to manipulate the strike price of the stock options they received. Because of their positions with Nabors, each of the Defendants was aware of these wrongful acts, had access to adverse non-public information and was required to disclose these facts promptly and accurately to Nabors shareholders and the financial markets but failed to do so.

27. Between 1995 and 2006, Defendants concealed that the stock option grants had been repeatedly and consciously **backdated** to ensure that the strike price associated with the option grants was at or near the lowest trading price for that fiscal period. Due to Defendants' breach of their fiduciary duty in the administration of the stock option plans, plaintiff seeks to have the directors' and officers' plans voided and gains from those plans returned to the Company. In the alternative, plaintiff seeks to have all of the unexercised options granted to defendants from as early as 1995 to 2002 cancelled, the financial gains obtained via the exercise of such options returned to the Company and to have Defendants revise the Company's financial statements to reflect the truth concerning these option grants.

28. To discharge their duties, the directors of Nabors were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and financial affairs of Nabors. By virtue of such duties, the officers and directors of Nabors were required, among other things, to:

(a)     manage, conduct, supervise and direct the business affairs of Nabors in accordance with all applicable law (including federal and state laws, government rules and regulations and the charter and bylaws of Nabors);

(b)     neither engage in self-dealing nor knowingly permit any officer, director or employee of Nabors to engage in self-dealing;

(c)     neither violate nor knowingly permit any officer, director or employee of Nabors to violate applicable laws, rules and regulations;

(d)　　remain informed as to the status of Nabors' operations, including its practices in relation to the cost of allowing the pervasive backdating and improperly accounting for such, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the U.S. federal securities laws and their duty of candor to the Company's shareholders;

(e)　　prudently protect the Company's assets, including taking all necessary steps to recover corporate assets (cash, stock options) improperly paid to Company executives and directors together with the related costs (professional fees) proximately caused by the illegal conduct described herein;

(f)　　establish and maintain systematic and accurate records and reports of the business and affairs of Nabors and procedures for the reporting of the business and affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(g)　　maintain and implement an adequate, functioning system of internal legal, financial and accounting controls, such that Nabors' financial statements – including its expenses, accounting for stock option grants and other financial information – would be accurate and the actions of its directors would be in accordance with all applicable laws;

(h)　　exercise control and supervision over the public statements to the securities markets and trading in Nabors stock by the officers and employees of Nabors; and

(i)　　supervise the preparation and filing of any financial reports or other information required by law from Nabors and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of Nabors and to make full and

accurate disclosure of all material facts concerning, *inter alia,* each of the subjects and duties set forth above.

29.      Each Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Nabors, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Defendants who were officers and/or directors of the Company during the relevant period has been ratified by the Director Defendants who comprised Nabors' entire Board during the relevant period.

30.      Defendants breached their duties of loyalty and good faith by allowing or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Defendants from taking such illegal actions.  As a result, Nabors has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

        (a)      improvidently paid executive compensation;

        (b)      increased capital costs as a result of the loss of market capitalization and the Company's damaged reputation in the investment community;

        (c)      costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

        (d)      incurring possible IRS penalties for improperly reporting compensation.

31.     These actions have irreparably damaged Nabors' corporate image and goodwill.  For
at least the foreseeable future, Nabors will suffer from what is known as the "liar's discount," a term
applied to the stocks of companies who have been implicated in illegal behavior and have misled the
investing public, such that Nabors' ability to raise equity capital or debt on favorable terms in the
future is now impaired.

## AIDING AND ABETTING AND CONCERTED ACTION

32.     In committing the wrongful acts alleged herein, Defendants have pursued or joined in
the pursuit of a common course of conduct and acted in concert with one another in furtherance of
their common plan.

33.     During all times relevant hereto, Defendants collectively and  individually initiated a
course of conduct which was designed to and did: (i) conceal the fact that the Company was
allowing its directors and senior officers to divert hundreds of millions of dollars to Nabors insiders
and directors and causing Nabors to misrepresent its financial results; (ii) maintain Defendants'
executive and directorial positions at Nabors and the profits, power and prestige which Defendants
enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of
Nabors, regarding Defendants' compensation practices and Nabors' financial performance.

34.     The purpose and effect of Defendants' common course of conduct was, among other
things, to disguise Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross
mismanagement, corporate waste and unjust enrichment, to conceal adverse information concerning
the Company's operation and financial condition and to artificially inflate the price of Nabors
common stock so they could dispose of millions of dollars of their own Nabors stock, and enhance
their executive and directorial positions and receive the substantial compensation they obtained as a
result thereof.

35.     Defendants accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully and/or recklessly engage in the option backdating scheme alleged herein and misrepresent Nabors' financial results.  Each of the Defendants was a direct, necessary, and substantial participant in the common enterprise and/or common course of conduct complained of herein.

36.     Each of the Defendants aided and abetted and rendered substantial  assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

**BACKGROUND**

37.     Nabors owns and operates approximately 600 land drilling and approximately 800 land workover and well-servicing rigs in North America.  Offshore, Nabors operates 46 platform rigs, 22 jack-up units and five barge rigs in the United States and multiple international markets. Nabors markets 29 marine transportation and supply vessels, primarily in the U.S. Gulf of Mexico. In addition, Nabors manufactures top drives and drilling instrumentation systems and provides comprehensive oilfield hauling, engineering, civil construction, logistics and facilities maintenance, and project management services.  Nabors participates in most of the significant oil, gas and geothermal markets in the world.

38.     Throughout the relevant period, Defendants caused Nabors to grant them millions of stock options permitting them to buy Nabors stock for pennies on the dollar which they could in turn sell as the Company's stock price increased.  A stock option gives the holder the right to buy a stock at a certain price in the future.  Typically, companies set that price at the same time their directors approve an option grant, with an exercise price – also known as the "strike price" – usually set at the

closing price of the stock that day, the closing price of the night before or by computing an average of the high and low prices on the day of the vote.

39.     However, many of the millions of options granted to Nabors' executives had a hidden, valuable component:  they were misdated, often making them even more significantly valuable.  The misdated stock option grants fell largely into three categories: (i) "look back" grants, in which the date of the grant was picked retroactively (*e.g.,* a decision in February to pick a January date); (ii) "wait and see" grants, in which a grant date was selected, but the decision was finalized – and sometimes changed – at a later date (*e.g.,* a decision on January 1 to issue a grant on January 15, but there is a period after January 15 in which the grantor waits to see if a more advantageous price occurs and, if one does, uses that later date instead); and (iii) grants where there was a failure to complete the option grant process by the date of the grant (*e.g.,* where there is a decision to issue a grant as of a certain date, but after that date there are changes in the grantees or amounts to grantees, and although the work is not complete on those grants as of the stated grant date, that date is nonetheless used).

## STOCK OPTION GRANTS

40.     Certain of Nabors' manipulative stock option grants are described below (unadjusted for subsequent stock splits):

**1997 Option Grants**

41.     Defendants dated many of Nabors' 1997 option grants to top executives as of July 22, 1997, at $29.55 per share – just before the stock increased to above $32.00 per share.  Defendants Isenberg and Petrello received 2,315,500 and 1,290,000 options, respectively, at the $29.55 exercise price.  Defendants dated many of Nabors' other 1997 option grants to top executives as of December 12, 1996, at $17.50 per share – the low of the month.  Within a week, the stock closed above $20.00



per share.  Defendants Isenberg and Petrello received 1,450,000 and 650,000 options, respectively, at the $17.50 exercise price.

**1998 Option Grant Repricing**

42.     Defendants dated Nabors' options repricing for top executives in 1998 as of December 11, 1998, at $12.50 per share – the low of the year.  The stock traded as high as $30 per share in 1998.  Defendants Isenberg, Petrello and Koch received 4.5 million, 2.5 million and 11,250 options, respectively, at the $12.50 exercise price.

**1999 Option Grants**

43.     Defendants dated most of Nabors' 1999 option grants to top executives as of December 7, 1999, at $24.75 per share – within one day, the stock reached $26.37 per share and by the end of the month it reached $31 per share.  Defendants Isenberg, Petrello and Koch received 1,500,000, 750,000 and 25,000 options, respectively, at the $24.75 exercise price.

**2000 Option Grants**

44.     Defendants dated many of Nabors' 2000 option grants to top executives as of September 11, 2000 (although they used the closing price as of September 21, 2000, which was lower), at $46.50 per share – the low of the month.  Within four days, the stock reached $50 per share.  Defendants Isenberg and Petrello received 2,436,339 and 1,149,325 options, respectively, at the $46.50 exercise price.  Defendants dated other 2000 option grants to top executives as of December 4, 2000, at $45.55 per share – near the low of the month ($44.62 per share).  The stock closed as high as $59.58 per share in December 2000.  Defendants Isenberg, Petrello and Koch received 1,000,000, 500,000 and 15,000 options, respectively, at the $45.55 exercise price.

**2002 Option Grants**

45.     Defendants dated all of Nabors' 2002 option grants to top executives as of January 22, 2002, at $27.05 per share – the low of the month.  Within three days, the stock closed above $31

per share. Defendants Isenberg, Petrello, Koch and McLachlin received 1,900,000, 950,000, 25,000 and 5,000 options, respectively, at the $27.05 exercise price.

46.     Below are several of Nabors' grants which occurred right before significant stock price increases (adjusted for subsequent stock split):












Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete





Click Here & Upgrade
Expanded Features
Unlimited Pages



47.     Complicating matters and magnifying the harm to Nabors, during the relevant period, Nabors' internal controls and accounting controls with respect to option grants and exercises, and its financial reporting, were grossly inadequate.  The weaknesses allowed dates of both grants and exercises to be manipulated and the Company's executive compensation expenses to be materially understated.  They also allowed grant dates to be changed to provide executives with more favorably priced options, in effect augmenting their compensation, with no benefit running to the Company.

48.     Specifically, in many instances the reported dates Nabors stock options were granted differed from the dates on which the options appear to have been actually granted.  The practice applied to the overwhelming majority of stock option grants made during the relevant period, which allowed executives and employees to make more money on their options because it set a lower "strike price" at which the options could be exercised, allowing employees to take larger profits when the stock price later rose.

49.     Through their fiduciary duties of care, good faith and loyalty, Defendants owed to Nabors a duty to ensure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company.  In order to adequately carry out these duties, it is necessary for the Defendants to know and understand the material non-public information to be either disclosed or omitted from the Company's public statements.  This material non-public information included the problems Nabors faced because of its deficient internal controls. Furthermore, defendants Sheinfeld, Whitman and Schmidt, as members of the Audit Committee during the relevant period, had a special duty to know and understand this material information as set out in the Audit Committee's charter, which provides that the Audit Committee is responsible for reviewing, in conjunction with management, the Company's policies generally with respect to the Company's earnings press releases and with respect to financial information and earnings guidance provided to analysts and rating agencies.  Defendants, as directors or officers of Nabors, had ample opportunity to discuss this material information with fellow directors or officers at any of the scores of Board or management meetings that occurred during the relevant period as well as at committee meetings of the Board.  Despite these duties, Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, the misleading statements to be disseminated by Nabors to the investing public and the Company's shareholders during the relevant period.

50.     Specifically, since at least 1995, Defendants have caused Nabors to report false and misleading fiscal and quarterly financial results which materially understated its compensation expenses and thus overstated its earnings as follows:

| FISCAL YEAR[1] | REPORTED EARNINGS (in millions) | REPORTED DILUTED EARNINGS PER SHARE FROM CONTINUING OPERATIONS |
|---|---|---|
| 1995 | 51.10 | $0.29 |
| 1996 | $70.50 | $0.38 |
| 1997 | $114.81 | $0.54 |
| 1998 | $124.99 | $0.58 |
| 1999 | $27.70 | $0.12 |
| 2000 | $137.36 | $0.45 |
| 2001 | $357.45 | $1.17 |
| 2002 | $121.49 | $0.41 |
| 2003 | $192.23 | $0.63 |
| 2004 | $302.46 | $0.96 |
| 2005 | $648.70 | $2.00 |

51.     Meanwhile, Defendants were causing the Company to grant them millions of stock options, many of which were misdated.  The Company's executive directors and officers also received a significant number of stock options as compensation during the relevant period.  In total, during the relevant period Defendants caused the Company to grant them millions of stock options, many of which, the evidence will show, were misdated.

52.     Moreover, throughout the relevant period certain Defendants exercised many of these stock options contributing to their ability to sell over $884 million worth of Nabors stock – stock they obtained often by cashing in under-priced stock options:

| DEFENDANT | DATES OF SALES | SHARES SOLD | PROCEEDS RECEIVED |
|---|---|---|---|
| ISENBERG | 10/18/96 – 3/16/05 | 28,217,480 | $558,991,008 |
| PETRELLO | 10/18/96 – 3/16/05 | 12,649,846 | $244,248,724 |
| KOCH | 9/11/96 – 11/8/06 | 355,200 | $8,182,454 |
| MCLACHLIN | 6/6/96 – 11/22/06 | 130,826 | $2,591,631 |
| WHITMAN | 4/26/96 – 5/10/05 | 2,249,094 | $37,415,777 |
| SHEINFELD | 12/14/95 – 6/23/05 | 248,000 | $5,643,300 |

---

[1]     Effective January 1, 1998, Nabors changed its fiscal year-end from September 30 to December 31.  As a result, Nabors' fiscal years prior to January 1, 1998 ran from October 1 to September 30, whereas Nabors' fiscal years thereafter ran from January 1 to December 31.


Case 4:07-cv-00509   Document 1   Filed in TXSD on 02/06/07   Page 26 of 49

| SCHMIDT | 2/17/00 – 2/26/03 | 186,000 | $3,559,994 |
|---------|-------------------|---------|------------|
| WEXLER | 8/9/96 – 3/22/05 | 1,085,600 | $19,801,640 |
| PAYNE | 3/24/00 – 2/8/05 | 157,532 | $3,617,794 |
| | | | |
| **TOTAL** | | **45,279,578** | **$884,052,322** |

53.    On December 27, 2006, *The Wall Street Journal* published an article entitled "Bosses' Pay:  How Stock Options Became Part of the Problem."  The article stated in part:

Eugene Isenberg is the little-known chief executive of a modest-sized oil-services company in Houston. But he stands out in one way: He is among the highest-paid corporate executives in history. In the past 19 years, he has pocketed more than $450 million.

The key to this wealth: stock options, in abundance. His employer, Nabors Industries Ltd., has lavished more than 25 million options on him over the years.

They became lucrative partly because of Nabors's generally rising stock price, but also because of some controversial moves that gave the options more punch. When Nabors's stock fell below the price at which the options could be exercised, temporarily making them worthless, Nabors let him trade in some of his options for new ones with lower exercise prices. And when Mr. Isenberg cashed some options in, Nabors "reloaded" him, replacing those he'd exercised with the same number of new ones.

\*        \*        \*

Nabors's Mr. Isenberg offers an example of the huge wealth CEOs have gained through stock options. Now, some of his option grants appear to raise questions about how they were dated. A number came on days when the stock hit its lowest close for the month or the quarter. At other companies, a series of low-price grants has been a pattern that has suggested possible dating problems. At the least, the favorable grant dates added to Mr. Isenberg's mammoth options gains.

A spokesman for Nabors said its legal department did an internal review and found "no irregularities in its grant practices." Nabors showed internal documents to The Wall Street Journal that the company said provide evidence the grants were properly dated. Some of the documents bolster that assertion. The spokesman, citing Mr. Isenberg's record in lifting Nabors from a company in bankruptcy court to one with a market value of more than $9 billion today, also said that "Nabors strongly believes that Mr. Isenberg is appropriately compensated."

\*        \*        \*

For a time, Nabors operated under an options "reload" plan. It was a generous one: Instead of replacing only a portion of options that were exercised, it replaced them one-for-one. Mr. Isenberg could cash in options and take profits yet still have just as many options as before, though with higher exercise prices.



In another atypical feature, the replacement options sometimes had new terms of 10 years, making them even more valuable. Nabors says it stopped reloads before 2000. But in that year it gave Mr. Isenberg a "special award" of 2.4 million options, in lieu of a reload on 4.7 million options that he exercised for a $122 million gain. (Share figures in this article aren't adjusted for a recent two-for-one stock split.)

In 1998, amid an industry slump, Nabors's stock sank sharply. Some of Mr. Isenberg's options were "under water." The board repriced them. In exchange for giving up a fourth of his old options, he got new ones carrying a more favorable exercise price.

"The repricing was designed to restore incentive value to the option packages," said Nabors's Mr. Smith. He said repricing was widely available to employees. As it happened, Mr. Isenberg made less money by accepting the repricing deal and giving up some of his options than if he had held on, Mr. Smith said.

Following a single grant from its genesis shows how the various maneuvers can pile up profit.

Mr. Isenberg received a grant of 1.8 million options dated in Sept. 23, 1991. He exercised them in 1996 and 1997, pocketing about $24 million in profits.

Normally, that would have been the end of these options. But Nabors reloaded Mr. Isenberg, replacing his exercised options with a similar number – which had 10 more years to run.

Then in 1998, amid the stock downturn, Nabors repriced the reload options.

Mr. Isenberg cashed in most of them in 2000 and gave the rest to a family member in 2002. His total profit from a single grant – reloaded, extended and repriced: about $54 million, not including the gift.

The CEO's overall stock-option gains, both realized and not yet cashed in, came to $685 million at the end of last year, says S&P ExecuComp – putting him 8th on its list of big winners from 1992 to 2005.

Mr. Isenberg also has benefited from some good timing of his option grants. The Sept. 23, 1991, award was dated on the day Nabors's stock touched its lowest closing price of that month, $5.

But it isn't clear when the price was actually set. Company documents suggest the grant price may actually have been determined many months earlier, on another day when the stock closed at $5. Moreover, the grant was contingent on a new Isenberg employment contract – which other documents indicate wasn't signed until well after Sept. 23, when the stock was higher.

For a grant of a million options dated Dec. 4, 1995, another monthly low, Nabors produced no minutes of a compensation-committee meeting. Instead, a memo seven weeks later said there had been a discussion on Dec. 4 of Mr. Isenberg trading

in part of his bonus for options. The memo said the idea first would be run by a consultant, suggesting the grant wasn't made final until weeks after the stated Dec. 4 award date.

In all, of 11 new option grants to Mr. Isenberg between 1991 and 2002, two were dated at quarterly lows in the Nabors stock price and five more at monthly lows. The odds against such a fortunate pattern occurring by chance are long.

54.    Then, this same day, December 27, 2006, Nabors filed a Form 8-K with the SEC announcing that the Company had initiated an internal review of its stock option grant practices.

55.    In effect, during the relevant period, the Defendants caused Nabors' shares to trade at artificially inflated levels by issuing a series of materially false and misleading statements regarding the Company's financial statements, business and prospects. Specifically, Defendants caused or allowed Nabors to issue statements that failed to disclose or misstated the following: (i) that the Company had problems with its internal controls that prevented it from issuing accurate financial reports and projections; (ii) that because of improperly recorded stock-based compensation expenses the Company's financial results violated GAAP; and (iii) that the Company's public disclosures presented an inflated view of Nabors' earnings and earnings per share.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

56.    Plaintiff brings this action derivatively in the right and for the benefit of Nabors to redress injuries suffered and to be suffered by Nabors as a direct result of Defendants' violations of state and federal law, breaches of fiduciary duty, abuse of control, constructive fraud, gross mismanagement, corporate waste and unjust enrichment, as well as the aiding and abetting thereof, by the Defendants.  This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

57.    Plaintiff will adequately and fairly represent the interests of Nabors and its shareholders in enforcing and prosecuting its rights.

58.     Plaintiff is an owner of Nabors stock and was an owner of Nabors stock during times relevant to Defendants' illegal and wrongful course of conduct alleged herein.

59.     Based upon the facts set forth throughout this Complaint, applicable law and the longstanding rule that equity does not compel a useless and futile act, a pre-filing demand upon the Nabors Board of Directors to institute this action against the officers and members of the Nabors Board of Directors is excused as futile.   A pre-filing demand would be a useless and futile act because:

(a)     The members of Nabors' Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein.   These are people they have developed professional relationships with, who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

(b)     The Nabors Board of Directors and senior management participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Nabors' stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.   As a result of their access to and review of internal corporate documents, or conversations and connections with other corporate officers, employees, and directors and attendance at management and/or Board meetings, each of the Defendants knew the adverse non-public information regarding the improper stock option grants and financial reporting.   Pursuant to their specific duties as Board members, the Director Defendants are charged with the management of the Company and to conduct its business affairs.   Defendants breached the fiduciary duties that they owed to Nabors and its shareholders in that they failed to prevent and correct the improper stock option granting and financial reporting.

Certain directors are also dominated and controlled by other directors and cannot act independently of them. Thus, the Nabors Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of its members participated personally in the wrongdoing or are dependent upon other Defendants who did.

       (c)     The acts complained of constitute violations of the fiduciary duties owed by Nabors' officers and directors and these acts are incapable of ratification.

       (d)     The acts complained of constitute *ultra vires* acts in that the options were granted outside the authority granted by the respective executive option plans which provided that:

> Option Exercise Price. The option exercise price shall be set by the Committee, but shall be no less than the Fair Market Value per share of Common Stock on the date of the grant of the options . . . .

       (e)     The Defendants control approximately 10% of Nabors' voting stock and Isenberg and Petrello doinate and control the board.

       (f)     The members of Nabors' Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

       (g)     Any suit by the current directors of Nabors to remedy these wrongs would likely further expose the liability of Defendants under the federal securities laws, which could result in additional civil and/or criminal actions being filed against one or more of the Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

       (h)     Nabors has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the current Board has not filed any lawsuits against itself

or others who were responsible for that wrongful conduct to attempt to recover for Nabors any part of the damages Nabors suffered and will suffer thereby.

(i)     In order to properly prosecute this lawsuit, it would be necessary for the directors to sue themselves and the other Defendants, requiring them to expose themselves and their comrades to millions of dollars in potential civil liability and criminal sanctions, or IRS penalties. This they will not do.

(j)     Nabors' current and past officers and directors are protected against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.,* monies belonging to the stockholders of Nabors. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Defendants in this case contain provisions which eliminate coverage for any action brought directly by Nabors against these Defendants, known as, *inter alia,* the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Nabors, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.

(k)     In order to bring this action for breaching their fiduciary duties, the members of the Nabors Board would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do.

60.     Plaintiff has not made any demand on shareholders of Nabors to institute this action since such demand would be a futile and useless act for the following reasons:

(a)      Nabors is a publicly traded company with approximately 299 million shares outstanding, and thousands of shareholders;

(b)      Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)      Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

**THE STOCK OPTION BACKDATING SCHEME AND ITS IMPACT
ON NABORS' FINANCIAL STATEMENTS**

**The 1995 Form 10-K**

61.      On or about December 30, 1995, the Company filed its fiscal 1995 Form 10-K with the SEC.  The fiscal 1995 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 1995 Form 10-K included Nabors' 1995 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Nabors' compensation expense was understated and its net earnings were overstated.

**The 1996 Form 10-K**

62.      On or about December 30, 1996, the Company filed its fiscal 1996 Form 10-K with the SEC.  The fiscal 1996 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 1996 Form 10-K included Nabors' 1996 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Nabors' compensation expense was understated and its net earnings were overstated.

**The 1997 Form 10-K**

63.      On December 29, 1997, the Company filed its fiscal 1997 Form 10-K with the SEC. The fiscal 1997 Form 10-K was simultaneously distributed to shareholders and the public.  The

- 31 -

fiscal 1997 Form 10-K included Nabors' 1997 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, Nabors' compensation expense was understated and its net earnings were overstated.

**The 1998 Form 10-K**

64.     On or about March 31, 1999, the Company filed its fiscal 1998 Form 10-K with the SEC. The fiscal 1998 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 1998 Form 10-K included Nabors' 1998 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, Nabors' compensation expense was understated and its net earnings were overstated.

**The 1999 Form 10-K**

65.     On or about March 30, 2000, the Company filed its fiscal 1999 Form 10-K with the SEC. The 1999 Form 10-K was simultaneously distributed to shareholders and the public. The 1999 Form 10-K included Nabors' 1999 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, Nabors' compensation expense was understated and its net earnings were overstated.

**The 2000 Form 10-K**

66.     On or about April 2, 2001, the Company filed its fiscal 2000 Form 10-K with the SEC. The 2000 Form 10-K was simultaneously distributed to shareholders and the public. The 2000 Form 10-K included Nabors' 2000 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock



options.  As a result, Nabors' compensation expense was understated and its net earnings were overstated.

**The 2001 Form 10-K**

67.     On or about March 19, 2002, the Company filed its fiscal 2001 Form 10-K with the SEC.  The 2001 Form 10-K was simultaneously distributed to shareholders and the public.  The 2001 Form 10-K included Nabors' 2001 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Nabors' compensation expense was understated and its net earnings were overstated.

**The 2002 Form 10-K**

68.     On or about March 31, 2003, the Company filed its fiscal 2002 Form 10-K with the SEC.  The 2002 Form 10-K was simultaneously distributed to shareholders and the public.  The 2002 Form 10-K included Nabors' 2002 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Nabors' compensation expense was understated and its net earnings were overstated.

**The 2003 Form 10-K**

69.     On or about March 15, 2004, the Company filed its fiscal 2003 Form 10-K with the SEC.  The 2003 Form 10-K was simultaneously distributed to shareholders and the public.  The 2003 Form 10-K included Nabors' 2003 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Nabors' compensation expense was understated and its net earnings were overstated.

**The 2004 Form 10-K**

70.    On or about March 7, 2005, the Company filed its fiscal 2004 Form 10-K with the SEC.  The 2004 Form 10-K was simultaneously distributed to shareholders and the public.  The 2004 Form 10-K included Nabors' 2004 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Nabors' compensation expense was understated and its net earnings were overstated.

**The 2005 Form 10-K**

71.    On or about March 16, 2006, the Company filed its fiscal 2005 Form 10-K with the SEC.  The 2005 Form 10-K was simultaneously distributed to shareholders and the public.  The 2005 Form 10-K included Nabors' 2005 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Nabors' compensation expense was understated and its net earnings were overstated.

**DEFENDANTS' SCHEME BEGINS TO UNRAVEL**

72.    The 1995-2006 Proxy Statements concealed Defendants' option backdating scheme. Thus, the Company's shareholders remained unaware of Defendants' wrongdoing when voting on proxy proposals between 1995 and 2006.  In fact, it was not until December 2006 that shareholders learned that the Proxy Statements which they had relied upon for years were false and misleading. Defendants have been unjustly enriched at the expense of Nabors, which has received and will receive less money from the Defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated.

73.    For instance, if Isenberg's 1998 repricing of 4.5 million shares had not been backdated to the yearly low of $12.50 per share but had been granted at $15.20 per share (the

average price for the fourth quarter of 1998, *Nabors would have received $68.4 million when Isenberg exercised those options instead of $56.25 million – a cost to Nabors of $12.15 million just for Isenberg's 1998 repricing.*

THE ADVERSE IMPACT OF DEFENDANTS' MISCONDUCT

74.     Unlike most companies which avoid such option backdating abuse by issuing stock option grants at the same time each year, which eliminates the potential for backdating, Defendants ensured that executives would not have any such restrictions.  Given the many times Nabors' grants were the low of the month in which options were granted, the date of their stock option grants was clearly more than merely coincidental.

75.     As a result of the backdating of options, Defendants have been unjustly enriched at the expense of Nabors, which has received and will receive less money from Defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated.

TOLLING OF THE STATUTE OF LIMITATIONS

76.     The Counts alleged herein are timely.  As an initial matter, Defendants wrongfully concealed their manipulation of the stock option plans, through strategic timing and fraudulent backdating, by issuing false and misleading Proxy Statements, by falsely reassuring Nabors' public investors that Nabors' option grants were being administered by a committee of independent directors, and by failing to disclose that backdated options were, in fact, actually issued on dates other than those disclosed, and that strategically timed option grants were issued based on the manipulation of insider information that ensured that the true fair market value of the Company's stock was, in fact, higher than the publicly traded price on the date of the option grant.

77.     Nabors' public investors had no reason to know of the Defendants' breaches of their fiduciary duties until December 2006.  On December 27, 2006, *The Wall Street Journal* published an

- 35 -

article entitled "Bosses' Pay:  How Stock Options Became Part of the Problem."  The article stated

in part:

> Eugene Isenberg is the little-known chief executive of a modest-sized oil-services company in Houston. But he stands out in one way: He is among the highest-paid corporate executives in history. In the past 19 years, he has pocketed more than $450 million.

> The key to this wealth: stock options, in abundance. His employer, Nabors Industries Ltd., has lavished more than 25 million options on him over the years.

> They became lucrative partly because of Nabors's generally rising stock price, but also because of some controversial moves that gave the options more punch. When Nabors's stock fell below the price at which the options could be exercised, temporarily making them worthless, Nabors let him trade in some of his options for new ones with lower exercise prices. And when Mr. Isenberg cashed some options in, Nabors "reloaded" him, replacing those he'd exercised with the same number of new ones.

> \*          \*          \*

> Nabors's Mr. Isenberg offers an example of the huge wealth CEOs have gained through stock options. Now, some of his option grants appear to raise questions about how they were dated. A number came on days when the stock hit its lowest close for the month or the quarter. At other companies, a series of low-price grants has been a pattern that has suggested possible dating problems. At the least, the favorable grant dates added to Mr. Isenberg's mammoth options gains.

> A spokesman for Nabors said its legal department did an internal review and found "no irregularities in its grant practices." Nabors showed internal documents to The Wall Street Journal that the company said provide evidence the grants were properly dated. Some of the documents bolster that assertion. The spokesman, citing Mr. Isenberg's record in lifting Nabors from a company in bankruptcy court to one with a market value of more than $9 billion today, also said that "Nabors strongly believes that Mr. Isenberg is appropriately compensated."

> \*          \*          \*

> For a time, Nabors operated under an options "reload" plan. It was a generous one: Instead of replacing only a portion of options that were exercised, it replaced them one-for-one. Mr. Isenberg could cash in options and take profits yet still have just as many options as before, though with higher exercise prices.

> In another atypical feature, the replacement options sometimes had new terms of 10 years, making them even more valuable. Nabors says it stopped reloads before 2000. But in that year it gave Mr. Isenberg a "special award" of 2.4 million options, in lieu of a reload on 4.7 million options that he exercised for a $122 million gain. (Share figures in this article aren't adjusted for a recent two-for-one stock split.)

- 36 -

In 1998, amid an industry slump, Nabors's stock sank sharply. Some of Mr. Isenberg's options were "under water." The board repriced them. In exchange for giving up a fourth of his old options, he got new ones carrying a more favorable exercise price.

"The repricing was designed to restore incentive value to the option packages," said Nabors's Mr. Smith. He said repricing was widely available to employees. As it happened, Mr. Isenberg made less money by accepting the repricing deal and giving up some of his options than if he had held on, Mr. Smith said.

Following a single grant from its genesis shows how the various maneuvers can pile up profit.

Mr. Isenberg received a grant of 1.8 million options dated in Sept. 23, 1991. He exercised them in 1996 and 1997, pocketing about $24 million in profits.

Normally, that would have been the end of these options. But Nabors reloaded Mr. Isenberg, replacing his exercised options with a similar number – which had 10 more years to run.

Then in 1998, amid the stock downturn, Nabors repriced the reload options.

Mr. Isenberg cashed in most of them in 2000 and gave the rest to a family member in 2002. His total profit from a single grant – reloaded, extended and repriced: about $54 million, not including the gift.

The CEO's overall stock-option gains, both realized and not yet cashed in, came to $685 million at the end of last year, says S&P ExecuComp – putting him 8th on its list of big winners from 1992 to 2005.

Mr. Isenberg also has benefited from some good timing of his option grants. The Sept. 23, 1991, award was dated on the day Nabors's stock touched its lowest closing price of that month, $5.

But it isn't clear when the price was actually set. Company documents suggest the grant price may actually have been determined many months earlier, on another day when the stock closed at $5. Moreover, the grant was contingent on a new Isenberg employment contract – which other documents indicate wasn't signed until well after Sept. 23, when the stock was higher.

For a grant of a million options dated Dec. 4, 1995, another monthly low, Nabors produced no minutes of a compensation-committee meeting. Instead, a memo seven weeks later said there had been a discussion on Dec. 4 of Mr. Isenberg trading in part of his bonus for options. The memo said the idea first would be run by a consultant, suggesting the grant wasn't made final until weeks after the stated Dec. 4 award date.

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

In all, of 11 new option grants to Mr. Isenberg between 1991 and 2002, two were dated at quarterly lows in the Nabors stock price and five more at monthly lows. The odds against such a fortunate pattern occurring by chance are long.

78.     Then, this same day, December 27, 2006, Nabors filed a Form 8-K with the SEC announcing that the Company had initiated an internal review of its stock option grant practices.

79.     Finally, as fiduciaries of Nabors and its public shareholders, the Defendants cannot rely on any limitations defense where they withheld from Nabors' public shareholders the facts that give rise to the claims asserted herein, *i.e.,* that the Nabors Board had abdicated its fiduciary responsibilities to oversee the Company's executive compensation practices, and that the option grant dates had been manipulated to maximize the profit for the grant recipients and, accordingly, to maximize the costs for the Company.

## COUNT I

### Violations of §14(a) of the Exchange Act Against
### All Defendants

80.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

81.     Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

82.     The 1995-2006 Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that certain of the Defendants were causing Nabors to engage in an option backdating scheme, a fact that Defendants were aware of and participated in from at least 1995.

83.     In the exercise of reasonable care, Defendants should have known that the Proxy Statements were materially false and misleading.

84.     The misrepresentations and omissions in the Proxy Statements were material to plaintiff in voting on each Proxy Statement.  The Proxy Statements were an essential link in the accomplishment of the continuation of Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

85.     The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

## COUNT II

### Accounting

86.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

87.     At all relevant times, Defendants, as directors and/or officers of Nabors, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

88.     In breach of their fiduciary duties owed to Nabors and its shareholders, the Defendants caused Nabors, among other things, to grant backdated stock options to themselves and/or certain other officers and directors of Nabors and/or failed to properly investigate whether these grants had been improperly made.  By this wrongdoing, the Defendants breached their fiduciary duties owed to Nabors and its shareholders.

89.     The Defendants possess complete and unfettered control over the improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to certain of the Defendants.

90.     As a result of Defendants' misconduct, Nabors has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

91.     Plaintiff demands an accounting be made of all stock option grants made to any of the Defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted to any of the Defendants, as well as the disposition of any proceeds received by any of the Defendants via sale or other exercise of backdated stock option grants received by those Defendants.

## COUNT III

### Breach of Fiduciary Duty and/or Aiding and Abetting
### Against All Defendants

92.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

93.     Each of the Defendants agreed to and did participate with Isenberg and Petrello and the other Defendants and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of fiduciary duties the Defendants owed to the Company.

94.     The Defendants have violated fiduciary duties of care, loyalty, candor and independence owed to Nabors and its public shareholders, have engaged in unlawful self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of Nabors and its shareholders.

95.     As demonstrated by the allegations above, Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to Nabors and its public shareholders, and they failed to disclose material information and/or made material misrepresentations to shareholders regarding Defendants' option backdating scheme.

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

96.   By reason of the foregoing acts, practices and course of conduct, the Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Nabors and its public shareholders.

97.   As a proximate result of Defendants' conduct, in concert with Isenberg and Petrello, Nabors has been injured and is entitled to damages.

## COUNT IV

### Abuse of Control Against All Defendants

98.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

99.   The Defendants employed the alleged scheme for the purpose of maintaining and entrenching themselves in their positions of power, prestige and profit at, and control over, Nabors, and to continue to receive the substantial benefits, salaries and emoluments associated with their positions at Nabors.  As a part of this scheme, Defendants actively made and/or participated in the making of or aided and abetted the making of, misrepresentations regarding Nabors.

100.   Defendants' conduct constituted an abuse of their ability to control and influence Nabors.

101.   By reason of the foregoing, Nabors has been damaged.

## COUNT V

### Gross Mismanagement Against All Defendants

102.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

103.   Defendants had a duty to Nabors and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Nabors.

104.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Nabors in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Nabors' affairs and in the use and preservation of Nabors' assets.

105.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Nabors to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Nabors, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged Nabors.

106.    By reason of the foregoing, Nabors has been damaged.

## COUNT VI

### Constructive Fraud Against All Defendants

107.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

108.    As corporate fiduciaries, Defendants owed to Nabors and its shareholders a duty of candor and full accurate disclosure regarding the true state of Nabors' business and assets and their conduct with regard thereto.

109.    As a result of the conduct complained of, Defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from Nabors' shareholders despite their duties to, *inter alia,* disclose the true facts regarding their stewardship of Nabors.  Thus they have committed constructive fraud and violated their duty of candor.

110.    By reason of the foregoing, Nabors has been damaged.



## COUNT VII

### Corporate Waste Against All Defendants

111.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

112.    By failing to properly consider the interests of the Company and its public shareholders, by failing to conduct proper supervision, and by giving away millions of dollars to Defendants via the option backdating scheme, Defendants have caused Nabors to waste valuable corporate assets.

113.    As a result of Defendants' corporate waste, they are liable to the Company.

## COUNT VIII

### Unjust Enrichment Against All Defendants

114.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

115.    As a result of the conduct described above, Defendants will be and have been unjustly enriched at the expense of Nabors, in the form of unjustified salaries, benefits, bonuses, stock option grants and other emoluments of office.

116.    All the payments and benefits provided to the Defendants were at the expense of Nabors.  The Company received no benefit from these payments.  Nabors was damaged by such payments.

117.    Certain of the Defendants sold Nabors stock for a profit during the period of deception, misusing confidential non-public corporate information.  These Defendants should be required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of Nabors.  A constructive trust for the benefit of the Company should be imposed thereon.

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

## COUNT IX

### Against the Officer Defendants for Rescission

118.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

119.    As a result of the acts alleged herein, the stock option contracts between the Officer Defendants and Nabors entered into during the relevant period were obtained through Defendants' fraud, deceit, and abuse of control.  Further, the backdated stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the publicly filed contracts regarding the Officer Defendants' employment agreements and the Company's stock option plan which was also approved by Nabors shareholders and filed with the SEC.

120.    All contracts which provide for stock option grants between the Officer Defendants and Nabors and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

## COUNT X

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

121.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

122.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Nabors common stock on the basis of such information.

123.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Nabors common stock.

124.     At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of Nabors common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

125.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.     Awarding money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure Defendants do not participate therein or benefit thereby;

B.     Directing all Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and imposing a constructive trust thereon;

C.     Directing Nabors to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote adoption of the following Corporate Governance policies:

(i)     a proposal requiring that the office of CEO of Nabors and Chairman of the Nabors Board of Directors be permanently held by separate individuals and that the Chairman of the Nabors Board meets rigorous "independent" standards;

(ii)     a proposal to strengthen the Nabors Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(iii)    appropriately test and then strengthen the internal audit and control function;

(iv)    rotate independent auditing firms every five years;

(v)     control and limit insider stock selling and the terms and timing of stock option grants; and

(vi)    reform executive compensation.

D.      Ordering the imposition of a constructive trust over Defendants' stock options and any proceeds derived therefrom;

E.      Awarding punitive damages;

F.      As to all improperly dated and/or improperly priced options that have been exercised, ordering Defendants to make a payment to the Company in an amount equal to the difference between the prices at which the options were exercised and the exercise prices the options should have carried if they were priced at fair market value on the actual date of grant;

G.      As to all improperly dated and/or improperly priced options that have been granted but not yet exercised or expired, ordering the Company to rescind such options so they carry the exercise prices they should have carried if they were priced at fair market value on the actual date of grant;

H.      Awarding costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees; and

I.      Granting such other and further relief as this Court may deem just and proper.



## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  February 6, 2007                CROWLEY DOUGLAS & NORMAN, LLP
                                        TIMOTHY J. CROWLEY (05170700)
                                        RICHARD E. NORMAN (00788128)


                                        _____
                                               s/ *Richard E. Norman*
                                        RICHARD E. NORMAN

                                        1301 McKinney Street, Suite 3500
                                        Houston, TX  77010-3034
                                        Telephone:  713/651-1771
                                        713/651-1775 (fax)

                                        LERACH COUGHLIN STOIA GELLER
                                           RUDMAN & ROBBINS LLP
                                        WILLIAM S. LERACH
                                        DARREN J. ROBBINS
                                        TRAVIS E. DOWNS III
                                        655 West Broadway, Suite 1900
                                        San Diego, CA  92101-3301
                                        Telephone:  619/231-1058
                                        619/231-7423 (fax)

                                        Attorneys for Plaintiff

S:\CptDraft\Derivative\Cpt Nabors Industries Derv.doc

## NABORS INDUSTRIES LTD. VERIFICATION

I, Kenneth H. Karstedt, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief.

DATE: 1/30/07

SIGNATURE