UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| KENNETH H. KARSTEDT, Derivatively on Behalf of NABORS INDUSTRIES LTD., | § § § | Civil Action No. 4:07-cv-00509 **(Consolidated)** |
| Plaintiff, | § § | |
| vs. | § § | |
| EUGENE M. ISENBERG, et al., | § § | |
| Defendants, | § § | |
| – and – | § § | |
| NABORS INDUSTRIES LTD., a Bermuda corporation, | § § § | |
| Nominal Defendant. | § § § | |

**CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, CORPORATE WASTE, GROSS MISMANAGEMENT, CONSTRUCTIVE FRAUD AND UNJUST ENRICHMENT**

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of Nabors Industries

Ltd. ("Nabors" or the "Company") on behalf of the Company against its Board of Directors and

certain of its senior executives (collectively, "Defendants").   This action seeks to remedy

Defendants' violations of federal and state law, including breaches of fiduciary duty, abuse of

control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement, arising

out of a scheme and wrongful course of business whereby Defendants allowed senior Nabors

insiders to divert hundreds of millions of dollars of corporate assets to themselves, and other

employees via the manipulation of grant dates associated with hundreds of thousands of stock

options granted to Nabors insiders.  Each of the Defendants also participated in the concealment of

the backdating option scheme complained of herein and/or refused to take advantage of the

Company's legal rights to require these senior insiders to disgorge the hundreds of millions in

illicitly obtained incentive compensation and proceeds diverted to corporate employees since 1995.

2.      Between 1991 and 2006, Defendants also caused Nabors to file false and misleading

statements with the Securities and Exchange Commission ("SEC"), including Proxy Statements filed

with the SEC which stated that the options granted by Nabors carried with them an exercise price

that was *not less than* the fair market value of Nabors' stock on the date of grant and issuance.

3.      In fact, Defendants were aware that the practices employed by the Board allowed the

stock option grants to be *backdated* to dates when the Company's shares were trading at or near the

lowest price for that relevant period.  By December 2006, Defendants' backdating scheme had

yielded stock option grants to the Company's executive officers worth millions of dollars.  These

grants were included in more than $884 million in stock sale proceeds for Defendants.

4.      Defendants' misrepresentations and wrongful course of conduct violated the

Securities Exchange Act of 1934 (the "Exchange Act"), as well as Texas law.  By authorizing and/or

acquiescing in the stock option backdating scheme, Defendants: (i) caused Nabors to issue false statements; (ii) diverted hundreds of millions of dollars of corporate assets to senior Nabors executives; and (iii) subjected Nabors to potential liability from regulators, including the SEC and the IRS.

5.      Defendants' gross mismanagement and malfeasance over the past decade has exposed Nabors and its senior executives to criminal and civil liability for issuing false and misleading financial statements.  Specifically, Defendants caused or allowed Nabors to issue statements that failed to disclose or misstated the following: (i) that the Company had problems with its internal controls that prevented it from issuing accurate financial reports and projections; (ii) that because of improperly recorded stock-based compensation expenses, the Company's financial results violated Generally Accepted Accounting Principles ("GAAP"); and (iii) that the Company's public disclosures presented an inflated view of Nabors' earnings and earnings per share.

6.      Defendants' malfeasance and mismanagement during the relevant period has wreaked hundreds of millions of dollars of damages on Nabors.  The Company's senior executives were incentivized to over-pay themselves, to profit from their misconduct by cashing in on under-priced stock options and to issue false financial statements to cover up their misdeeds.  Defendants' breaches of fiduciary duties in the administration of the Company's stock option plans so polluted the plans with grant date manipulations so as to void all grants made pursuant to the plans.  The Company has now been mentioned as one of several companies likely to have manipulated options. Meanwhile, certain of the Defendants, who received under-priced stock options and/or knew material non-public information regarding Nabors' internal control problems, abused their fiduciary relationship with the Company by selling over $884 million worth of their personally held shares at artificially inflated prices during the relevant period.  This action seeks recovery for Nabors against

these faithless fiduciaries, as Nabors' Board of Directors, as currently composed, is simply unable or unwilling to do so.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under §14(a) of the Exchange Act, 15 U.S.C. §78n(a), and under state law for breach of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement.  In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

8.      This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1331.  This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

9.      This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

10.     Venue is proper in this district pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  Nabors is located in and conducts its business in this District.  Further, certain of the Defendants are citizens of Texas and reside in this District.

## PARTIES

11.     Plaintiff Kenneth H. Karstedt, is a shareholder of Nabors, and holds and has continually held Nabors' stock since 1998.

12.     Plaintiff Gail McKinney is a shareholder of Nabors, and holds and had continually held Nabors' stock since 1998.

13.     Nominal party Nabors is a Bermuda corporation with its corporate headquarters located in Hamilton, Bermuda, and its executive and administrative office is located at 515 West Greens Road, Suite 1170, Houston, Texas 77067.

14.     Defendant Eugene M. Isenberg ("Isenberg") has been a director, Chairman of the Board, Chairman of the Executive Committee of the Board and Chief Executive Officer ("CEO") of Nabors since 1987.  Because of Isenberg's positions, he knew the adverse non-public information about the business of Nabors, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board meetings and committees thereof and via reports and other information provided to him in connection therewith.  Isenberg, along with members of Nabors' Compensation Committee, engaged in backdating stock options.  During any given fiscal year between 1991 and 2005, Isenberg received between 27% and 58% of Nabors' option grants.  Through this and his receipt of millions of shares of backdated stock options, Isenberg knew or severely recklessly disregarded that he and other Nabors' directors were backdating stock option grants.  Although he knew or severely recklessly disregarded that he and other of Nabors' directors were backdating stock option grants, Isenberg participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings, and signed Nabors' Reports on Form 10-Q, Reports on Form 10-K, Proxies and Sarbanes-Oxley certifications.  Based on his knowledge of material non-public information regarding the Company, defendant Isenberg sold 28.2 million shares of Nabors' stock for proceeds of $558.9 million during the relevant period.  The backdated stock options Isenberg received constituted illegal compensation from Nabors that was not disclosed to the Company's shareholders.  As of the time this lawsuit was filed, Isenberg beneficially owned approximately 6.5% of Nabors' outstanding stock and exercised control of the Company thereby and through his deceptive conduct pleaded herein, to

accomplish and perpetuate his self dealing and the self dealing of other Defendants in backdated stock options. Also pleaded herein, Isenberg engaged in *ultra vires* acts. Defendant Isenberg may be served at 2 North Breakers Row, Unit 525, Palm Beach, Florida 33480.

15. Defendant Anthony G. Petrello ("Petrello") has served as President and Chief Operating Officer ("COO") of Nabors since 1992. Additionally, Petrello has been a director and member of the Executive Committee of the Board since 1991 and Deputy Chairman of the Company since 2003. Because of Petrello's positions, he knew the adverse non-public information about the business of Nabors, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board meetings and committees thereof and via reports and other information provided to him in connection therewith. During any given fiscal year between 1992 and 2005, Petrello received between 12% and 48% of Nabors' option grants. Through this and his receipt of millions of shares of backdated stock options, Petrello knew or severely recklessly disregarded that Nabors' executives and directors were backdating stock option grants. Although Petrello knew or severely recklessly disregarded that Nabors' executives and directors were backdating stock option grants, he participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings, and signed Nabors' Reports on Forms 10-Q and 10-K. Based on his knowledge of material non-public information regarding the Company, defendant Petrello sold 12.6 million shares of Nabors' stock for proceeds of $244.2 million during the relevant period. The backdated stock options Petrello received constituted illegal compensation from Nabors that was not disclosed to the Company's shareholders. As of the time this lawsuit was filed, Petrello beneficially owned approximately 3.5% of Nabors' outstanding stock and exercised control of the Company thereby and through his deceptive conduct pleaded herein, to accomplish and perpetuate self dealing and the self dealing of other Defendants in backdated stock

options.  Also pleaded herein, Petrello engaged in *ultra vires* acts.  Defendant Petrello may be served at 10 Remington Lane, Houston, Texas 77005.

16.     Defendant Bruce P. Koch ("Koch") has been Chief Financial Officer ("CFO") and Vice President of Nabors since February 2003.  Previously Koch served as Corporate Controller of Nabors from March 1990 to 1995 and Vice President-Finance from January 1996 to February 2003.  Because of Koch's positions, he knew the adverse non-public information about the business of Nabors, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  Defendant Koch, by his specialized financial expertise, was in a unique position to understand the business of Nabors as well as its finances, markets and present and future business prospects.  Through this and his receipt of hundreds of thousands of shares of backdated stock options, Koch knew or severely recklessly disregarded that Nabors' executives and directors were backdating stock option grants.   Although Koch knew or severely recklessly disregarded that Nabors' executives and directors were backdating stock option grants, he participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings, and signed Nabors' Reports on Forms 10-Q and 10-K, and Sarbanes-Oxley certifications.  Based on his knowledge of material non-public information regarding the Company, defendant Koch sold 355,200 shares of Nabors' stock for proceeds of $8.1 million during the relevant period.  The backdated stock options Koch received constituted illegal compensation from Nabors that was not disclosed to the Company's shareholders.  Through his deceptive conduct pleaded herein, Koch (along with the other Defendants) engaged in *ultra vires* acts and controlled the Company to accomplish and perpetuate his self dealing and the self dealing of other Defendants,

in backdated stock options.  Defendant Koch may be served at 35 Meadow Brook Place, The Woodlands, Texas 77382.

17.     Defendant Daniel McLachlin ("McLachlin") has served as Vice President, Administration and Secretary of Nabors since 1986.  Previously, McLachlin served as Vice President, Human Resources of Nabors Drilling Limited, a subsidiary of Nabors from 1979 to 1984 and Manager, Administration of the Company from 1984 to 1986.  Because of McLachlin's positions, he knew the adverse non-public information about the business of Nabors, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  Through this and his receipt of tens of thousands of shares of backdated stock options, McLachlin knew or severely recklessly disregarded that Nabors' executives and directors were backdating stock option grants.  Although McLachlin knew or severely recklessly disregarded that Nabors' executives and directors were backdating stock option grants, he participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings, and signed Nabors' Reports on Form 10-K and Proxies.  Based on his knowledge of material non-public information regarding the Company, defendant McLachlin sold 130,826 shares of Nabors' stock for proceeds of $2.5 million during the relevant period.  The backdated stock options McLachlin received constituted illegal compensation from Nabors that was not disclosed to the Company's shareholders.  Through his deceptive conduct pleaded herein, McLachlin (along with the other Defendants) engaged in *ultra vires* acts and controlled the Company to accomplish and perpetuate his self dealing and the self dealing of other Defendants, in backdated stock options.  Defendant McLachlin may be served at 515 West Greens Rd., Suite 1170, Houston, Texas 77067.

18.   Defendant Martin J. Whitman ("Whitman") has been a director of Nabors since 1991 and currently serves as lead director.  Because of Whitman's position, he knew the adverse non-public information about the business of Nabors, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at board meetings and committees thereof and via reports and other information provided to him in connection therewith.  In addition, Defendant Whitman also worked as a member of Nabors' Governance and Nominating Committee and as a member of Nabors' Executive Committee.  Whitman also chaired and worked on Nabors' Compensation Committee and/or worked on Nabors' Audit Committee continuously throughout the period of backdating at the Company.  While working on Nabors' Compensation Committee, where he controlled the other Defendants' stock option awards, Whitman participated in (and did work in connection with) four meetings in 2003 and numerous meetings in 2004-2005, during which he engaged in backdating stock options.  As a member of these committees, Whitman caused and allowed Nabors to disseminate false and misleading statements in connection with Nabors' financial statements.  Through his work and receipt of tens of thousands of shares of backdated stock options, Whitman knew or severely recklessly disregarded that Nabors' executives and directors (including himself) were backdating stock option grants.  Although Whitman knew or severely recklessly disregarded that Nabors' executives and directors were backdating stock option grants, he participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings, and signed Nabors' Reports on Form 10-K.  Based on his knowledge of material non-public information regarding the Company, defendant Whitman sold 2.2 million shares of Nabors' stock for proceeds of $37.4 million during the relevant period.  The backdated stock options Whitman received constituted illegal compensation from Nabors that was not disclosed to the Company's shareholders.  Through his deceptive conduct pleaded herein, Whitman (along with

the other Defendants) engaged in *ultra vires* acts and controlled the Company to accomplish and perpetuate his self dealing and the self dealing of other Defendants, in backdated stock options. Defendant Whitman may be served at 285 Central Park West, Unit 12S, New York, New York 10024.

19.     Defendant Hans W. Schmidt ("Schmidt") has been a director of Nabors since 1993. Because of Schmidt's position, he knew the adverse non-public information about the business of Nabors, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at board meetings and committees thereof and via reports and other information provided to him in connection therewith.   Schmidt worked on Nabors' Audit and Governance and Nominating Committees.   Schmidt also worked on Nabors' Compensation Committee, where he controlled the other Defendants' stock option awards.   Schmidt participated in (and did work in connection with) at least one meeting in 2004 and in 2005, during which he engaged in backdating stock options.   As a member of the Compensation Committee, Schmidt caused and allowed Nabors to disseminate false and misleading statements in connection with Nabors' financial statements.   Through his work and receipt of hundreds of thousands of shares of backdated stock options, Schmidt knew or severely recklessly disregarded that Nabors' executives and directors (including him) were backdating stock option grants.   Although Schmidt knew or severely recklessly disregarded that Nabors' executives and directors were backdating stock option grants, he participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings, and signed Nabors' Reports on Form 10-K.   Based on his knowledge of material non-public information regarding the Company, Defendant Schmidt sold 186,000 shares of Nabors' stock for proceeds of $3.5 million during the relevant period.   The backdated stock options Schmidt received constituted illegal compensation from Nabors that was not

disclosed to the Company's shareholders.  Through his deceptive conduct pleaded herein, Schmidt (along with the other Defendants) engaged in *ultra vires* acts and controlled the Company to accomplish and perpetuate his self dealing and the self dealing of other Defendants, in backdated stock options.  Defendant Schmidt may be served at 515 West Greens Road, Suite 1170, Houston, Texas 77067.

20.     Defendant Myron M. Sheinfeld ("Sheinfeld") has served as a director of Nabors since 1988.  Because of Sheinfeld's position, he knew the adverse non-public information about the business of Nabors, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at board meetings and committees thereof and via reports and other information provided to him in connection therewith.  Sheinfeld worked on Nabors' Governance and Nominating Committee.  Sheinfeld also chaired and worked on Nabors' Audit Committee and worked on Nabors' Compensation Committee nearly continuously throughout the period of backdating at the Company.  While working on Nabors' Compensation Committee, where he controlled the other Defendants' stock option awards, Sheinfeld participated in (and did work in connection with) six meetings in fiscal 1993, three meetings in fiscal 1994, four meetings in fiscal 1995, two meetings in fiscal 1996, three meetings in fiscal 1997, three meetings in fiscal 1998, two meetings in fiscal 1999, three meetings in fiscal 2000, one meeting in fiscal 2001, two meetings in fiscal 2002, four meetings in fiscal 2003, and numerous meetings in 2004-2005, during which he engaged in backdating stock options.  As a member of these committees, Sheinfeld caused and allowed Nabors to disseminate false and misleading statements in connection with Nabors' financial statements.  Through his work and receipt of hundreds of thousands of shares of backdated stock options, Sheinfeld knew or severely recklessly disregarded that Nabors' executives and directors (including himself) were backdating stock option grants.  Although Whitman knew or severely

recklessly disregarded that Nabors' executives and directors were backdating stock option grants, he participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings, and signed Nabors' Reports on Form 10-K.  Based on his knowledge of material non-public information regarding the Company, Defendant Sheinfeld sold 248,000 shares of Nabors' stock for proceeds of $5.6 million during the relevant period.  The backdated stock options Sheinfeld received constituted illegal compensation from Nabors that was not disclosed to the Company's shareholders.  Through his deceptive conduct pleaded herein, Sheinfeld (along with the other Defendants) engaged in *ultra vires* acts and controlled the Company to accomplish and perpetuate his self dealing and the self dealing of other Defendants, in backdated stock options. Defendant Sheinfeld may be served at 2201 Robinhood Street, Houston, TX 77005.

21.     Defendant James L. Payne ("Payne") has been a director of Nabors since 1999. Because of Payne's position, he knew the adverse non-public information about the business of Nabors, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at board meetings and committees thereof and via reports and other information provided to him in connection therewith.  Payne chaired and worked on the Governance and Nominating Committee.  Payne also worked on the Compensation Committee where he controlled the other Defendants' stock option awards.  Through this and his receipt of tens of thousands of shares of backdated stock options, Payne knew or severely recklessly disregarded that Nabors' executives and directors were backdating stock option grants.  Although he knew or severely recklessly disregarded that Nabors' executives and directors were backdating stock option grants, Payne participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings, and signed Nabors' Reports on Forms 10-Q and 10-K. Based on his knowledge of material non-public information regarding the Company, Defendant

Payne sold 157,532 shares of Nabors' stock for proceeds of $3.6 million during the relevant period. The backdated stock options Payne received constituted illegal compensation from Nabors that was not disclosed to the Company's shareholders. Through his deceptive conduct pleaded herein, Payne (along with the other Defendants) engaged in *ultra vires* acts and controlled the Company to accomplish and perpetuate his self dealing and the self dealing of other Defendants, in backdated stock options. Defendant Payne may be served at 31 Pinewold Circle, Houston, TX 77056.

22. Defendant Alexander M. Knaster ("Knaster") has been a director of Nabors since 2004. Because of Knaster's position, he knew the adverse non-public information about the business of Nabors, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at board meetings and committees thereof and via reports and other information provided to him in connection therewith. Knaster worked on Nabors' Governance and Nominating Committee. Knaster also worked on Nabors' Compensation Committee, where he controlled the other Defendants' stock option awards. Knaster participated in (and did work in connection with) at least one meeting in 2005, during which he engaged in backdating stock options. As a member of the Compensation Committee, Knaster caused and allowed Nabors to disseminate false and misleading statements in connection with Nabors' financial statements. Through his work and receipt of tens of thousands of shares of backdated stock options, Knaster knew or severely recklessly disregarded that Nabors' executives and directors (including himself) were backdating stock option grants. Although Knaster knew or severely recklessly disregarded that Nabors' executives and directors were backdating stock option grants, he participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings, and signed Nabors' Reports on Form 10-K. During the relevant period, Knaster participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press

releases and SEC filings.  The backdated stock options Knaster received constituted illegal

compensation from Nabors that was not disclosed to the Company's shareholders.  Through his

deceptive conduct pleaded herein, Knaster (along with the other Defendants) engaged in *ultra vires*

acts and controlled the Company to accomplish and perpetuate his self dealing and the self dealing

of other Defendants, in backdated stock options.  Defendant Knaster may be served at 800 Ocean

Drive, Suite 1005, Juno Beach, Florida 33408.

23.     Defendant Jack Wexler ("Wexler") has been a director of Nabors since 1987 and

currently acts as Director Emeritus of the Company.  Because of Wexler's position, he knew the

adverse non-public information about the business of Nabors, as well as its finances, markets and

present and future business prospects, via access to internal corporate documents, conversations and

connections with other corporate officers and employees, attendance at board meetings and

committees thereof and via reports and other information provided to him in connection therewith.

Wexler also chaired and worked on Nabors' Compensation Committee and worked on Nabors'

Audit Committee nearly continuously throughout the period of backdating at the Company.  While

working on Nabors' Compensation Committee, where he controlled the other Defendants' stock

option awards, Wexler participated in (and did work in connection with) two meetings in fiscal 1992,

six meetings in fiscal 1993, three meetings in fiscal 1994, four meetings in fiscal 1995, two meetings

in fiscal 1996, three meetings in fiscal 1997, three meetings in fiscal 1998, two meetings in fiscal

1999, three meetings in fiscal 2000, one meeting in fiscal 2001, two meetings in fiscal 2002, four

meetings in fiscal 2003, and meetings in 2004, during which he engaged in backdating stock options.

As a member of these committees, Wexler caused and allowed Nabors to disseminate false and

misleading statements in connection with the Company's financial statements.  Through his work

and receipt of hundreds of thousands of shares of backdated stock options, Wexler knew or severely

recklessly disregarded that Nabors' executives and directors (including himself) were backdating

stock option grants.  Although he knew or severely recklessly disregarded that Nabors' executives and directors were backdating stock option grants, Wexler participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings and signed Nabors' Reports on Form 10-K.  Based on his knowledge of material non-public information regarding the Company, defendant Wexler sold 1.08 million shares of Nabors' stock for proceeds of $19.8 million during the relevant period.  The backdated stock options Wexler received constituted illegal compensation from Nabors that was not disclosed to the Company's shareholders.  Through his deceptive conduct pleaded herein, Wexler (along with the other Defendants) engaged in *ultra vires* acts and controlled the Company to accomplish and perpetuate his self dealing and the self dealing of other Defendants, in backdated stock options.  For over 10 years during the relevant time period, Wexler's son was employed by Nabors Corporate Services, a subsidiary of Nabors, and while there he received cash bonuses and stock options.  Defendant Wexler may be served at 800 Saint Ames Lane, Vero Beach, Florida 32697.

24.     The Defendants identified in ¶¶14-15 and 18-23 are referred to herein as the "Director Defendants."   The Defendants identified in ¶¶14-17 are referred to herein as the "Officer Defendants."  The Defendants identified in ¶¶14-21 and 23 are referred to herein as the "Insider Selling Defendants."

### DEFENDANTS' DUTIES

25.     Each officer and director of Nabors named herein owed the Company and Nabors' shareholders the duty to exercise a high degree of care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Nabors' directors and officers complained of herein involves knowing, intentional and culpable violations of their obligations as officers and directors of Nabors.  Further,

the misconduct of Nabors' officers has been ratified by Nabors' Board, which has failed to take any legal action on behalf of the Company against them.

26.     By reason of their positions as officers, directors and fiduciaries of Nabors and because of their ability to control the business and corporate affairs of the Company, the Defendants owed Nabors and its shareholders fiduciary obligations of candor, trust, loyalty and care, and were required to use their ability to control and manage Nabors in a fair, just, honest and equitable manner, and to act in furtherance of the best interests of Nabors and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  In addition, as officers and/or directors of a publicly held company, the Defendants had a duty to refrain from utilizing their control over Nabors to divert assets to themselves via improper and/or unlawful practices.  Defendants also had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, earnings and compensation practices.

27.     Because of their positions of control and authority as directors or officers of Nabors, each of the Defendants was able to and did, directly and indirectly, control the wrongful acts complained of herein.  As to the Director Defendants, these acts include: (i) agreement to and/or acquiescence in Defendants' option backdating scheme; (ii) willingness to cause Nabors to disseminate false SEC filings, including Proxy Statements for 1994 - 2006, which Proxy Statements failed to disclose Defendants' option backdating scheme and omitted the fact that executive officers were allowed to backdate their stock option grants in order to manipulate the strike price of the stock options they received.  Because of their positions with Nabors, each of the Defendants was aware of these wrongful acts, had access to adverse non-public information and was required to disclose these facts promptly and accurately to Nabors' shareholders and the financial markets but failed to do so.

28.     Between 1994 and 2006, Defendants concealed that the stock option grants had been repeatedly and consciously *backdated* to ensure that the strike price associated with the option grants

was at or near the lowest trading price for that fiscal period.  Due to Defendants' breach of their fiduciary duty in the administration of the stock option plans, plaintiff seeks to have the directors' and officers' plans voided and gains from those plans returned to the Company.  In the alternative, plaintiff seeks to have all of the unexercised backdated options granted to Defendants from as early as 1991 to 2005 cancelled, the financial gains obtained via the exercise of such options returned to the Company and to have Defendants revise the Company's financial statements to reflect the truth concerning these option grants.

29.     To discharge their duties, the directors of Nabors were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and financial affairs of Nabors.  By virtue of such duties, the officers and directors of Nabors were required, among other things, to:

(a)     manage, conduct, supervise and direct the business affairs of Nabors in accordance with all applicable law (including federal and state laws, government rules and regulations and the charter and bylaws of Nabors);

(b)     neither engage in self dealing nor knowingly permit any officer, director or employee of Nabors to engage in self dealing;

(c)     neither violate nor knowingly permit any officer, director or employee of Nabors to violate applicable laws, rules and regulations;

(d)     remain informed as to the status of Nabors' operations, including its practices in relation to the cost of allowing the pervasive backdating and improperly accounting for such, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the U.S. federal securities laws and their duty of candor to the Company's shareholders;

- 16 -

(e)     prudently protect the Company's assets, including taking all necessary steps to recover corporate assets (cash, stock options) improperly paid to Company executives and directors together with the related costs (professional fees) proximately caused by the illegal conduct described herein;

(f)     establish and maintain systematic and accurate records and reports of the business and affairs of Nabors and procedures for the reporting of the business and affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(g)     maintain and implement an adequate, functioning system of internal legal, financial and accounting controls, such that Nabors' financial statements – including its expenses, accounting for stock option grants and other financial information – would be accurate and the actions of its directors would be in accordance with all applicable laws;

(h)     exercise control and supervision over the public statements to the securities markets and trading in Nabors' stock by the officers and employees of Nabors; and

(i)     supervise the preparation and filing of any financial reports or other information required by law from Nabors and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of Nabors and to make full and accurate disclosure of all material facts concerning, *inter alia,* each of the subjects and duties set forth above.

30.     Each Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of

Nabors, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Defendants who were officers and/or directors of the Company during the relevant period has been ratified by the Director Defendants who comprised Nabors' entire Board during the relevant period.

31.     Defendants breached their duties of loyalty and good faith by allowing or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Defendants from taking such illegal actions.  As a result, Nabors has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)     improvidently paid executive compensation;

(b)     increased capital costs as a result of the loss of market capitalization and the Company's damaged reputation in the investment community;

(c)     costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(d)     incurring possible IRS penalties for improperly reporting compensation.

32.     These actions have irreparably damaged Nabors' corporate image and goodwill.  For at least the foreseeable future, Nabors will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Nabors' ability to raise equity capital or debt on favorable terms in the future is now impaired.

## AIDING AND ABETTING AND CONCERTED ACTION

33.     In committing the wrongful acts alleged herein, Defendants have pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan.

34.     During all times relevant hereto, Defendants collectively and individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company was allowing its directors and senior officers to divert hundreds of millions of dollars to Nabors insiders and directors and causing Nabors to misrepresent its financial results; (ii) maintain Defendants' executive and directorial positions at Nabors and the profits, power and prestige which Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Nabors, regarding Defendants' compensation practices and Nabors' financial performance.

35.     The purpose and effect of Defendants' common course of conduct was, among other things, to disguise Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, corporate waste and unjust enrichment, to conceal adverse information concerning the Company's operation and financial condition and to artificially inflate the price of Nabors' common stock so they could dispose of millions of dollars of their own Nabors' stock, and enhance their executive and directorial positions and receive the substantial compensation they obtained as a result thereof.

36.     Defendants accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully and/or recklessly engage in the option backdating scheme alleged herein and misrepresent Nabors' financial results.  Each of the Defendants was a direct, necessary, and substantial participant in the common enterprise and/or common course of conduct complained of herein.

37.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

38.     Nabors owns and operates approximately 600 land drilling and approximately 800 land workover and well-servicing rigs in North America.  Offshore, Nabors operates 46 platform rigs, 22 jack-up units and five barge rigs in the United States and multiple international markets. Nabors markets 29 marine transportation and supply vessels, primarily in the U.S. and Gulf of Mexico.  In addition, Nabors manufactures top drives and drilling instrumentation systems and provides comprehensive oilfield hauling, engineering, civil construction, logistics and facilities maintenance, and project management services.  Nabors participates in most of the significant oil, gas and geothermal markets in the world.

39.     Throughout the relevant period, Defendants caused Nabors to grant them millions of stock options permitting them to buy Nabors' stock for pennies on the dollar which they could in turn sell as the Company's stock price increased.  A stock option gives the holder the right to buy a stock at a certain price in the future.  Typically, companies set that price at the same time their directors approve an option grant, with an exercise price – also known as the "strike price" – usually set at the closing price of the stock that day, the closing price of the night before or by computing an average of the high and low prices on the day of the vote.

40.     However, many of the millions of options granted to Nabors' executives had a hidden, valuable component:  they were misdated, often making them even more significantly valuable.  The misdated stock option grants fell largely into three categories: (i) "look back" grants,

in which the date of the grant was picked retroactively (*e.g.,* a decision in February to pick a January date); (ii) "wait and see" grants, in which a grant date was selected, but the decision was finalized – and sometimes changed – at a later date (*e.g.,* a decision on January 1 to issue a grant on January 15, but there is a period after January 15 in which the grantor waits to see if a more advantageous price occurs and, if one does, uses that later date instead); and (iii) grants where there was a failure to complete the option grant process by the date of the grant (*e.g.,* where there is a decision to issue a grant as of a certain date, but after that date there are changes in the grantees or amounts to grantees, and although the work is not complete on those grants as of the stated grant date, that date is nonetheless used).

## BACKDATED AND IMPROPERLY PRICED STOCK OPTION GRANTS

### Nabors' Stock Option Plans Authorized by the Shareholders

41.     At all relevant times Nabors granted stock options pursuant to its stock option plans in effect during 1991-2006, including the: (i) 1993 Stock Option Plan for Non-Employee Directors ("1993 NED Plan"); (ii) 1993 Key Employee Stock Plan ("1993 Plan"); (iii) 1996 Employee Stock Plan ("1996 Plan"); and (iv) the 2003 Employee Stock Plan (original and amended) ("2003 Plan"). The option grants to the recipients identified herein were made pursuant to Nabors' discretionary plans.  Those plans (the 1993 Plan, 1996 Plan, and 2003 Plan) were inherently flexible in giving the Committee discretion to choose (but not backdate) grant dates.  Indeed, the grant dates of options granted under the plans occurred sporadically, but very fortuitously.

42.     A fundamental requirement of Nabors' stock option plans is and in all relevant instances was that the exercise price of options be no less than the fair market value per share of stock on the date of the grant of the option.  *See for example* 1993 NED Plan, §6.3 ("not be less than 100% of the Fair Market Value"); 1993 Plan, §5(b) ("no less than the Fair Market Value per share of Common Stock on the date of the grant of the option"); 1996 Plan, §5(b)(ii) ("no less than 100% of

the Fair Market Value per Share of Common Stock on the date of the grant of the option"); 2003

Plan, §7(b) ("shall not be less than 100% of the Fair Market Value per Share on such date").  This

fundamental requirement directly contradicts dating a stock option on a date prior to its grant or

pricing a stock option as if it were dated prior to the date of the grant.   Nonetheless, the

Compensation Committees and the Board, over the years repeatedly committed *ultra vires* acts and

approved stock options which on their face were backdated.  During this period of time, two of the

Company's top officers, Isenberg and Petrello, in any given year received between 27% and 58%,

and between 12% and 48% of the Company's option grants, respectively.  Many of those grants

were backdated.

### Certain Alleged Backdated Stock Option Grants
### Accomplished by *Ultra Vires* Acts and Self Dealing

| Purported Option Grant | Price | Directors & Officers Who Received Grant | Number of Options Received | Options Exercised, Stock Sold | Defendant Directors and Officers Who Engaged in Backdating the Purported Stock Option Grant |
|---|---|---|---|---|---|
| 1/22/1991 | $4.250 | Wexler | 40,000 | √ | Wexler |
| 9/23/1991 | $5.000 | Isenberg | 1,800,000 | | Wexler |
| 12/10/1991 | $5.880 | Koch | 20,000 | √ | Wexler |
| 10/7/1992 | $6.500 | Schmidt | 50,000 | √ | Wexler and Sheinfeld |
| 9/14/1993 | $8.500 | Wexler | 20,000 | | Isenberg, Wexler and Sheinfeld |
| | | Whitman | 20,000 | √ | |
| | | Schmidt | 20,000 | | |
| | | Sheinfeld | 20,000 | | |
| 12/20/1993 | $6.250 | Petrello | 325,000 | | Wexler and Sheinfeld |
| | | Koch | 15,000 | | |
| | | McLachlin | 5,000 | | |
| | | Isenberg | 425,000 | | |
| 3/1/1994 | $6.875 | Wexler | 5,000 | | Isenberg, Wexler and Sheinfeld |
| | | Whitman | 5,000 | √ | |
| | | Schmidt | 5,000 | √ | |
| 12/28/1994 | $6.375 | Isenberg | 1,800,000 | | Wexler and Sheinfeld |
| | | Petrello | 1,600,000 | | |
| | | Stratton | 200,000 | | |
| 1/13/1995 | $6.250 | Koch | 20,000 | √ | Wexler and Sheinfeld |

| Purported Option Grant | Price | Directors & Officers Who Received Grant | Number of Options Received | Options Exercised, Stock Sold | Defendant Directors and Officers Who Engaged in Backdating the Purported Stock Option Grant |
|---|---|---|---|---|---|
| | | McLachlin | 7,500 | | |
| 12/4/1995 | $9.56 | Isenberg | 1,000,000 | | Isenberg, Wexler and Sheinfeld |
| | | Petrello | 303,000 | | |
| 1/17/1996 | $10.375 | Koch | 20,000 | | Wexler and Sheinfeld |
| | | McLachlin | 10,000 | | |
| 12/12/1996 | $17.500 | Isenberg | 1,450,000 | | Wexler and Sheinfeld |
| | | Petrello | 650,000 | | |
| | | Stratton | 350,000 | | |
| 6/12/1997 | $22.500 | Stratton | 150,000 | | Wexler and Sheinfeld |
| 7/22/1997 | $29.550 | Isenberg | 2,315,500 | | Wexler and Sheinfeld |
| | | Petrello | 1,290,000 | | |
| | | Stratton | 412,500 | | |
| 12/11/1998 | $12.500 | Isenberg | 4,509,375 | √ | Wexler and Sheinfeld |
| | | Koch | 11,250 | √ | |
| | | Petrello | 2,577,750 | √ | |
| | | McLachlin | 9,000 | | |
| | | Stratton | 1,063,125 | | |
| 12/30/1998 | $12.625 | Isenberg | 2,200,000 | | Wexler and Sheinfeld |
| | | Petrello | 900,000 | √ | |
| | | Stratton | 300,000 | | |
| | | Sheinfeld | 17,500 | √ | |
| | | Schmidt | 15,000 | | |
| | | Whitman | 12,500 | | |
| 2/26/1999 | $11.500 | Koch | 25,600 | √ | Wexler and Sheinfeld |
| | | McLachlin | 1,900 | √ | |
| 8/23/1999 | $21.125 | Stratton | 87,500 | | Wexler and Sheinfeld |
| 12/7/1999 | $24.750 | Isenberg | 1,500,000 | √ | Isenberg, Wexler and Sheinfeld |
| | | Koch | 25,000 | √ | |
| | | Petrello | 750,000 | | |
| | | Stratton | 250,000 | | |
| | | McLachlin | 4,250 | √ | |
| | | Sheinfeld | 36,500 | √ | |
| | | Wexler | 11,500 | √ | |
| | | Payne | 30,000 | √ | |
| | | Schmidt | 21,500 | | |
| 9/21/2000 | $46.500 | Isenberg | 2,436,339 | | Wexler and Sheinfeld |
| | | Petrello | 1,149,325 | √ | |
| | | Stratton | 315,943 | | |
| 12/4/2000 | $45.500 | Isenberg | 1,000,000 | | Isenberg, Wexler and |

- 23 -

| Purported Option Grant | Price | Directors & Officers Who Received Grant | Number of Options Received | Options Exercised, Stock Sold | Defendant Directors and Officers Who Engaged in Backdating the Purported Stock Option Grant |
|---|---|---|---|---|---|
| | | | | | Sheinfeld |
| | | Koch | 15,000 | √ | |
| | | Petrello | 500,000 | | |
| | | Stratton | 250,000 | | |
| | | McLachlin | 3,000 | √ | |
| | | Wexler | 45,000 | √ | |
| | | Payne | 22,500 | | |
| | | Schmidt | 30,000 | | |
| | | Sheinfeld | 37,500 | | |
| 1/22/2002 | $27.050 | Isenberg | 1,900,000 | | Isenberg, Wexler and Sheinfeld |
| | | Koch | 25,000 | √ | |
| | | McLachlin | 5,000 | √ | |
| | | Petrello | 950,000 | | |
| | | Stratton | 400,000 | | |
| | | Sheinfeld | 55,000 | √ | |
| | | Wexler | 65,000 | √ | |
| | | Payne | 35,000 | √ | |
| | | Schmidt | 45,000 | | |
| | | Whitman | 30,000 | | |
| 2/20/2004 | $45.910 | Isenberg | 950,000 | | Isenberg, Whitman, Sheinfeld, and Wexler |
| | | Koch | 30,000 | | |
| | | McLachlin | 4,500 | √ | |
| | | Petrello | 475,000 | | |
| | | Wexler | 45,000 | √ | |
| | | Payne | 40,000 | | |
| | | Schmidt | 40,000 | | |
| | | Sheinfeld | 45,000 | | |
| | | Whitman | 80,000 | | |
| 11/9/2004 | $47.020 | Knaster | 30,000 | | Whitman, Sheinfeld and Wexler |
| 7/8/2005 | $62,100 | Koch | 5,000 | | Schmidt, Whitman and Sheinfeld |

43.     The chart above reflects the number and price of options unadjusted for stock splits.

Nabors enacted a 2-for-1 stock split on April 17, 2006.  This effectively doubled the number of

shares of stock for which outstanding options could be exercised and halved the exercise price of those shares.

44.    While members of Nabors' Compensation Committee, Defendants Knaster, Payne, Schmidt, Sheinfeld, Whitman and Wexler were the ones who had the responsibilities to "administer" the Company's stock option plans.  Those responsibilities have never been anything less than full responsibility, authority and discretion to determine and grant stock options as a committee.  *See for example* 1993 NED Plan, §3 ("power to construe the provisions of the Plan, to determine all questions arising thereunder"); 1993 Plan, §2 ("final authority"); *id.*, §5(b) ("The Committee shall, in its discretion . . ."); 1996 Plan, §2 ("final authority"); *id.*, §5(b)(ii) ("The Committee shall, in its discretion . . ."); 2003 Plan, §3 ("the Administrator shall have the power and authority, without limitation"); *id.*, §7(b) (exercise price "determined by the Administrator in its sole discretion").  *See also infra* ¶¶80(a)-(b), 80(d), 83(a)-(b), 86(a)-(c), 89(a)-(b), 92(a)-(b), 94(a), 99(a), 97(a), 102(a), 105(a), 105(c), 108(a), 111(a), 114(a), 114(c) (referencing Proxy Statements concerning Compensation Committee).

45.    Abusing that authority and committing *ultra vires* acts, Defendants Knaster, Payne, Schmidt, Sheinfeld, Whitman and Wexler (among other things) violated Nabors' stock option plans, for they: (i) backdated and mispriced stock options; and (ii) in collusion with on another or other Defendants determined and granted option awards dated with dates prior to, the dates the awards were properly authorized, employees were entitled to receive the options, or the option or price was known.  As Nabors recently admitted, "senior executives" and "other[s]" received backdated options.  Each of these Defendants abused their authority in causing the backdating and mispricing to occur without disclosure.

46.    An objective analytical screen of the stock option grants to directors and officers of Nabors between 1987 and 2005 reveals that stock option grants were often dated: (i) near or on the

very day that Nabors' stock price hit its low price for the month, quarter and/or year; and/or (ii) in advance of significant stock price increases. Indeed, nearly one in every four grants to Nabors' officers and directors came at the lowest price date in the month for Nabors' shares, and approximately 36% of grants were made at the lowest or second lowest price date. The odds of that happening absent intentional manipulation are so extremely remote as to show backdating is the reason for defendants' incredible recurring fortunes over the years. And that is not even considering the fact that approximately 15% of the option grants occurred at the lowest or second lowest price date of the quarter or year, including the option grants backdated to 1/22/91, 9/23/91, 9/14/93, 12/20/93, 1/13/95 and 1/17/96, among others. In some cases there is no known SEC Forms 4 or Thompson financial data derived from such filings showing the changes in beneficial ownership from these purported grants – the options were not evidenced until *years* later, when defendants made SEC filings indicating the *exercise* of these options. In other cases Forms 4 evidencing these backdated grants (and others) were filed by defendants many months or even years after the purported grant.

47.     For example, as *The Wall Street Journal* reported on December 27, 2006: "In all, of 11 new option grants to Mr. Isenberg between 1991 and 1992, two were dated at quarterly lows in the Nabors' stock price and five more at monthly lows. The odds against such a fortunate pattern occurring by chance are long." Indeed, in every year during the relevant period, the returns on defendants' option grants, *exceeded* the stock returns of Nabors' public investors who held Nabors' stock for the year. And in some years public investors *lost* money on their stock holdings while those who received backdated option grants saw annualized increases in such stock of over 266%. The following describes some of the backdated and mispriced grants and their recipients. Those grants dated prior to when plaintiffs held their stock demonstrate repeated intentional conduct and a

- 26 -

predisposition to engage in backdating.  Many of the defendants herein engaged in backdating for well over a decade.

**Option Grant Retroactively Priced and Backdated to January 22, 1991**

48.     This option was granted to Wexler.  It was dated and priced at Nabors' second lowest closing price for the month, quarter and year.  The 10- and 20-day increases in Nabors' stock price following that date were 17.6% and 35.3%, respectively, with the annualized increases being 642% and 635%, respectively.



**Option Grant Retroactively Priced and Backdated to September 23, 1991**

49.     This option was granted to Isenberg.  On December 27, 2006, *The Wall Street Journal* reported that internal Company documents suggest the grant was not actually made "until well after Sept. 23, when the stock was higher."  It was dated and priced at Nabors' lowest closing price for the

month and second lowest closing price for the quarter.  The 10- and 20-day increases in Nabors'

stock price following that date were 10% and 30%, respectively, with the annualized increases being

365% and 540%, respectively.



**Option Grant Retroactively Priced and Backdated to December 10, 1991**

50.    This option was granted to Koch.  It was dated and priced near Nabors' lowest

closing price for the month.  The 20-day increase in Nabors' stock price following that date was

4.3%, with the annualized increase being 77.4%.



**Nabors Industries Ltd.**
November 8, 1991 to January 10, 1992

**Option Grant Retroactively Priced and Backdated to October 7, 1992**

51.    This option was granted to Schmidt.  It was dated and priced at Nabors' second lowest closing price for the month and near the lowest closing price for the year.  The 10-day increase in Nabors' stock price following that date was 7.7%, with the annualized increase being 281%.  In comparison, public investors who held Nabors' stock throughout 1992 saw *no* increase.



**Option Grant Retroactively Priced and Backdated to September 14, 1993**

52.     This option was granted to Schmidt, Sheinfeld, Wexler and Whitman.  It was dated and priced at Nabors' lowest closing price for the month and quarter.  The 10- and 20-day increases in Nabors' stock price following that date were 5.9%, with the annualized increases being 215% and 106%, respectively.



**Option Grant Retroactively Priced and Backdated to December 20, 1993**

53.     This option was granted to Isenberg, Koch, McLachlin, Petrello and Richard A. Stratton ("Stratton").[1]  It was dated and priced at Nabors' lowest closing price for the month and quarter.  The 10- and 20-day increases in Nabors' stock price following that date were 20% and 14%, respectively, with the annualized increases being 730% and 252%, respectively.



---

[1]     Stratton deceased October 31, 2005.

**Option Grant Retroactively Priced and Backdated to March 1, 1994**

54.    This option was granted to Schmidt and Whitman.  It was dated and priced near Nabors' lowest closing price for the month.  The 10-day increase in Nabors' stock price following that date was 7.3%, with the annualized increase being 266%.  In comparison, public investors who held Nabors' stock throughout 1994 *lost* 14.8%.



- 33 -

**Option Grant Retroactively Priced and Backdated to December 28, 1994**

55.     This option was granted to Isenberg, Petrello and Stratton.  It was dated and priced at Nabors' second lowest closing price for the month and near the lowest closing price for the quarter and year.  The 10- and 20-day increases in Nabors' stock price following that date were 2% and 3.9%, respectively, with the annualized increases being 37% and 70%, respectively.  In comparison, public investors who held Nabors' stock throughout 1994 *lost* 14.8%.



**Option Grant Retroactively Priced and Backdated to January 13, 1995**

56.    This option was granted to Koch, McLachlin and others.  It was dated and priced at Nabors' lowest closing price for the month and near the lowest closing price for the quarter and year. The 10- and 20-day increases in Nabors' stock price following that date were 6% and 4%, respectively, with the annualized increases being 219% and 72%, respectively.



**Option Grant Retroactively Priced and Backdated to December 4, 1995**

57.     This option, granted to Isenberg and Petrello, was not identified by Plaintiffs'
analytical methodology.  It was identified by *The Wall Street Journal*, which on December 27, 2006
reported an internal Company document "suggesting the grant wasn't made final until weeks after
the stated Dec. 4 award date."  Since then, the Company has admitted the grant was improperly
dated (back six weeks) and mispriced.  Indeed, the grant was dated and priced at Nabors' lowest
closing price for the month.  The 10- and 20-day increases in Nabors' stock price following that date
were 12.4% and 16.3%, respectively, with the annualized increases being 453% and 293%,
respectively.



**Option Grant Retroactively Priced and Backdated to January 17, 1996**

     58.    This option was granted to Koch and McLachlin.  It was dated and priced at Nabors'

lowest closing price for the month and quarter.  The 10- and 20-day increases in Nabors' stock price

following that date were 16.9% and 19.3%, respectively, with the annualized increases being 616%

and 347%, respectively.



**Option Grant Retroactively Priced and Backdated to December 12, 1996**

59.    This option was granted to Isenberg, Petrello and Stratton. It was dated and priced at Nabors' lowest closing price for the month. The 10- and 20-day increases in Nabors' stock price following that date were 17.9% and 20%, respectively, with the annualized increases being 653% and 360%, respectively.



**Option Grant Retroactively Priced and Backdated to June 12, 1997**

     60.     This option was granted to Stratton.  It was dated and priced at Nabors' lowest closing price for the month.  The 10- and 20-day increases in Nabors' stock price following that date were 2.8% and 25%, respectively, with the annualized increases being 102% and 450%, respectively.



**Option Grant Retroactively Re-Priced and Backdated to December 11, 1998**

61.     This option was granted to Isenberg, Koch, Petrello, Stratton and McLachlin.  It was dated and priced at Nabors' second lowest closing price for the month and quarter and third lowest closing price for the year.  The 10- and 20-day increases in Nabors' stock price following that date were 1% and 14.5%, respectively, with the annualized increases being 36.5% and 261%, respectively.  In comparison, public investors who held Nabors' stock throughout 1998 *lost* 55%.



- 40 -

**Option Grant Retroactively Priced and Backdated to December 30, 1998**

62.     This option was granted to Isenberg, Petrello, Stratton, Sheinfeld, Schmidt and Whitman.  It was dated and priced near Nabors' lowest closing price for the month, quarter and year. The 10-day increase in Nabors' stock price following that date was 5%, with the annualized increase being 182%.  In comparison, public investors who held Nabors' stock throughout 1998 *lost* 55%.



**Option Grant Retroactively Priced and Backdated to February 26, 1999**

63.     This option was granted to Koch and McLachlin.  It was dated and priced at Nabors'

third lowest closing price for the month and near the lowest closing price for the quarter and year.

The 10- and 20-day increases in Nabors' stock price following that date were 32.6% and 55.4%,

respectively, with the annualized increases being 1190% and 997%, respectively.



**Option Grant Retroactively Priced and Backdated to December 7, 1999**

64.     This option was granted to Isenberg, Koch, Petrello, Stratton, McLachlin, Sheinfeld, Wexler, Payne and Schmidt.  It was dated and priced at Nabors' lowest closing price for the month. The 10- and 20-day increases in Nabors' stock price following that date were 7.6% and 19.7%, respectively, with the annualized increases being 277% and 354%, respectively.



**Option Grant Retroactively Priced and Backdated to September 21, 2000**

65.    This option was granted to Isenberg, Petrello and Stratton.  It was dated and priced at Nabors' lowest closing price for the month.  The 10- and 20-day increases in Nabors' stock price following that date were 10.6% and 17.5%, respectively, with the annualized increases being 387% and 315%, respectively.



- 44 -

**Option Grant Retroactively Priced and Backdated to December 4, 2000**

66.     This option was granted to Isenberg, Petrello, Koch, Stratton, McLachlin, Wexler, Payne, Schmidt and Sheinfeld.  It was dated and priced at Nabors' second lowest closing price for the month and third lowest closing price for the quarter.  The 10- and 20-day increases in Nabors' stock price following that date were 23.3% and 21%, respectively, with the annualized increases being 850% and 378%, respectively.



**Option Grant Retroactively Priced and Backdated to January 22, 2002**

67.     This option was granted to Isenberg, Petrello, Koch, Stratton, McLachlin, Wexler, Payne, Schmidt, Sheinfeld and Whitman.  It was dated and priced at Nabors' lowest closing price for the month and quarter and second lowest closing price for the year.  The 10- and 20-day increases in Nabors' stock price following that date were 11.3% and 17.8%, respectively, with the annualized increases being 412% and 320%, respectively.



**Option Grant Retroactively Priced and Backdated to February 20, 2004**

68.     This option was granted to Isenberg, Petrello, Koch, Stratton, McLachlin, Wexler, Payne, Schmidt, Sheinfeld and Whitman.  It was dated and priced near Nabors' lowest closing price for the month.  The 10-day increase in Nabors' stock price following that date was 2.7%, with the annualized increase being 98%.



**Option Grant Retroactively Priced and Backdated to November 9, 2004**

69.    This option was granted to Knaster.  It was dated and priced at Nabors' second lowest closing price for the month and quarter.  The 10- and 20-day increases in Nabors' stock price following that date were 11.9% and 4.4%, respectively, with the annualized increases being 434% and 79%, respectively.



**Option Grant Retroactively Priced and Backdated to July 8, 2005**

70.     This option was granted to Koch.   It was dated and priced near Nabors' lowest closing price for the month and quarter.   The 10- and 20-day increases in Nabors' stock price following that date were 5.6% and 6.0%, respectively, with the annualized increases being 103.6% and 108%, respectively.



71.     And in fact, based on a review of "certain employee equity awards . . . from 1988 through 2006," (Fiscal 2006 Form 10-K, at 55) the Company has now largely admitted to backdating (it won't use the word "backdate"): "the Company had historically used an incorrect 'measurement date' in determining the amount of compensation expense to be recognized for such employee stock option awards."   Fiscal 2006 Form 10-K, at 13.   Wexler, Sheinfeld and others also engaged in backdating other grants dated at or near the lowest closing price of Nabors' stock for the month on

other occasions.  And certain of the defendants received those grants.  Although the Company has not yet admitted a number of grants were backdated, it has essentially admitted other grants were backdated (again it won't say "backdated"), including grants purportedly made on January 4, 1991, for which the grant date "should have been March 5, 1991," grants purportedly made on December 4, 1995, for which the grant date "should have been January 18, 1996," and grants purportedly made on July 22, 1997, for which the grant date "should have been August 5, 1997."  Fiscal 2006 Form 10-K, at 13.

72.   The issuance of options identified above violated Nabors' stock option plans that provided the exercise price of options to purchase Nabors' stock shall not be less than 100% of the fair market value on the date of grant.  As shown in the next three sections, it also contradicted Nabors' statements in SEC filings and other reports to Nabors' shareholders.  The secret practice of backdating stock option grants to themselves and their colleagues was in breach of Defendants' fiduciary duties, including their duties of good faith, honesty and loyalty, owed to Nabors and its shareholders.

73.   The backdating, among other things, enabled Defendants to disguise the fact that the Company was paying higher compensation to executives and employees by awarding them in-the-money options and to avoid having to expense the in-the-money portion as compensation expense and thus avoid reductions in the Company's net income.  Keeping the scheme secret also hid the injury to the Company which occurred when executives and employees exercised the options and made capital contributions to Nabors that were less than they should have paid, had the options not been granted in-the-money.

74.   The scheme also conferred great personal financial benefits on Defendants.  Before the recent disclosures of Defendants' stock option backdating, Nabors' stock traded at prices as high as $41.35 per share, propelled in large part by the admittedly false financial statements that

Defendants had caused Nabors to issue.  Indeed, Nabors' stock price significantly increased in response to Nabors' reported financial statements that overstated income, net income and earnings per share as a result of the backdating.  While the price of Nabors' stock was artificially inflated, Defendants engaged in a massive insider trading bailout, selling more than $800 million worth of Nabors' stock in violation of securities laws.  When Nabors began to disclose the backdating and its impact in fall-winter 2006, Nabors' stock price significantly decreased in response.

75.     Nabors' directors profited handsomely from the backdating.  The members of Nabors' Compensation Committee alone during the period of backdating cashed in their options for over $70 million.  In all, the Board reaped over $628 million from exercising hundreds of thousands of their options.

## NABORS' FALSE AND MISLEADING PROXY STATEMENTS

76.     In its Proxies, the Company (and numerous Defendants) repeatedly communicated to Nabors' shareholders (i) that it was the Compensation Committee that was determining stock option grants pursuant to its authorization of the shareholders through Nabors' stock option plans, and also no executive officer was performing those functions, (ii) that had been granting and would continue to grant stock options priced in accordance with Nabors' stock option plans and at no less than fair market value at the date of grant, and (iii) that stock options were being granted prudently and consistent with the Company's compensation policies to compensate management through future growth in the Company's market value (*i.e.*, not by granting "in-the-money" stock options), so that option holders would benefit only when, and to the extent, the Company's stock price increased after the grant.

77.     But these statements (many of which are identified below) were materially false and misleading.  In truth, and as those who signed and approved Nabors' Proxies knew, Nabors' Compensation Committee (i) backdated and mispriced stock options in violation of Nabors' stock

option plans, and (ii) otherwise determined and granted option awards dated with dates prior to, the dates the awards were properly authorized, employees were entitled to receive the options, or the option or price was known.

78.     By issuing false and misleading statements in Nabors' Proxy Statements, the Defendants identified below were able to (i) increase the numbers of authorized shares of common stock of Nabors from which Defendants could gain shares by exercise of their backdated stock options; (ii) gain the ability to grant to themselves and others backdated stock options; and (iii) obtain elected directorships enabling them to perpetuate the scheme.  Were the truth disclosed, Nabors' shareholders would not have reasonably followed Defendants' recommendations concerning the proposals submitted for their approval in the Company's Proxy statements identified below.

**Proxy Statement Filed January 28, 1994**

79.     On or about January 28, 1994, Nabors filed with the SEC its Proxy Statement for the annual meeting of shareholders held on March 1, 1994 ("1994 Proxy Statement").  The 1994 Proxy Statement was signed by Isenberg and McLachlin, and reviewed and approved by Isenberg, McLachlin, Petrello, Sheinfeld, Wexler, Whitman, Schmidt and Koch.  The 1994 Proxy Statement also contained a "Report of the Compensation Committee" signed by Wexler and Sheinfeld.  Proxy at 18.

80.     The 1994 Proxy Statement made numerous significant representations concerning Nabors' stock option plans.  For instance, relating to the authority of the Compensation Committee to grant stock options, the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)     The 1994 Proxy Statement represented that the Compensation Committee was "responsible for" reviewing and administrating (among other compensation programs) stock options.  Proxy at 18.  The Report of the Compensation Committee further stated that the Committee was

"responsible for recommendations with regard to . . . stock option awards to employee directors and key employees" and stock option plans.  Proxy at 18.

(b)     The 1994 Proxy Statement also communicated that stock option grants were not being backdated and would not be backdated in the future.  In its Report, the Compensation Committee stated it granted stock options to the Company's officers and that "[a]ll option grants" it identified "for the past three years were made at fair market value [of the underlying Shares] at the time of grant so that holders will benefit from such options only when, and to the extent, the [Share] price increases after the option grant."  Proxy at 19.  When identifying stock option grants, the Proxy also stated the exercise price was "the fair market value of underlying Common Stock on the date of the grant," and made other statements of similar substance.  Proxy at 9.

(c)     In recommending approval of the 1993 Stock Option Plan for Non-Employee Directors ("1993 NED Plan"), the Proxy stated options were granted to the then-existing non-employee directors "at an exercise price" that was "the fair market value of the stock on that date."  Proxy at 25.  It further stated "[t]he option exercise price per share of common stock subject to an option" under the 1993 NED Plan "shall not be less than 100% of the fair market value on the date of the grant as defined in §6.3 of the Plan."  Proxy at 26.  Supporting these representations, the proposed Plan was attached to the Proxy Statement and expressly referenced.  The attached Plan further served to represent that option exercise prices under the Plan were and would not be less than 100% of the fair market value per share of the underlying common stock on the date of the grant of the option.  This was stated in sum and substance throughout the 1993 NED Plan's provisions concerning stock option grants.

(d)     In recommending approval of the 1993 Key Employee Stock Plan, the Proxy stated the Compensation Committee would "administ[er]" the 1993 Key Employee Stock Plan ("1993 Employee Stock Plan" or "1993 Plan") and with respect to stock options the "option exercise

price shall be set by the Committee, but shall be no less than the Fair Market Value per Share of Common Stock on the date of the grant of the option." Proxy at 29. The Proxy stated "[a]ll of the options granted under the Employee Plan will be at fair market value of the underlying stock on the date of the grant so that key employees will benefit only if the stock price increases," and the 1993 Plan "provides for the issuance of 'new' options at fair market value to replace exercised options." Proxy at 28. The Proxy further stated options were granted to top officers "at an exercise price" that was "based upon the closing market price of the Common Stock on the date of grant." Proxy at 28. Supporting these representations, the proposed 1993 Plan was attached to the Proxy Statement and expressly referenced. The attached 1993 Plan further served to represent that the "option exercise price shall be set by the Committee, but shall be no less than the Fair Market Value per Share of Common Stock on the date of the grant of the option." Proxy at 29. This was stated in sum and substance throughout the 1993 Plan's provisions concerning stock option grants.

81. The 1994 Proxy Statement representations were made in connection with and essential to a number of proposals Nabors' Board made to the Company's shareholders for a vote.

(a) The *first* proposal concerned "ELECTION OF DIRECTORS" – including certain of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to Nabors' shareholders. Each Defendant then a director, explicitly recommended "**[a vote] FOR the election of [each nominee]**." Proxy at 4.

(b) The *third* proposal concerned an amendment to the Company's Restated Certificate of Incorporation which authorized Nabors to increase to 200 million the number of shares of common stock the Company would be authorized to issue. Each Defendant then a director, explicitly recommended Nabors' shareholders approve the amendment: "**[The Board of Directors recommends a vote] FOR the amendment to the Restated Certificate of Incorporation.**" Proxy at 3.

(c)     The *fourth* proposal concerned "APPROVAL OF THE 1993 STOCK OPTION PLAN FOR NON-EMPLOYEE DIRECTORS."  Proxy at 25.  Each Defendant then a director, explicitly recommended approval of this proposal: **"The Board of Directors recommends a vote FOR the approval of the Plan."**  Proxy at 27.

(d)     The *fifth* proposal concerned "APPROVAL OF THE 1993 KEY EMPLOYEE STOCK PLAN."  Proxy at 28.  Each Defendant then a director,  explicitly recommended approval of the Plan: "**The Board of Directors recommends a vote FOR the approval of the Plan**."  Proxy at 30.

**Proxy Statement Filed January 27, 1995**

82.     On or about January 27, 1995, Nabors filed with the SEC its Proxy Statement for the annual meeting of shareholders held on March 7, 1995 ("1995 Proxy Statement").  The 1995 Proxy Statement was signed by Isenberg and McLachlin, and reviewed and approved by Isenberg, McLachlin, Petrello, Sheinfeld, Wexler, Whitman, Schmidt and Koch.  The 1995 Proxy Statement also contained a "Report of the Compensation Committee" signed by Wexler and Sheinfeld.  Proxy at 13.

83.     The 1995 Proxy Statement made numerous significant representations concerning Nabors' stock option plans.  For instance, relating to the authority of the Compensation Committee to grant stock options, the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)     The 1995 Proxy Statement represented that the Compensation Committee was "responsible for" reviewing and administrating (among other compensation programs) stock options. Proxy at 5.  The Report of the Compensation Committee further stated that the Committee was "responsible for recommendations with regard to . . . stock option [grants] to [management] and [other] key employees."  Proxy at 13.

(b)      The 1995 Proxy Statement also communicated that stock option grants were not being backdated and would not be backdated in the future.  In its Report the Compensation Committee stated it granted stock options to the Company's officers and that "[a]ll option grants" it identified "for the past three years were made at fair market value [of the underlying Shares] at the time of grant so that holders will benefit from such options only when, and to the extent, the [Share] price increases after the option grant."  Proxy at 14.  When identifying stock option grants, the Proxy also stated the exercise price was "the fair market value of an underlying Share on the date of the grant," and made other statements of similar substance.  Proxy at 6.

84.      The 1995 Proxy Statement representations were made in connection with and essential to a proposal concerning the election of Nabors' directors – including certain of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to Nabors' shareholders.  Each Defendant then a director, recommended "**a vote FOR the Election of each nominee,**" as stated on the reverse side of the proxy card.

**Proxy Statement Filed January 31, 1996**

85.      On or about January 31, 1996, Nabors filed with the SEC its Proxy Statement for the annual meeting of shareholders held on March 5, 1996 ("1996 Proxy Statement").  The 1996 Proxy Statement was signed by Isenberg and McLachlin, and reviewed and approved by Isenberg, McLachlin, Petrello, Sheinfeld, Wexler, Whitman, Schmidt and Koch.  The 1996 Proxy Statement also contained a "Report of the Compensation Committee" signed by Wexler and Sheinfeld.  Proxy at 17.

86.      The 1996 Proxy Statement made numerous significant representations concerning Nabors' stock option plans.  For instance, relating to the authority of the Compensation Committee to grant stock options, the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

- 56 -

(a)      The 1996 Proxy Statement represented that the Compensation Committee was "responsible for" reviewing and administrating (among other compensation programs) stock options. Proxy at 10-11.  The Report of the Compensation Committee further stated that the Committee was "responsible for recommendations with regard to . . . stock option grants to management and other key employees."  Proxy at 17.  The 1996 Proxy Statement also attached the Company's proposed Incentive Compensation Plan and 1996 Employee Stock Plan which contained numerous provisions giving the Compensation Committee final authority and discretion to determine and grant stock options.  *See* Incentive Compensation Plan §§2(c), 4(f); 1996 Employee Stock Plan §§2, 5-6.

(b)      The 1996 Proxy Statement also communicated that stock option grants were not being backdated and would not be backdated in the future.  In its Report the Compensation Committee stated it granted stock options to the Company's officers and that "[a]ll option grants" it identified "for the past three years were made at market value of the underlying Shares at the time of grant so that holders will benefit from such options only when, and to the extent, the Share price increases after the option grant."  Proxy at 18.  When identifying stock option grants, the Proxy also stated the "exercise price was equal to the per Share market price on the date of the grant," the "exercise price was equal to the current market price of the underlying stock on the date of the grant," the "per Share exercise price" was "the market value of an underlying Share on the date of the grant," and made other statements of similar substance.  Proxy at 14-15, 19.

(c)      In recommending approval of the 1996 Employee Stock Plan, the Proxy stated the Compensation Committee would "administ[er]" the 1996 Employee Stock Plan ("1995 Employee Stock Plan" or "1996 Plan") and with respect to stock options would "determine which Covered Persons will receive . . . option grants" and "the size, timing and duration" and "the exercise price of the option grants."  Proxy at 24.  It further stated "the option exercise price shall be set by the Committee, but shall be no less than the Fair Market Value per Share on the date of the grant of

the option." Proxy at 25. Supporting these representations, the proposed 1996 Plan was attached to the Proxy Statement and expressly incorporated by reference. The attached 1996 Plan further served to represent that the "option exercise price shall be set by the Committee, but . . . shall be no less than 100% of the Fair Market Value per Share of Common Stock on the date of the grant of the option." Proxy at 36. This was stated in sum and substance throughout the 1996 Plan's provisions concerning stock option grants.

87.    The 1996 Proxy Statement representations were made in connection with and essential to a number of proposals Nabors' Board made to the Company's shareholders for a vote.

(a)    The *first* proposal concerned "ELECTION OF DIRECTORS" – including certain of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to Nabors' shareholders. Proxy at 7.

(b)    The *second* proposal concerned "APPROVAL OF THE INCENTIVE COMPENSATION PLAN." Each Defendant a director at the time, explicitly recommended approval of this proposal: "THE BOARD RECOMMENDS THAT SHAREHOLDERS VOTE FOR THE INCENTIVE COMPENSATION PLAN." Proxy at 21-22.

(c)    The *third* proposal concerned "APPROVAL OF THE 1996 EMPLOYEE STOCK PLAN." Each Defendant a director at the time, recommended approval of the Plan: "THE BOARD OF DIRECTORS RECOMMENDS THAT SHAREHOLDERS VOTE FOR THE 1996 EMPLOYEE STOCK PLAN." Proxy at 23, 27.

**Proxy Statement filed March 4, 1997**

88.    On or about March 4, 1997, Nabors filed with the SEC its Proxy Statement for the 1997 annual meeting of shareholders ("1997 Proxy Statement"). The 1997 Proxy Statement was signed by Isenberg and McLachlin, and reviewed and approved by Isenberg, McLachlin, Petrello,

- 58 -

Sheinfeld, Wexler, Whitman, Schmidt and Koch.  The 1997 Proxy Statement also contained a "Report of the Compensation Committee" signed by Wexler and Sheinfeld.  Proxy at 17.

89.     The 1997 Proxy Statement made numerous significant representations concerning Nabors' stock option plans.  For instance, relating to the authority of the Compensation Committee to grant stock options, the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)     The 1997 Proxy Statement represented that the Compensation Committee was "responsible for" reviewing and administrating (among other compensation programs) stock options.  Proxy at 11.  The Report of the Compensation Committee further stated that the Committee was "responsible for recommendations with regard to . . . stock option grants to management and other key employees."  Proxy at 17.

(b)     The 1997 Proxy Statement also communicated that stock option grants were not being backdated and would not be backdated in the future.  The Report of the Compensation Committee stated the Committee granted stock options to the Company's officers and that "[a]ll option grants" it identified "for the past three years were made at market value of the underlying Shares at the time of grant so that holders will benefit from such options only when, and to the extent, the Share price increases after the option grant."  Proxy at 18.  When identifying stock option grants, the Proxy also stated the "exercise price was equal to the per Share market price on the date of the grant," the "per Share exercise price" was "the market value of an underlying Share on the date of the grant," and statements of similar substance.  Proxy at 15, 19.  The Report of the Compensation Committee also discussed the "Incentive Bonus Program," and in particular the granting of stock options.  The Proxy stated that "stock option grants . . . are critical in motivating and rewarding the creation of long-term shareholder value" and that "stock options align[] executive interests with shareholders."  Proxy at 18-19.  Thus, stock options were not being backdated but

rather were granted to incentivize the Company's management by the granting of market value options.

90.     The 1997 Proxy Statement representations were made in connection with and essential to a proposal concerning the election of Nabors' directors – including certain of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to Nabors' shareholders.  Each Defendant then a director, recommended "a vote FOR the Election of each nominee for Director."  Proxy at 24.

**Proxy Statement filed March 3, 1998**

91.     On or about March 3, 1998, Nabors filed with the SEC its Proxy Statement for the 1998 annual meeting of shareholders ("1998 Proxy Statement").  The 1998 Proxy Statement was signed by Isenberg and McLachlin, and reviewed and approved by Isenberg, McLachlin, Petrello, Sheinfeld, Wexler, Whitman, Schmidt and Koch.  The 1998 Proxy Statement also contained a "Report of the Compensation Committee" signed by Wexler and Sheinfeld.  Proxy at 20.

92.     The 1998 Proxy Statement made numerous significant representations concerning Nabors' stock option plans.  For instance, relating to the authority of the Compensation Committee to grant stock options, the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)     The 1998 Proxy Statement represented that the Compensation Committee was "responsible for" reviewing and administrating (among other compensation programs) stock options.  Proxy at 11.  The "Report of the Compensation Committee" further stated that the Committee was "responsible for recommendations with regard to . . . stock option grants to management and other key employees."  Proxy at 20.

(b)     The 1998 Proxy Statement also communicated that stock option grants were not being backdated and would not be backdated in the future.  The Report of the Compensation

Committee stated the Committee granted stock options to the Company's officers and that "[a]ll option grants" it identified "for the past three years were made at market value of the underlying Shares at the time of grant so that holders will benefit from such options only when, and to the extent, the Share price increase after the option grant." Proxy at 21.  When identifying stock option grants, the Proxy also stated the "exercise price was equal to the per Share market price on the date of the grant," the "[a]ll options are granted at an exercise price equal to the market value of the Shares on the date of the grant," the "per Share exercise price" was "the market value of an underlying Share on the date of the grant," and statements of similar substance.  Proxy at 17, 21. The "Report of the Compensation Committee" also discussed the "Incentive Bonus Program," and in particular the granting of stock options.  It stated that "stock option grants . . . are critical in motivating and rewarding the creation of long-term shareholder value" and that "stock options align[] executive interests with shareholders."  Proxy at 21.  Thus, stock options were not being backdated but rather were granted to incentivize the Company's management by the granting of market value options.

(c)     The 1998 Proxy Statement representations were made in connection with and essential to a proposal concerning "ELECTION OF DIRECTORS" – including certain of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to Nabors' shareholders.  Proxy at 7.  Each Defendant then a director, recommended "A VOTE FOR THE ELECTION OF EACH NOMINEE FOR DIRECTOR."  Proxy at 25.

**Proxy Statement filed June 8, 1999**

93.     On or about June 8, 1999, Nabors filed with the SEC its Proxy Statement for the 1999 annual meeting of shareholders ("1999 Proxy Statement").  The 1999 Proxy Statement was signed by Isenberg and McLachlin, and reviewed and approved by Isenberg, McLachlin, Petrello,

Sheinfeld, Wexler, Whitman, Schmidt and Koch.  The 1999 Proxy Statement also contained a "Report of the Compensation Committee" signed by Wexler and Sheinfeld.  Proxy at 23.

94.     The 1999 Proxy Statement made numerous significant representations concerning Nabors' stock option plans.  For instance, relating to the authority of the Compensation Committee to grant stock options, the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)     The 1999 Proxy Statement represented that the Compensation Committee was "responsible for" reviewing and administrating (among other compensation programs) stock options.  Proxy at 12.  The Report of the Compensation Committee further stated that the Committee was "responsible for recommendations with regard to . . . stock option grants to management and other key employees."  Proxy at 24.

(b)     The 1999 Proxy Statement also communicated that stock option grants were not being backdated and would not be backdated in the future.  When identifying stock option grants, the Proxy stated "[a]ll options are granted at an exercise price equal to the market value of the shares on the date of the grant," the "per share exercise price" was "the market value of an underlying Share on the date of the grant," and statements of similar substance.  Proxy at 20, 25.  The 1999 Proxy Statement also stated that certain stock options had been repriced to "an exercise price of . . . $12.50, the closing stock price on that day."  Proxy at 22.  The Report of the Compensation Committee discussed the "Incentive Bonus Program," and in particular the granting of stock options.  It stated that "stock option grants . . . are critical in motivating and rewarding the creation of long-term shareholder value" and that "stock options align[] executive interests with shareholders."  Proxy at 25.  Thus, stock options were not being backdated but rather were granted to incentivize the Company's management by the granting of market value options.

95.    The 1999 Proxy Statement representations were made in connection with and essential to a proposal concerning "ELECTION OF DIRECTORS" – including certain of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to Nabors' shareholders.  Each Defendant then a director, recommended "A VOTE FOR THE ELECTION OF EACH NOMINEE FOR DIRECTOR."  Proxy at 7, 30.

**Proxy Statement filed June 6, 2000**

96.    On or about June 6, 2000, Nabors filed with the SEC its Proxy Statement for the 2000 annual meeting of shareholders ("2000 Proxy Statement").  The 2000 Proxy Statement was signed by Isenberg and McLachlin, and reviewed and approved by Isenberg, McLachlin, Payne, Petrello, Sheinfeld, Wexler, Whitman, Schmidt and Koch.  The 2000 Proxy Statement also contained a "Report of the Compensation Committee" signed by Wexler and Sheinfeld.  Proxy at 18.

97.    The 2000 Proxy Statement made numerous significant representations concerning Nabors' stock option plans.  For instance, relating to the authority of the Compensation Committee to grant stock options, the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)    The 2000 Proxy Statement represented that the Compensation Committee was "responsible for" reviewing and administrating (among other compensation programs) stock options. Proxy at 18.  The Report of the Compensation Committee further stated that the Committee was "responsible for recommendations with regard to . . . stock option grants to management and other key employees."  Proxy at 18.

(b)    The 2000 Proxy Statement also communicated that stock option grants were not being backdated and would not be backdated in the future.  When identifying stock option grants, the Proxy stated "[a]ll options are granted at an exercise price equal to the market value of [the Shares] on the date of [the] grant," and statements of similar substance.  Proxy at 15.  The

Report of the Compensation Committee discussed the "Incentive Bonus Program," and in particular the granting of stock options.  It stated that "stock option grants . . . are critical in motivating and rewarding the creation of long-term shareholder value" and that stock options align executive interests with shareholders.  Proxy at 19.  Thus, stock options were not being backdated but rather were granted to incentivize the Company's management by the granting of market value options.

98.     The 2000 Proxy Statement representations were made in connection with and essential to a number of proposals Nabors' Board made to the Company's shareholders for a vote.

(a)     The *first* proposal concerned "ELECTION OF DIRECTORS" – certain of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to Nabors' shareholders.  Proxy at 6.  Each Defendant then a director, explicitly recommended approval of this proposal:  "THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR THE ELECTION OF THE . . . NOMINEES."  Proxy at 6.

(b)     The **second** proposal concerned an amendment to the Company's Restated Certificate of Incorporation to authorized Nabors to issue an additional 200 million shares of common stock.  Each Defendant then a director, explicitly recommended Nabors' shareholders approve the amendment: "THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR THE AMENDMENT TO THE RESTATED CERTIFICATE OF INCORPORATION."  Proxy at 25.

**Proxy Statement filed June 5, 2001**

99.     On or about June 5, 2001, Nabors filed with the SEC its Proxy Statement for the 2001 annual meeting of shareholders ("2001 Proxy Statement").  The 2001 Proxy Statement was signed by Isenberg and McLachlin, and reviewed and approved by Isenberg, McLachlin, Petrello, Payne, Sheinfeld, Wexler, Whitman, Schmidt and Koch.  The 2001 Proxy Statement also contained a "Report of the Compensation Committee" signed by Wexler and Sheinfeld.  Proxy at 18.

100.    The 2001 Proxy Statement made numerous significant representations concerning Nabors' stock option plans.  For instance, relating to the authority of the Compensation Committee to grant stock options, the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)    The 2001 Proxy Statement represented that the Compensation Committee was "responsible for" reviewing and administrating (among other compensation programs) stock options. Proxy at 18.  The Report of the Compensation Committee further stated that the Committee was "responsible for recommendations with regard to . . . stock option grants to management and other key employees."  Proxy at 18.

(b)    The 2001 Proxy Statement also communicated that stock option grants were not being backdated and would not be backdated in the future.  When identifying stock option grants, the Proxy stated the "exercise price was equal to the per Share market price on the date of the grant," the "[a]ll options are granted at an exercise price equal to the market value of [the Shares] . . . on the date of [the] grant," the "per [S]hare exercise price" was "the market value of an underlying [S]hare on the date of [the] grant," and statements of similar substance.  Proxy at 15, 19.  The Report of the Compensation Committee discussed the "Incentive Bonus Program," and in particular the granting of stock options.  It stated that "stock option grants . . . are critical in motivating and rewarding the creation of long-term shareholder value."  Proxy at 19.  Thus, stock options were not being backdated but rather were granted to incentivize the Company's management by the granting of market value options.

(c)    The 2001 Proxy Statement representations were made in connection with and essential to a proposal concerning "ELECTION OF DIRECTORS" – including certain of the same directors who were backdating and/or receiving backdated stock options and making

misrepresentations to Nabors' shareholders.   Proxy at 6.   Each Defendant then a director,

recommended "A VOTE FOR THE ELECTION OF THE . . . NOMINEES."  Proxy at 6.

**Proxy Statement filed June 4, 2002**

101.   On or about June 4, 2002, Nabors filed with the SEC its Proxy Statement for the 2002

annual meeting of shareholders ("2002 Proxy Statement").  The 2002 Proxy Statement was signed

by Isenberg and McLachlin, and reviewed and approved by Isenberg, McLachlin, Petrello, Payne,

Sheinfeld, Wexler, Whitman, Schmidt and Koch.   The 2002 Proxy Statement also contained a

"Report of the Compensation Committee" signed by Wexler and Sheinfeld.  Proxy at 18.

102.   The 2002 Proxy Statement made numerous significant representations concerning

Nabors' stock option plans.  For instance, relating to the authority of the Compensation Committee

to grant stock options, the purpose of stock option grants, how stock options were being granted, and

how stock options would be granted in the future.

(a)   The 2002 Proxy Statement represented that the Compensation Committee was

"responsible for" reviewing and administrating (among other compensation programs) stock options.

Proxy at 18.  The Report of the Compensation Committee further stated that the Committee was

"responsible for [recommendations with regard to] . . . stock option grants to management and other

key employees."  Proxy at 18.

(b)   The 2002 Proxy Statement also communicated that stock option grants were

not being backdated and would not be backdated in the future.  When identifying stock option

grants, the Proxy stated "[a]ll of the options were granted at a per share price" equal to "the market

value of a share on the date of grant," the "per Share exercise price" was "the market value of an

underlying Share on the date of the grant," and statements of similar substance.  Proxy at 12, 19.

The Report of the Compensation Committee discussed the "Incentive Bonus Program," and in

particular the granting of stock options.  Proxy at 19.  It stated that "stock option grants . . . are

critical in motivating and rewarding the creation of long-term shareholder value." Proxy at 19. Thus, stock options were not being backdated but rather were granted to incentivize the Company's management by the granting of market value options.

103.    The 2002 Proxy Statement representations were made in connection with and essential to a proposal concerning "ELECTION OF DIRECTORS" – including certain of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to Nabors' shareholders.   Proxy at 6.   Each Defendant then a director, recommended "A VOTE FOR THE ELECTION OF THE . . . NOMINEES."[2]  Proxy at 6.

**Proxy Statement filed June 3, 2003**

104.    On or about June 3, 2003, Nabors filed with the SEC its Proxy Statement for the 2003 annual meeting of shareholders ("2003 Proxy Statement").  The 2003 Proxy Statement was signed by Isenberg and McLachlin, and reviewed and approved by Isenberg, McLachlin, Petrello, Payne, Sheinfeld, Wexler, Whitman, Schmidt and Koch.  The 2003 Proxy Statement also contained a "Report of the Compensation Committee" signed by Wexler and Sheinfeld.  Proxy at 22.

105.    The 2003 Proxy Statement made numerous significant representations concerning Nabors' stock option plans.  For instance, relating to the authority of the Compensation Committee to grant stock options, the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)    The 2003 Proxy Statement represented that the Compensation Committee was "responsible for" overseeing the administration of compensation programs, including stock options, and setting the compensation of key executives.  The 2003 Proxy Statement also attached a charter

---

[2]    The 2002 Proxy Statement also contained a shareholder proposal that the Board "set a goal of establishing a board of directors with at least two-thirds of its members being independent directors," which the Board recommended "AGAINST."  Proxy at 25-26.

of the Compensation Committee stating the Committee reviewed proposed stock option awards. Proxy at 22.  Also attached to the 2003 Proxy Statement was the Company's proposed 2003 Employee Stock Plan, which contained numerous provisions giving the Compensation Committee (at the Board's discretion) "the power and authority, without limitation" to determine the terms of and grant (among other compensation) stock options.  *See* 2003 Employee Stock Plan §§3, 5-7.

        (b)      The 2003 Proxy Statement also communicated that stock option grants were not being backdated and would not be backdated in the future.  Referencing option grants, the Proxy stated that "[a]ll options are granted at an exercise price equal to the market value of Nabors' common stock on the date of grant," (Proxy at 19), "[a]ll of the options were granted at a per share price" that was "the market value of the Company's shares on the date of grant," (Proxy at 14), the "exercise price of the options awarded is . . . the closing price per share . . . on the grant date," and statements of similar substance.  Proxy at 17.  The Report of the Compensation Committee discussed the "Incentive Bonus Program," and in particular the granting of stock options.  It stated that "stock option grants . . . are critical in motivating and rewarding the creation of long-term shareholder value."  Proxy at 23.  Thus, stock options were not being backdated but rather were granted to incentivize the Company's management by the granting of market value options.

        (c)      In recommending approval of the 2003 Employee Stock Plan, the Proxy stated that the Board anticipated the Compensation Committee would administer the 2003 Employee Stock Plan and that subject to the provisions of the 2003 Stock Plan the Committee would "determine the persons to whom awards will be granted, the type of awards to be granted, the number of shares to be made subject to awards and the exercise price."  Proxy at 28.  It further stated "[t]he exercise price of a stock option granted under the Plan will be determined by the Committee at the time the option is granted, but the exercise price may not be less than the fair market value of the common shares (determined generally as the closing price per common share of the Company on the date of

grant)." Proxy at 29.  Supporting these representations, the proposed 2003 Employee Stock Plan was attached to the Proxy Statement.  The attached 2003 Employee Stock Plan further served to represent:  "The per share Exercise Price of Shares purchasable under an Option shall be determined by the Administrator in its sole discretion at the time of grant but shall not be less than 100% of the Fair Market Value per Share on such date . . . ."  Proxy at 56.  This was stated in sum and substance throughout the 2003 Plan's provisions concerning stock option grants.

106.    The 2003 Proxy Statement representations were made in connection with and essential to a number of proposals Nabors' Board made to the Company's shareholders for a vote.

(a)    "PROPOSAL NO. 1" concerned "ELECTION OF DIRECTORS" – including certain of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to Nabors' shareholders.  Each Defendant then a director, explicitly recommended approval of this proposal: "THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR THE ELECTION OF THE . . . DIRECTOR NOMINEES . . . ."  Proxy at 8.

(b)    "PROPOSAL NO. 3" concerned "APPROVAL OF THE 2003 EMPLOYEE STOCK PLAN."  Proxy at 27.  Each Defendant then a director, explicitly recommended approval of this proposal: "THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR THE APPROVAL OF THE NABORS INDUSTRIES LTD. 2003 EMPLOYEE STOCK PLAN."  Proxy at 32.

**Proxy Statement filed June 1, 2004**

107.    On or about June 1, 2004, Nabors filed with the SEC its Proxy Statement for the 2004 annual meeting of shareholders ("2004 Proxy Statement").  The 2004 Proxy Statement was signed by Isenberg and McLachlin, and reviewed and approved by Isenberg, McLachlin, Petrello, Payne, Sheinfeld, Wexler, Whitman, Schmidt and Koch.  The 2004 Proxy Statement also contained a "REPORT OF THE COMPENSATION COMMITTEE . . ." signed by Wexler, Sheinfeld and Whitman.  Proxy at 18.

108.     The 2004 Proxy Statement made numerous significant representations concerning Nabors' stock option plans, for instance, relating to the authority of the Compensation Committee to grant stock options, the purpose of stock option grants, how stock options were being granted and how stock options would be granted in the future.

(a)     The 2004 Proxy Statement represented that the Compensation Committee was "responsible for" overseeing the administration of compensation programs, including stock options, and setting the compensation of key executives.  The 2004 Proxy Statement also referenced a charter of the Compensation Committee stating the Committee reviewed proposed stock option awards. Proxy at 18.

(b)     The 2004 Proxy Statement also communicated that stock option grants were not being backdated and would not be backdated in the future.  Referencing option grants, the Proxy stated that "[a]ll options are granted at an exercise price equal to the closing price of Nabors' common shares on the date of grant," (Proxy at  15),"[a]ll of the options were granted at a per share price" that was "the closing price of the Company's shares on the date of grant," (Proxy at 10), that stock options were granted "with a per share exercise price" that was "the closing price of an underlying share on the date of grant," (Proxy at 19), that the "exercise price of the options awarded is . . . the closing price per common share . . . on the grant date," and statements of similar substance. Proxy at 13.  The Report of the Compensation Committee discussed the "Incentive Bonus Program," and in particular the granting of stock options.  It stated that "stock option grants . . . are critical in motivating and rewarding the creation of long-term shareholder value."  Proxy at 19.  Thus, stock options were not being backdated but rather were granted to incentivize the Company's management by the granting of market value options.

109.     The 2004 Proxy Statement representations were made in connection with and essential to a proposal concerning "ELECTION OF DIRECTORS" – including certain of the same

directors who were backdating and/or receiving backdated stock options and making misrepresentations to Nabors' shareholders.  Each Defendant then a director, recommended "A VOTE FOR THE ELECTION OF MESSRS. PAYNE AND SCHMIDT."[3]  Proxy at 4.

**Proxy Statement filed June 7, 2005**

110.    On or about June 7, 2005, Nabors filed with the SEC its Proxy Statement for the 2005 annual meeting of shareholders ("2005 Proxy Statement").  The 2005 Proxy Statement was signed by Isenberg and McLachlin, and reviewed and approved by Isenberg, McLachlin, Petrello, Payne, Sheinfeld, Wexler, Whitman, Knaster, Schmidt and Koch.  The 2005 Proxy Statement also contained a "REPORT OF THE COMPENSATION COMMITTEE" signed by Wexler, Sheinfeld and Whitman.  Proxy at 18.

111.    The 2005 Proxy Statement made numerous significant representations concerning Nabors' stock option plans, for instance, relating to the authority of the Compensation Committee to grant stock options, the purpose of stock option grants, how stock options were being granted and how stock options would be granted in the future.

(a)    The 2005 Proxy Statement represented that the Compensation Committee was "responsible for" overseeing the administration of compensation programs, including stock options, and setting the compensation of key executives.  The 2005 Proxy Statement also referenced a charter of the Compensation Committee stating the Committee reviewed proposed stock option awards.  Proxy at 18.

(b)    The 2005 Proxy Statement also communicated that stock option grants were not being backdated and would not be backdated in the future.  Referencing option grants, the Proxy

---

[3]    The 2004 Proxy Statement also contained a shareholder proposal that the Board "take the measures necessary to change the Company's jurisdiction of incorporation from Bermuda to Delaware," which the Board recommended "AGAINST."  Proxy at 24-25.

stated that "[a]ll options are granted at an exercise price equal to the closing price of Nabors' common shares on the date of grant," (Proxy at 15), the "exercise price of the options awarded is . . . the closing price per share . . . on the grant date," and statements of similar substance.  Proxy at 13.  The Report of the Compensation Committee discussed the "INCENTIVE BONUS PROGRAM," and in particular the granting of stock options.  It stated that stock option grants/equity awards "are critical in motivating and rewarding the creation of long-term shareholder value."  Proxy at 19.  Thus, stock options were not being backdated but rather were granted to incentivize the Company's management by the granting of market value options.

        (c)      In recommending an amendment to the 2003 Employee Stock Plan to make nonemployee directors (including the Compensation Committee) eligible participants and to reserve for issuance 3.5 million common shares, the Proxy attached and explicitly referenced the 2003 Employee Stock Plan (as amended).  The attached 2003 Employee Stock Plan (as amended) further served to represent: "The per share Exercise Price of Shares purchasable under an Option shall be determined by the Administrator in its sole discretion at the time of grant but shall not be less than 100% of the Fair Market Value per Share on such date . . . ."  Proxy at 35.  This was stated in sum and substance throughout the 2003 Plan's provisions concerning stock option grants.

        (d)      In recommending shareholders vote ***against*** a shareholder proposal to require the Company to adopt a policy that a significant amount of future stock grants to senior executives be performance-based, the 2005 Proxy stated: the stock options that had been granted "already are performance-based because ***the exercise price equals the market value of Company's common stock on the date of award.  Accordingly, no economic benefit is conferred on the optionee unless the Company's stock increases in value subsequent to the award date.***"  Proxy at 27.  In particular, the shareholder proposal sought: (i) indexed options, in which the exercise price is linked to an industry or well-defined peer group index; (ii) premium-priced stock options, in which the exercise

price is set above the market price on the grant date; or (iii) performance-vesting options, which vest when a performance target is met.  The Board rejected this proposal, calling it "unnecessary and detrimental to the long-term interests of the Company's stockholders."  Proxy at 28.  According to the Board, because in existing options "the exercise price equals the market value of Company's common stock on the date of award," employees "realize the full benefits of positive market performance and experience the effects of negative market performance, *as do shareholders*" and use of such stock options "is *directly aligned with the interests of stockholders*."  Proxy at 27.

112.    The 2005 Proxy Statement representations were made in connection with and essential to a number of proposals Nabors' Board made to the Company's shareholders for a vote, and the Board's position with respect to a shareholder's proposal.

(a)      The *first* proposal concerned "ELECTION OF DIRECTORS" – including certain of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to Nabors' shareholders.  Each Defendant then a director, explicitly recommended approval of this proposal:  "THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR THE ELECTION OF MESSRS. PETRELLO, SHEINFELD AND WHITMAN . . . ."  Proxy at 4.

(b)      The *fourth* proposal concerned the amendment of the 2003 Employee Stock Plan to make nonemployee directors (including the Compensation Committee) eligible participants and to reserve for issuance 3.5 million common shares.  Each Defendant then a director, explicitly recommended approval of this proposal: "THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR THE APPROVAL OF THE AMENDMENT TO THE 2003 EMPLOYEE STOCK PLAN." Proxy at 26.

(c)      The *fifth* proposal was the shareholder proposal to require the Company to adopt a policy that a significant amount of future stock grants to senior executives be: (i) indexed

options, in which the exercise price is linked to an industry or well-defined peer group index; (ii) premium-priced stock options, in which the exercise price is set above the market price on the grant date; or (iii) performance-vesting options, which vest when a performance target is met.  Each Defendant then a director, explicitly recommended *against* approval of this proposal: "THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE AGAINST THE SHAREHOLDER PROPOSAL."  Proxy at 27.

**Proxy Statement filed May 4, 2006**

113.    On May 4, 2006, Nabors filed with the SEC its Proxy Statement for the 2006 annual meeting of shareholders ("2006 Proxy Statement").  The 2006 Proxy Statement was signed by Isenberg and McLachlin, and reviewed and approved by Isenberg, McLachlin, Petrello, Payne, Sheinfeld, Whitman, Knaster, Schmidt and Koch.  The 2006 Proxy Statement also contained a "Report of the Compensation Committee" signed by Whitman, Knaster, Payne, Schmidt and Sheinfeld.

114.    The 2006 Proxy Statement made numerous significant representations concerning Nabors' stock option plans, for instance, relating to the authority of the Compensation Committee to grant stock options, the purpose of stock option grants, how stock options were being granted and how stock options would be granted in the future.

(a)    The 2006 Proxy Statement represented that the Compensation Committee was "responsible for" overseeing the administration of compensation programs, including stock options, and setting the compensation of key executives.  The 2006 Proxy Statement also referenced a charter of the Compensation Committee stating the Committee reviewed proposed stock option awards. Proxy at 20.

(b)    The 2006 Proxy Statement also communicated that stock option grants were not being backdated and would not be backdated in the future.  Referencing option grants, the Proxy

stated that "[a]ll options are granted at an exercise price equal to the closing price of Nabors' common shares on the date of grant," (Proxy at 16), the "exercise price of the options awarded is . . . the closing price per share . . . on the grant date," and statements of similar substance.  The Report of the Compensation Committee discussed the "Incentive Bonus Program," and in particular the granting of stock options.  It stated that stock option grants/equity awards "are critical in motivating and rewarding the creation of long-term shareholder value."  Proxy at 21.  Thus, stock options were not being backdated but rather were granted to incentivize the Company's management by the granting of market value options.

(c)     In recommending approval of an amendment to the 2003 Employee Stock Plan to increase the number of shares that may be issued under the Plan to 7 million common shares, and to provide for automatic increases in the future, the Proxy stated the Compensation Committee would "administer" the Amended and Restated 2003 Employee Stock Plan and with respect to stock options would "determine the persons to whom awards will be granted . . . the number of shares to be made subject to awards and the exercise price."  Proxy at 28.  It further stated "[t]he exercise price of a stock option granted under the Plan is determined by the Committee at the time the option is granted, but the exercise price may not be less than the fair market value of the common shares (determined generally as the closing price per common share of the Company on the date of grant)."  Proxy at 29.  Supporting these representations, the proposed Amended and Restated 2003 Employee Stock Plan was attached to the Proxy Statement and expressly referenced.  The attached Amended and Restated 2003 Employee Stock Plan further served to represent: "The per share Exercise Price of Shares purchasable under an Option shall be determined by the Administrator in its sole discretion at the time of grant but shall not be less than 100% of the Fair Market Value per Share on such date . . . ."  Proxy at 39.  This was stated in sum and substance throughout the Amended and Restated 2003 Employee Stock Plan's provisions concerning stock option grants.

115.     The 2006 Proxy Statement representations were made in connection with and essential to a number of proposals Nabors' Board made to the Company's shareholders for a vote.

(a)     The *first* proposal concerned "ELECTION OF DIRECTORS" – including certain of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to Nabors' shareholders.  Proxy at 5.  Each Defendant then a director, explicitly recommended approval of this proposal: "THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR THE ELECTION OF MR. ISENBERG . . . ."  Proxy at 6.

(b)     The *third* proposal concerned the amendment of the 2003 Employee Stock Plan to increase the number of shares that may be issued under the Plan to 7 million common shares, and to provide for automatic increases in the future.  Each Defendant then a director, explicitly recommended approval of this proposal: "THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR THE APPROVAL OF NABORS INDUSTRIES LTD. AMENDED AND RESTATED 2003 EMPLOYEE STOCK PLAN."  Proxy at 32.

116.     Complicating matters and magnifying the harm to Nabors, during the relevant period, Nabors' internal controls and accounting controls with respect to option grants and exercises, and its financial reporting, were grossly inadequate.  The weaknesses allowed dates of both grants and exercises to be manipulated and the Company's executive compensation expenses to be materially understated.  They also allowed grant dates to be changed to provide executives with more favorably priced options, in effect augmenting their compensation, with no benefit running to the Company.

117.     Through their fiduciary duties of care, good faith and loyalty, Defendants owed to Nabors a duty to ensure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company.  In order to adequately carry out these duties, it is necessary for the Defendants to know and understand the material non-public information to be either disclosed or omitted from the Company's public statements.  This material

- 76 -

non-public information included the problems Nabors faced because of its deficient internal controls. Furthermore, Defendants Sheinfeld, Whitman and Schmidt, as members of the Audit Committee during the relevant period, had a special duty to know and understand this material information as set out in the Audit Committee's charter, which provides that the Audit Committee is responsible for reviewing, in conjunction with management, the Company's policies generally with respect to the Company's earnings press releases and with respect to financial information and earnings guidance provided to analysts and rating agencies. Defendants, as directors or officers of Nabors, had ample opportunity to discuss this material information with fellow directors or officers at any of the scores of Board or management meetings that occurred during the relevant period as well as at committee meetings of the Board. Despite these duties, Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, the misleading statements to be disseminated by Nabors to the investing public and the Company's shareholders during the relevant period.

118.    Specifically, since at least 1995, Defendants have caused Nabors to report false and misleading fiscal and quarterly financial results which materially understated its compensation expenses and thus overstated its earnings as follows:

| Fiscal Year[4] | Reported Earnings (In Millions) | Reported Diluted Earnings Per Share From Continuing Operations |
|---|---|---|
| 1995 | $ 51.10 | $0.29 |
| 1996 | $ 70.50 | $0.38 |
| 1997 | $114.81 | $0.54 |
| 1998 | $124.99 | $0.58 |
| 1999 | $ 27.70 | $0.12 |
| 2000 | $137.36 | $0.45 |
| 2001 | $357.45 | $1.17 |
| 2002 | $121.49 | $0.41 |
| 2003 | $192.23 | $0.63 |

---

[4]    Effective January 1, 1998, Nabors changed its fiscal year-end from September 30 to December 31. As a result, Nabors' fiscal years prior to January 1, 1998 ran from October 1 to September 30, whereas Nabors' fiscal years thereafter ran from January 1 to December 31.

| Fiscal Year[4] | Reported Earnings (In Millions) | Reported Diluted Earnings Per Share From Continuing Operations |
|---|---|---|
| 2004 | $302.46 | $0.96 |
| 2005 | $648.70 | $2.00 |

119. Meanwhile, Defendants were causing the Company to grant them millions of stock options, many of which were misdated. The Company's executive directors and officers also received a significant number of stock options as compensation during the relevant period. In total, during the relevant period Defendants caused the Company to grant them millions of stock options, many of which, the evidence will show, were misdated.

120. Moreover, throughout the relevant period certain Defendants exercised many of these stock options contributing to their ability to sell over $884 million worth of Nabors' stock – stock they obtained often by cashing in under-priced stock options:

**Nabors Industries**
**Insider Sales:  1996 - Present**

| Last Name | First Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| Isenberg | Eugene | 10/18/1996 | 1,440,000 | $8.44 | $12,153,600 |
| | | 10/23/1996 | 594,000 | $8.12 | $4,823,280 |
| | | 11/11/1996 | 240,000 | $8.50 | $2,040,000 |
| | | 11/11/1996 | 9,120 | $8.56 | $78,067 |
| | | 11/12/1996 | 350,880 | $8.44 | $2,961,427 |
| | | 11/13/1996 | 600,000 | $8.44 | $5,064,000 |
| | | 11/14/1996 | 300,000 | $8.81 | $2,643,000 |
| | | 11/20/1996 | 300,000 | $10.12 | $3,036,000 |
| | | 11/22/1996 | 660,000 | $10.50 | $6,930,000 |
| | | 7/22/1997 | 4,631,000 | $14.77 | $68,399,870 |
| | | 3/23/2000 | 9,400,000 | $19.00 | $178,600,000 |
| | | 3/16/2005 | 9,692,480 | $28.09 | $272,261,763 |
| | | | 28,217,480 | | $558,991,007 |
| | | | | | |
| Koch | Bruce | 9/11/1996 | 20,000 | $7.50 | $150,000 |
| | | 7/18/1997 | 20,400 | $14.87 | $303,348 |
| | | 7/18/1997 | 19,600 | $14.81 | $290,276 |
| | | 4/28/1999 | 10,000 | $9.94 | $99,400 |
| | | 8/20/1999 | 10,000 | $14.00 | $140,000 |
| | | 8/23/1999 | 10,000 | $14.50 | $145,000 |
| | | 12/29/1999 | 2,000 | $15.50 | $31,000 |

| Last Name | First Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| | | 2/11/2000 | 20,000 | $16.59 | $331,800 |
| | | 2/15/2000 | 20,000 | $16.90 | $338,000 |
| | | 9/11/2000 | 15,000 | $25.21 | $378,150 |
| | | 3/16/2005 | 165,700 | $28.09 | $4,654,513 |
| | | 11/7/2006 | 12,500 | $31.21 | $390,125 |
| | | 11/8/2006 | 12,000 | $31.00 | $372,000 |
| | | 11/8/2006 | 7,000 | $31.01 | $217,070 |
| | | 11/8/2006 | 2,800 | $31.10 | $87,080 |
| | | 11/8/2006 | 2,400 | $31.03 | $74,472 |
| | | 11/8/2006 | 1,800 | $31.09 | $55,962 |
| | | 11/8/2006 | 800 | $31.05 | $24,840 |
| | | 11/8/2006 | 800 | $31.08 | $24,864 |
| | | 11/8/2006 | 700 | $31.04 | $21,728 |
| | | 11/8/2006 | 700 | $31.06 | $21,742 |
| | | 11/8/2006 | 600 | $31.11 | $18,666 |
| | | 11/8/2006 | 200 | $31.02 | $6,204 |
| | | 11/8/2006 | 200 | $31.07 | $6,214 |
| | | | 355,200 | | $8,182,454 |
| | | | | | |
| McLachlin | Daniel | 6/6/1996 | 18,750 | $7.75 | $145,313 |
| | | 6/27/1997 | 6,250 | $12.28 | $76,750 |
| | | 8/10/1999 | 10,000 | $13.44 | $134,400 |
| | | 1/7/2000 | 18,000 | $15.65 | $281,700 |
| | | 1/7/2000 | 4,124 | $15.69 | $64,706 |
| | | 2/16/2000 | 9,500 | $17.56 | $166,820 |
| | | 5/2/2000 | 3,800 | $20.47 | $77,786 |
| | | 3/8/2001 | 3,800 | $31.29 | $118,902 |
| | | 3/8/2001 | 2,626 | $31.29 | $82,168 |
| | | 4/2/2002 | 3,800 | $21.86 | $83,068 |
| | | 4/2/2002 | 3,000 | $21.86 | $65,580 |
| | | 4/2/2002 | 1,876 | $21.86 | $41,009 |
| | | 4/4/2003 | 9,300 | $19.71 | $183,303 |
| | | 10/28/2004 | 2,600 | $24.90 | $64,740 |
| | | 10/28/2004 | 1,800 | $24.94 | $44,892 |
| | | 10/28/2004 | 700 | $24.95 | $17,465 |
| | | 10/28/2004 | 400 | $24.94 | $9,976 |
| | | 3/22/2005 | 21,500 | $29.71 | $638,765 |
| | | 11/22/2006 | 4,200 | $32.70 | $137,340 |
| | | 11/22/2006 | 1,400 | $32.69 | $45,766 |
| | | 11/22/2006 | 1,100 | $32.68 | $35,948 |
| | | 11/22/2006 | 700 | $32.67 | $22,869 |
| | | 11/22/2006 | 600 | $32.71 | $19,626 |
| | | 11/22/2006 | 400 | $32.73 | $13,092 |
| | | 11/22/2006 | 400 | $32.75 | $13,100 |
| | | 11/22/2006 | 200 | $32.74 | $6,548 |

| Last Name | First Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| | | | 130,826 | | $2,591,632 |
| | | | | | |
| Payne | James | 3/24/2000 | 10,250 | $18.97 | $194,443 |
| | | 7/17/2000 | 2,050 | $21.72 | $44,526 |
| | | 1/6/2004 | 20,000 | $21.50 | $430,000 |
| | | 1/6/2004 | 20,000 | $21.42 | $428,400 |
| | | 1/6/2004 | 10,000 | $21.43 | $214,300 |
| | | 1/6/2004 | 10,000 | $21.35 | $213,500 |
| | | 1/6/2004 | 10,000 | $21.25 | $212,500 |
| | | 1/6/2004 | 10,000 | $21.17 | $211,700 |
| | | 1/6/2004 | 1,900 | $21.47 | $40,793 |
| | | 2/8/2005 | 63,332 | $25.70 | $1,627,632 |
| | | | 157,532 | | $3,617,794 |
| | | | | | |
| Petrello | Anthony | 10/18/1996 | 96,000 | $8.44 | $810,240 |
| | | 10/23/1996 | 394,000 | $8.12 | $3,199,280 |
| | | 11/11/1996 | 160,000 | $8.50 | $1,360,000 |
| | | 11/11/1996 | 6,080 | $8.56 | $52,045 |
| | | 11/12/1996 | 33,920 | $8.44 | $286,285 |
| | | 11/13/1996 | 400,000 | $8.44 | $3,376,000 |
| | | 11/14/1996 | 200,000 | $8.81 | $1,762,000 |
| | | 11/20/1996 | 200,000 | $10.12 | $2,024,000 |
| | | 11/22/1996 | 440,000 | $10.50 | $4,620,000 |
| | | 7/22/1997 | 2,580,000 | $14.77 | $38,106,600 |
| | | 3/23/2000 | 4,400,000 | $19.00 | $83,600,000 |
| | | 3/16/2005 | 3,739,846 | $28.09 | $105,052,274 |
| | | | 12,649,846 | | $244,248,724 |
| | | | | | |
| Schmidt | Hans | 2/17/2000 | 34,400 | $17.06 | $586,864 |
| | | 2/17/2000 | 23,800 | $17.00 | $404,600 |
| | | 2/17/2000 | 15,000 | $17.03 | $255,450 |
| | | 2/17/2000 | 5,200 | $17.09 | $88,868 |
| | | 2/17/2000 | 1,600 | $17.12 | $27,392 |
| | | 5/1/2000 | 6,000 | $19.87 | $119,220 |
| | | 5/10/2000 | 60,000 | $21.00 | $1,260,000 |
| | | 2/26/2003 | 40,000 | $20.44 | $817,600 |
| | | | 186,000 | | $3,559,994 |
| | | | | | |
| Sheinfeld | Myron | 12/14/1995 | 1,000 | $5.50 | $5,500 |
| | | 12/15/1995 | 9,000 | $5.50 | $49,500 |
| | | 10/16/1996 | 10,000 | $8.00 | $80,000 |
| | | 1/21/2000 | 40,000 | $17.50 | $700,000 |
| | | 5/15/2000 | 10,000 | $21.50 | $215,000 |
| | | 10/31/2002 | 10,000 | $18.00 | $180,000 |
| | | 5/16/2003 | 35,000 | $21.71 | $759,850 |

| Last Name | First Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| | | 1/21/2004 | 20,000 | $22.50 | $450,000 |
| | | 3/1/2004 | 20,000 | $24.28 | $485,600 |
| | | 11/23/2004 | 33,000 | $26.45 | $872,850 |
| | | 6/23/2005 | 60,000 | $30.75 | $1,845,000 |
| | | | 248,000 | | $5,643,300 |
| | | | | | |
| Wexler | Jack | 8/9/1996 | 88,600 | $7.50 | $664,500 |
| | | 8/9/1996 | 2,000 | $7.56 | $15,120 |
| | | 8/12/1996 | 64,200 | $7.50 | $481,500 |
| | | 8/12/1996 | 45,200 | $7.37 | $333,124 |
| | | 10/18/1996 | 14,200 | $8.44 | $119,848 |
| | | 10/18/1996 | 10,000 | $8.37 | $83,700 |
| | | 10/18/1996 | 5,800 | $8.37 | $48,546 |
| | | 11/5/1996 | 80,000 | $8.00 | $640,000 |
| | | 6/5/1997 | 20,000 | $12.06 | $241,200 |
| | | 7/7/1997 | 30,000 | $13.56 | $406,800 |
| | | 7/18/1997 | 20,400 | $15.22 | $310,488 |
| | | 7/18/1997 | 10,000 | $14.94 | $149,400 |
| | | 7/18/1997 | 4,000 | $15.00 | $60,000 |
| | | 7/18/1997 | 3,600 | $14.87 | $53,532 |
| | | 7/18/1997 | 2,000 | $15.03 | $30,060 |
| | | 8/28/1997 | 46,600 | $17.25 | $803,850 |
| | | 8/28/1997 | 11,200 | $17.34 | $194,208 |
| | | 8/28/1997 | 5,000 | $17.22 | $86,100 |
| | | 8/28/1997 | 4,400 | $17.28 | $76,032 |
| | | 8/28/1997 | 2,800 | $17.31 | $48,468 |
| | | 9/18/1997 | 31,000 | $20.19 | $625,890 |
| | | 9/18/1997 | 9,000 | $20.22 | $181,980 |
| | | 8/10/1999 | 42,600 | $13.12 | $558,912 |
| | | 8/10/1999 | 23,800 | $13.09 | $311,542 |
| | | 8/10/1999 | 12,600 | $13.06 | $164,556 |
| | | 8/10/1999 | 1,000 | $13.19 | $13,190 |
| | | 8/26/1999 | 600 | $13.44 | $8,064 |
| | | 3/2/2000 | 40,000 | $20.12 | $804,800 |
| | | 8/15/2000 | 20,000 | $23.94 | $478,800 |
| | | 9/8/2000 | 10,000 | $25.34 | $253,400 |
| | | 4/24/2002 | 2,000 | $22.13 | $44,260 |
| | | 5/14/2002 | 40,000 | $23.70 | $948,000 |
| | | 5/14/2002 | 20,000 | $23.70 | $474,000 |
| | | 1/23/2004 | 40,000 | $22.55 | $902,000 |
| | | 11/24/2004 | 90,000 | $26.54 | $2,388,600 |
| | | 11/30/2004 | 50,000 | $26.18 | $1,309,000 |
| | | 3/22/2005 | 183,000 | $29.99 | $5,488,170 |
| | | | 1,085,600 | | $19,801,640 |
| | | | | | |

| Last Name | First Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| Whitman | Martin | 4/26/1996 | 394,000 | $7.94 | $3,128,360 |
| | | 5/22/1996 | 311,778 | $7.37 | $2,297,804 |
| | | 5/22/1996 | 48,222 | $7.37 | $355,396 |
| | | 4/2/1997 | 30,000 | $9.44 | $283,200 |
| | | 8/4/1997 | 30,200 | $15.44 | $466,288 |
| | | 8/4/1997 | 19,800 | $15.47 | $306,306 |
| | | 8/5/1997 | 11,000 | $15.47 | $170,170 |
| | | 8/5/1997 | 10,000 | $15.56 | $155,600 |
| | | 8/5/1997 | 9,000 | $15.44 | $138,960 |
| | | 8/5/1997 | 5,000 | $15.62 | $78,100 |
| | | 8/5/1997 | 5,000 | $15.69 | $78,450 |
| | | 8/5/1997 | 5,000 | $15.75 | $78,750 |
| | | 8/5/1997 | 5,000 | $15.78 | $78,900 |
| | | 8/6/1997 | 22,200 | $16.25 | $360,750 |
| | | 8/6/1997 | 5,000 | $16.12 | $80,600 |
| | | 8/6/1997 | 5,000 | $16.25 | $81,250 |
| | | 8/6/1997 | 5,000 | $16.37 | $81,850 |
| | | 8/6/1997 | 2,600 | $16.31 | $42,406 |
| | | 8/6/1997 | 200 | $16.34 | $3,268 |
| | | 8/7/1997 | 15,400 | $16.00 | $246,400 |
| | | 8/7/1997 | 7,000 | $15.62 | $109,340 |
| | | 8/7/1997 | 5,000 | $15.87 | $79,350 |
| | | 8/7/1997 | 4,600 | $16.37 | $75,302 |
| | | 8/7/1997 | 4,000 | $15.94 | $63,760 |
| | | 8/7/1997 | 3,200 | $15.50 | $49,600 |
| | | 8/7/1997 | 2,200 | $15.59 | $34,298 |
| | | 8/7/1997 | 2,000 | $15.56 | $31,120 |
| | | 8/7/1997 | 1,000 | $16.25 | $16,250 |
| | | 8/7/1997 | 600 | $15.69 | $9,414 |
| | | 8/8/1997 | 13,600 | $15.25 | $207,400 |
| | | 8/8/1997 | 8,000 | $15.06 | $120,480 |
| | | 8/8/1997 | 7,800 | $15.09 | $117,702 |
| | | 8/8/1997 | 5,200 | $15.12 | $78,624 |
| | | 8/8/1997 | 5,000 | $14.94 | $74,700 |
| | | 8/8/1997 | 3,400 | $15.00 | $51,000 |
| | | 8/8/1997 | 1,400 | $15.28 | $21,392 |
| | | 8/8/1997 | 600 | $15.12 | $9,072 |
| | | 10/6/1997 | 48,800 | $21.94 | $1,070,672 |
| | | 10/6/1997 | 10,600 | $21.90 | $232,140 |
| | | 10/6/1997 | 1,600 | $21.97 | $35,152 |
| | | 10/7/1997 | 20,000 | $22.00 | $440,000 |
| | | 10/7/1997 | 14,600 | $22.25 | $324,850 |
| | | 10/7/1997 | 12,200 | $22.31 | $272,182 |
| | | 10/7/1997 | 11,800 | $22.69 | $267,742 |
| | | 10/7/1997 | 10,000 | $21.87 | $218,700 |

| Last Name | First Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| | | 10/7/1997 | 10,000 | $21.90 | $219,000 |
| | | 10/7/1997 | 10,000 | $21.94 | $219,400 |
| | | 10/7/1997 | 10,000 | $22.12 | $221,200 |
| | | 10/7/1997 | 10,000 | $22.19 | $221,900 |
| | | 10/7/1997 | 10,000 | $22.34 | $223,400 |
| | | 10/7/1997 | 10,000 | $22.37 | $223,700 |
| | | 10/7/1997 | 10,000 | $22.44 | $224,400 |
| | | 10/7/1997 | 10,000 | $22.50 | $225,000 |
| | | 10/7/1997 | 10,000 | $22.56 | $225,600 |
| | | 10/7/1997 | 5,000 | $22.03 | $110,150 |
| | | 10/7/1997 | 5,000 | $22.06 | $110,300 |
| | | 10/7/1997 | 3,200 | $22.28 | $71,296 |
| | | 10/7/1997 | 1,200 | $22.65 | $27,180 |
| | | 10/8/1997 | 138,200 | $22.25 | $3,074,950 |
| | | 10/8/1997 | 54,400 | $22.06 | $1,200,064 |
| | | 10/8/1997 | 10,000 | $22.22 | $222,200 |
| | | 10/8/1997 | 8,000 | $22.31 | $178,480 |
| | | 10/8/1997 | 7,600 | $22.00 | $167,200 |
| | | 10/8/1997 | 4,000 | $22.28 | $89,120 |
| | | 10/8/1997 | 2,200 | $22.19 | $48,818 |
| | | 10/8/1997 | 1,000 | $22.03 | $22,030 |
| | | 10/9/1997 | 85,400 | $23.25 | $1,985,550 |
| | | 10/9/1997 | 33,400 | $23.34 | $779,556 |
| | | 10/9/1997 | 14,800 | $23.22 | $343,656 |
| | | 10/9/1997 | 14,200 | $22.62 | $321,204 |
| | | 10/9/1997 | 13,400 | $23.31 | $312,354 |
| | | 10/9/1997 | 11,800 | $23.37 | $275,766 |
| | | 10/9/1997 | 11,000 | $23.28 | $256,080 |
| | | 10/9/1997 | 10,600 | $23.22 | $246,132 |
| | | 10/9/1997 | 7,400 | $22.81 | $168,794 |
| | | 10/9/1997 | 6,400 | $22.87 | $146,368 |
| | | 10/9/1997 | 5,000 | $22.59 | $112,950 |
| | | 10/9/1997 | 4,800 | $22.69 | $108,912 |
| | | 10/9/1997 | 4,000 | $22.75 | $91,000 |
| | | 10/9/1997 | 3,600 | $22.56 | $81,216 |
| | | 10/9/1997 | 3,400 | $22.78 | $77,452 |
| | | 10/9/1997 | 1,200 | $22.84 | $27,408 |
| | | 10/10/1997 | 29,600 | $23.31 | $689,976 |
| | | 10/10/1997 | 24,400 | $23.25 | $567,300 |
| | | 10/10/1997 | 15,000 | $23.28 | $349,200 |
| | | 10/10/1997 | 12,600 | $23.12 | $291,312 |
| | | 10/10/1997 | 9,600 | $23.22 | $222,912 |
| | | 10/10/1997 | 8,400 | $22.94 | $192,696 |
| | | 10/10/1997 | 7,600 | $23.15 | $175,940 |
| | | 10/10/1997 | 2,000 | $23.19 | $46,380 |

| Last Name | First Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
|  |  | 10/10/1997 | 1,000 | $23.06 | $23,060 |
|  |  | 3/6/2001 | 600 | $30.36 | $18,216 |
|  |  | 3/7/2001 | 1,800 | $30.72 | $55,296 |
|  |  | 3/8/2001 | 400 | $31.14 | $12,456 |
|  |  | 3/9/2001 | 3,800 | $30.30 | $115,140 |
|  |  | 3/27/2001 | 200 | $27.75 | $5,550 |
|  |  | 4/25/2001 | 2,400 | $25.50 | $61,200 |
|  |  | 4/25/2001 | 2,400 | $25.50 | $61,200 |
|  |  | 5/3/2001 | 200 | $27.12 | $5,424 |
|  |  | 5/3/2001 | 200 | $27.12 | $5,424 |
|  |  | 5/11/2001 | 1,200 | $26.24 | $31,488 |
|  |  | 5/11/2001 | 1,200 | $26.24 | $31,488 |
|  |  | 5/15/2001 | 450 | $27.57 | $12,407 |
|  |  | 5/15/2001 | 450 | $27.57 | $12,407 |
|  |  | 5/15/2001 | 100 | $27.63 | $2,763 |
|  |  | 5/15/2001 | 100 | $27.63 | $2,763 |
|  |  | 5/16/2001 | 500 | $27.87 | $13,935 |
|  |  | 5/16/2001 | 500 | $27.87 | $13,935 |
|  |  | 5/17/2001 | 50 | $26.97 | $1,349 |
|  |  | 5/17/2001 | 50 | $26.97 | $1,349 |
|  |  | 5/23/2001 | 200 | $26.04 | $5,208 |
|  |  | 5/23/2001 | 200 | $26.04 | $5,208 |
|  |  | 5/30/2001 | 200 | $24.80 | $4,960 |
|  |  | 5/30/2001 | 200 | $24.80 | $4,960 |
|  |  | 6/14/2001 | 1,000 | $23.16 | $23,160 |
|  |  | 3/20/2002 | 100,000 | $21.17 | $2,117,000 |
|  |  | 6/13/2002 | 184,000 | $18.28 | $3,363,520 |
|  |  | 4/14/2005 | 72,600 | $28.03 | $2,034,978 |
|  |  | 5/10/2005 | 60,094 | $27.48 | $1,651,383 |
|  |  |  | 2,249,094 |  | $37,415,779 |
|  |  |  |  |  |  |
|  |  | **Total:** | **45,279,578** |  | **$884,052,324** |

121.   On December 27, 2006, *The Wall Street Journal* published an article entitled

"Bosses' Pay:  How Stock Options Became Part of the Problem."  The article stated in part:

>    Eugene Isenberg is the little-known chief executive of a modest-sized oil-services company in Houston. But he stands out in one way: He is among the highest-paid corporate executives in history. In the past 19 years, he has pocketed more than $450 million.

>    The key to this wealth: stock options, in abundance. His employer, Nabors Industries Ltd., has lavished more than 25 million options on him over the years.

They became lucrative partly because of Nabors' generally rising stock price, but also because of some controversial moves that gave the options more punch. When Nabors' stock fell below the price at which the options could be exercised, temporarily making them worthless, Nabors let him trade in some of his options for new ones with lower exercise prices. And when Mr. Isenberg cashed some options in, Nabors "reloaded" him, replacing those he'd exercised with the same number of new ones.

\*       \*       \*

Nabors' Mr. Isenberg offers an example of the huge wealth CEOs have gained through stock options. Now, some of his option grants appear to raise questions about how they were dated. A number came on days when the stock hit its lowest close for the month or the quarter. At other companies, a series of low-price grants has been a pattern that has suggested possible dating problems. At the least, the favorable grant dates added to Mr. Isenberg's mammoth options gains.

A spokesman for Nabors said its legal department did an internal review and found "no irregularities in its grant practices." Nabors showed internal documents to The Wall Street Journal that the company said provide evidence the grants were properly dated. Some of the documents bolster that assertion. The spokesman, citing Mr. Isenberg's record in lifting Nabors from a company in bankruptcy court to one with a market value of more than $9 billion today, also said that "Nabors strongly believes that Mr. Isenberg is appropriately compensated."

\*       \*       \*

For a time, Nabors operated under an options "reload" plan. It was a generous one: Instead of replacing only a portion of options that were exercised, it replaced them one-for-one. Mr. Isenberg could cash in options and take profits yet still have just as many options as before, though with higher exercise prices.

In another atypical feature, the replacement options sometimes had new terms of 10 years, making them even more valuable. Nabors says it stopped reloads before 2000. But in that year it gave Mr. Isenberg a "special award" of 2.4 million options, in lieu of a reload on 4.7 million options that he exercised for a $122 million gain. (Share figures in this article aren't adjusted for a recent two-for-one stock split.)

In 1998, amid an industry slump, Nabors' stock sank sharply. Some of Mr. Isenberg's options were "under water." The board repriced them. In exchange for giving up a fourth of his old options, he got new ones carrying a more favorable exercise price.

"The repricing was designed to restore incentive value to the option packages," said Nabors' Mr. Smith. He said repricing was widely available to employees. As it happened, Mr. Isenberg made less money by accepting the repricing deal and giving up some of his options than if he had held on, Mr. Smith said.

- 85 -

Following a single grant from its genesis shows how the various maneuvers can pile up profit.

Mr. Isenberg received a grant of 1.8 million options dated in Sept. 23, 1991. He exercised them in 1996 and 1997, pocketing about $24 million in profits.

Normally, that would have been the end of these options. But Nabors reloaded Mr. Isenberg, replacing his exercised options with a similar number – which had 10 more years to run.

Then in 1998, amid the stock downturn, Nabors repriced the reload options.

Mr. Isenberg cashed in most of them in 2000 and gave the rest to a family member in 2002. His total profit from a single grant – reloaded, extended and repriced: about $54 million, not including the gift.

The CEO's overall stock-option gains, both realized and not yet cashed in, came to $685 million at the end of last year, says S&P ExecuComp – putting him 8th on its list of big winners from 1992 to 2005.

Mr. Isenberg also has benefited from some good timing of his option grants. The Sept. 23, 1991, award was dated on the day Nabors' stock touched its lowest closing price of that month, $5.

But it isn't clear when the price was actually set. Company documents suggest the grant price may actually have been determined many months earlier, on another day when the stock closed at $5. Moreover, the grant was contingent on a new Isenberg employment contract – which other documents indicate wasn't signed until well after Sept. 23, when the stock was higher.

For a grant of a million options dated Dec. 4, 1995, another monthly low, Nabors produced no minutes of a compensation-committee meeting. Instead, a memo seven weeks later said there had been a discussion on Dec. 4 of Mr. Isenberg trading in part of his bonus for options. The memo said the idea first would be run by a consultant, suggesting the grant wasn't made final until weeks after the stated Dec. 4 award date.

In all, of 11 new option grants to Mr. Isenberg between 1991 and 2002, two were dated at quarterly lows in the Nabors stock price and five more at monthly lows. The odds against such a fortunate pattern occurring by chance are long.

122.    Then, this same day, December 27, 2006, Nabors filed a Form 8-K with the SEC

announcing that the Company had initiated an internal review of its stock option grant practices.

123.    In effect, during the relevant period, the Defendants caused Nabors' shares to trade at

artificially inflated levels by issuing a series of materially false and misleading statements regarding

the Company's financial statements, business and prospects. Specifically, Defendants caused or allowed Nabors to issue statements that failed to disclose or misstated the following: (i) that the Company had problems with its internal controls that prevented it from issuing accurate financial reports and projections; (ii) that because of improperly recorded stock-based compensation expenses the Company's financial results violated GAAP; and (iii) that the Company's public disclosures presented an inflated view of Nabors' earnings and earnings per share.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

124.    Plaintiffs bring this action derivatively in the right and for the benefit of Nabors to redress injuries suffered and to be suffered by Nabors as a direct result of Defendants' violations of state and federal law, breaches of fiduciary duty, abuse of control, constructive fraud, gross mismanagement, corporate waste and unjust enrichment, as well as the aiding and abetting thereof, by the Defendants.  This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

125.    Plaintiffs will adequately and fairly represent the interests of Nabors and its shareholders in enforcing and prosecuting their rights.

126.    Plaintiffs are owners of Nabors' stock and were owners of Nabors' stock during times relevant to Defendants' illegal and wrongful course of conduct alleged herein.

127.    Based upon the facts set forth throughout this Complaint, applicable law and the longstanding rule that equity does not compel a useless and futile act, a pre-filing demand upon the Nabors' Board of Directors to institute this action against the officers and members of the Nabors' Board of Directors is excused as futile.  All of Nabors' directors as of the lawsuit's filing knowingly *received* backdated stock options, all but one exercised their backdated options, all approved false and misleading SEC filings and four of the seven *engaged in backdating* stock options.

- 87 -

**Severely Disabled Nabors' Board of Directors as of Lawsuit Filing**

| Defendant Director | Board Tenure | *Received and Exercised Backdated Options* | Engaged in Backdating Options | Signed and/or Approved False & Misleading SEC Filings in Relevant Period | Worked on Compensation and/or Audit Committee in Relevant Period | Insider Trading Proceeds |
|---|---|---|---|---|---|---|
| Isenberg | 1987-filing | √ | √ | √ (1991-2006) | Chairman of the Board 1987-Filing | $558 MM |
| Sheinfeld | 1988-filing | √ | √ | √ (1991-2006) | Compensation: 1988-Filing Audit: 1988-Filing | $5.6 MM |
| Whitman | 1991-filing | √ | √ | √ (1991-2006) | Compensation: 2003-Filing Audit: 1991-Filing | $37.4 MM |
| Schmidt | 1993-filing | √ | √ | √ (1993-2006) | Compensation: 2004-Filing Audit: 2006 | $3.5 MM |
| Payne | 1999-filing | √ | | √ (1999-2006) | | $3.6 MM |
| Knaster | 2004-filing | √ (received) | | √ (2004-2006) | | |
| Petrello | 1991-filing | √ | | √ (1991-2006) | Deputy Chair: 2003-Filing | $244 MM |

128.     Indeed, through their deceptive conduct alleged herein, including backdating stock options and making false and misleading statements and omissions in Form 4s and 5s, Proxies and Reports on Forms 10-K and 10-Q, more than a majority of Nabors' Board engaged in *ultra vires* acts and controlled the Company to accomplish and perpetuate their self-dealing and the self-dealing of the other defendants in backdated stock options.   In addition, Isenberg and Petrello owned, respectively, approximately 6.5% and 3.5% of Nabors' outstanding stock as of this lawsuit's filing (and owned similarly large amounts of Nabors' stock during the relevant period), and exercised control of the Company thereby and through their deceptive conduct pleaded herein.  And at times during the relevant period, Whitman owned as much as 29.7% of Nabors' outstanding stock and exercised control of the Company thereby and through his deceptive conduct pleaded herein.

129.     A pre-filing demand would be a useless and futile act because:

(a)     The members of Nabors' Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein.  These are people they have developed professional relationships with, who are their friends

and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

(b)     The Nabors' Board of Directors and senior management participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Nabors' stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.  As a result of their access to and review of internal corporate documents, or conversations and connections with other corporate officers, employees, and directors and attendance at management and/or Board meetings, each of the Defendants knew the adverse non-public information regarding the improper stock option grants and financial reporting.  Pursuant to their specific duties as Board members, the Director Defendants are charged with the management of the Company and to conduct its business affairs.  Defendants breached the fiduciary duties that they owed to Nabors and its shareholders in that they failed to prevent and correct the improper stock option granting and financial reporting. Certain directors are also dominated and controlled by other directors and cannot act independently of them.  Thus, the Nabors' Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of its members participated personally in the wrongdoing or are dependent upon other Defendants who did.

(c)     The acts complained of constitute violations of the fiduciary duties owed by Nabors' officers and directors and these acts are incapable of ratification.

(d)     The acts complained of constitute *ultra vires* acts in that the options were granted outside the authority granted by the respective executive option plans which provided that:

> Option Exercise Price.  The option exercise price shall be set by the Committee, but shall be no less than the Fair Market Value per share of Common Stock on the date of the grant of the options . . . .

(e)     The Defendants control approximately 10% of Nabors' voting stock and Isenberg and Petrello dominate and control the board.

(f)     The members of Nabors' Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

(g)     Any suit by the current directors of Nabors to remedy these wrongs would likely further expose the liability of Defendants under the federal securities laws, which could result in additional civil and/or criminal actions being filed against one or more of the Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

(h)     Nabors has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the current Board has not filed any lawsuits against itself or others who were responsible for that wrongful conduct to attempt to recover for Nabors any part of the damages Nabors suffered and will suffer thereby.

(i)     In order to properly prosecute this lawsuit, it would be necessary for the directors to sue themselves and the other Defendants, requiring them to expose themselves and their comrades to millions of dollars in potential civil liability and criminal sanctions, or IRS penalties. This they will not do.

(j)     Nabors' current and past officers and directors are protected against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.,* monies belonging to the stockholders of Nabors. However, due to certain changes in the language of directors' and officers' liability insurance

policies in the past few years, the directors' and officers' liability insurance policies covering the Defendants in this case contain provisions which eliminate coverage for any action brought directly by Nabors against these Defendants, known as, *inter alia,* the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Nabors, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.

(k)     In order to bring this action for breaching their fiduciary duties, the members of the Nabors' Board would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do.

130.     Plaintiff has not made any demand on shareholders of Nabors to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     Nabors is a publicly traded company with approximately 299 million shares outstanding, and thousands of shareholders;

(b)     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

**Backdating Nabors' Stock Options Falsified the Company's Financial Statements**

131.     Backdating and mispricing Nabors' stock options materially falsified the Company's financial statements by causing the understatement of compensation expense, the overstatement of earnings and the overstatement of shareholders' equity, among other things.  Nabors recently admitted ***15 years*** of financial statements, from 1991 to 2006, ***understated*** compensation expense

and *overstated* income, net income and earnings per share.  The Company has admitted that in total, compensation expense was understated by tens of millions of dollars and net income was overstated by tens of millions of dollars.  And that is only with respect to the limited number of option grants to which the Company has admitted.  There are scores of backdated option grants Nabors has not yet admitted to backdating.

132.    Indeed, it was not until *The Wall Street Journal* published an expose on stock option backdating at Nabors that Nabors stated it had "initiat[ed] a further review of its option granting practices" and admitted to backdating at all.  Only then did the Company admit "senior executives" and "other[s]" received backdated options.  And only then did the Company admit it had used an "incorrect 'measurement date' in determining the amount of compensation expense to be recognized" in connection with stock option awards "made to certain senior executives."  *See* Fiscal 2007 Form 10-K, at 13.

133.    For 15 years, Defendants caused and/or allowed the Company to understate its compensation expense by not properly accounting for its stock options under GAAP and thus overstated the Company's net earnings.  Pursuant to Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25"), the applicable GAAP provision at the time of the options grants set forth herein, if the stock's market price on the date of grant exceeds the exercise price of the options, the corporation must recognize the difference as an expense, which directly impacts earnings.  It is well-known that "in-the-money" stock options must be recorded as an expense.  But backdated or retroactively-priced stock options priced below the fair market value of the company's stock at the date of the actual grant and issuance (as opposed to the stated date), escape detection because they are backdated.  Thus, Nabors did not properly expense its backdated options and this was with full knowledge of the Defendants, who engaged in the backdating and/or received backdated options.

134.     Although Defendants received lucrative "in-the-money" options, they and Nabors did not disclose this to shareholders or, worse, did not report the tens of millions of dollars of compensation expense (and reduced earnings) incurred by the Company as a result of those backdated options.  Nor did Defendants and Nabors properly report Defendants' compensation to the IRS.

135.     For years Defendants caused Nabors to violate IRS rules and regulations as a result of backdated stock options.  Nabors understated its tax liabilities by millions and now will owe the IRS for back taxes, penalties and interest for improperly reporting compensation.  Internal Revenue Code §162(m) generally limits a publicly traded company's tax deductions for compensation paid to each of its named executive officers to $1 million unless the pay is determined to be "performance-based".  In order for compensation to be performance-based, the compensation committee must have set pre-established and objective performance goals.  The goals must then be approved by the shareholders.  Section 162(m) defines stock options as performance-based provided they are issued at an exercise price that is no less than the fair market value of the stock on the date of the grant.  Stock options Nabors purportedly issued were not taken into account in calculating whether the compensation of certain executives exceeded the $1 million compensation cap when they should have been, because they were backdated to be "in-the-money."

136.     Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie top executives' soaring pay packages more closely to a company's performance.  This change in the tax law turned compensation practices for a company's top executives away from straight salary-based compensation to performance-based compensation, including stock options.  According to former SEC Chairman Harvey Pitt: "What [162(m)] did was create incentives to find other forms of compensation so people could get over the $1 million threshold without running afoul of the code."

Brian Grow & Eamon Javers, "Executive Pay Practices under Scrutiny," *Business Week*, Sept. 5, 2006, at 1.

137.    As a result all of the income resulting from the exercise of backdated options, the compensation of certain executives at Nabors (including Isenberg) exceeded the $1 million cap for federal tax purposes.  The Company has admitted this and took a charge for nearly $4 million as a result of underreporting compensation expense for non-reporting executives alone.

138.    Although Nabors presently contends its understatement of compensation expense and overstatement of earnings was not material for financial reporting purposes, it certainly was.  The effect of the backdating and the backdating itself is, and always has been material to Nabors' financial statements and should have been reported long ago.  Relevant guidance on whether accounting items are material is found in the Supreme Court's ruling in *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) and in SEC Staff Accounting Bulletin No. 99 ("SAB 99"), released August 12, 1999.  The Court ruled in *TSC* that a fact is material to investors if there is "a substantial likelihood that the . . . fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  426 U.S. at 449.  SAB 99 explains that both "quantitative" and "qualitative" factors help determine an item's materiality, rather than purely quantitative factors alone. Qualitative factors that can make a misstated fact material include, among others:

(a)    whether the misstatement has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation;

(b)    whether the misstatement arises from an item "capable of precise measurement";

(c)    whether the misstatement masks a change in earnings;

- 94 -

(d)     whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability; and

(e)     whether the misstatement affects the registrant's compliance with regulatory requirements.

139.     The backdating in this case and its effect is material under both a qualitative and a quantitative analysis.  First, there is a substantial likelihood that the reasonable investor would consider that facts about backdating significantly alter the total mix of information about Nabors.  That is because, among other things, improper backdating of stock options reflects the degree to which the Company's insiders promote their own interests ahead of the Company's.  The SEC has stated that the integrity of a company's management "is always a material factor."  Second, the improper backdating increased management's and directors' compensation, and reduced requirements for those insiders to gain bonuses and incentive compensation.  Third, the correct dates of option grants and the correct closing prices for stock on those dates can be precisely recorded and measured.  Fourth, the improper backdating of stock options masked the Company's true net income, which should have been reported as lower, due to greater compensation expenses.  Fifth, the improper backdating affects the incentives for management and directors to improve the Company's operations and profitability.  Sixth, the improper backdating of stock options violates financial-reporting requirements of public companies and violates tax laws related to compensation expenses.  Further, the backdating here was intentional conduct and therefore, by its nature, was material.

140.     Although any of the above qualitative factors would have identified the Defendants' stock option backdating as "material," the backdating also was material under quantitative criteria.  Backdating contributed to the Defendants' ability to sell hundreds of millions of dollars worth of Company's stock while in possession of material, non-public adverse information about the

backdating practices.  Therefore, the Defendants' only appropriate response would be to properly correct the errors for each of the periods affected by the backdating scheme and thus allow the shareholders and the investing public the transparency they deserve.

141.    In addition, under current accounting rules, a financial misstatement that appears immaterial as to a single reporting period may have a cumulative material impact on other periods. In such a situation, the misstatement must be disclosed, according to SEC Staff Accounting Bulletin No. 108 ("SAB 108").  This principle, which is reflected in SAB 108, has always been recognized in the financial accounting concept of materiality.   For at least **15 years** Nabors understated compensation expense and overstated its earnings as a result of stock option backdating.  The conduct and its effect in these individual years from fiscal 1991 to fiscal 1996 was material in and of itself.  Cumulatively, the financial statement effect is even more significant.

142.    Nabors' materially false and misleading financial statements were included in periodic reports filed with the SEC.  The results were also included in press releases issued by the Company.

**Reports on Form 10-K**

143.    Nabors' Reports on Form 10-K filed from 1991 through 2006 contained false and misleading financial statements and other statements **understating** compensation expense, **overstating** shareholders' equity, and **overstating** income, net income and earnings per share.  They also falsely communicated that stock options were being granted in accordance with Nabors' stock option plans, namely by pricing options according to the Company's stock price on the date of the grant.  Nabors' Reports on Form 10-K were furthermore false and misleading for stating that because the Company granted options at prices equal to the market price of its shares on the date of grant, it did not record compensation expense related to such grants in the consolidated statements of income.  These Reports on Form 10-K were false and misleading because (among other things)

Defendants were backdating and mispricing stock options.  As those who engaged in the backdating and/or received backdated options knew, many option grants were backdated and retroactively priced to be "in-the-money" and thus constituted significant unreported non-cash compensation expense.

**The Fiscal 1991 Form 10-K**

144.    On or about December 24, 1991, the Company filed its Fiscal 1991 Form 10-K with the SEC.  The Fiscal 1991 Form 10-K was simultaneously distributed to shareholders and the public. The Fiscal 1991 Form 10-K included Nabors' 1991 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  Because options identified herein were backdated and mispriced to be "in-the-money" they constituted significant unreported non-cash compensation expense.  As a result, Nabors' compensation expense was understated and its income and net income were overstated.

145.    The Fiscal 1991 Report on Form 10-K was signed by Defendants Isenberg, Petrello, McLachlin, Whitman, Sheinfeld and Wexler.

**The Fiscal 1992 Form 10-K**

146.    On or about December 28, 1992, the Company filed its Fiscal 1992 Form 10-K with the SEC.  The Fiscal 1992 Form 10-K was simultaneously distributed to shareholders and the public. The Fiscal 1992 Form 10-K included Nabors' 1992 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  Because options identified herein were backdated and mispriced to be "in-the-money" they constituted significant unreported non-cash compensation expense.  As a result, Nabors' compensation expense was understated and its income and net income were overstated.

147.    The Fiscal 1992 Report on Form 10-K was signed by Defendants Isenberg, Petrello, Koch, McLachlin, Whitman, Sheinfeld and Wexler.

**The Fiscal 1993 Form 10-K**

148.    On or about December 28, 1993, the Company filed its Fiscal 1993 Form 10-K with the SEC.  The Fiscal 1993 Form 10-K was simultaneously distributed to shareholders and the public. The Fiscal 1993 Form 10-K included Nabors' 1993 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  Because options identified herein were backdated and mispriced to be "in-the-money" they constituted significant unreported non-cash compensation expense.  As a result, Nabors' compensation expense was understated and its income and net income were overstated.

149.    The Fiscal 1993 Report on Form 10-K was signed by Defendants Isenberg, Petrello, Koch, McLachlin, Whitman, Schmidt, Sheinfeld and Wexler.

**The Fiscal 1994 Form 10-K**

150.    On or about December 28, 1994, the Company filed its Fiscal 1994 Form 10-K with the SEC.  The Fiscal 1994 Form 10-K was simultaneously distributed to shareholders and the public. The Fiscal 1994 Form 10-K included Nabors' 1994  financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  Because options identified herein were backdated and mispriced to be "in-the-money" they constituted significant unreported non-cash compensation expense.  As a result, Nabors' compensation expense was understated and its income and net income were overstated.

151.    The Fiscal 1994 Report on Form 10-K was signed by Defendants Isenberg, Petrello, Koch, McLachlin, Whitman, Schmidt, Sheinfeld and Wexler.

**The Fiscal 1995 Form 10-K**

152.    On or about December 29, 1995, the Company filed its Fiscal 1995 Form 10-K with the SEC.  The Fiscal 1995 Form 10-K was simultaneously distributed to shareholders and the public. The Fiscal 1995 Form 10-K included Nabors' 1995  financial statements which were materially false

and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  Because options identified herein were backdated and mispriced to be "in-the-money" they constituted significant unreported non-cash compensation expense.  As a result, Nabors' compensation expense was understated and its income and net income were overstated.

153.    The Fiscal 1995 Report on Form 10-K was signed by Defendants Isenberg, Petrello, Koch, Mclachlin, Whitman, Schmidt, Sheinfeld and Wexler.

**The Fiscal 1996 Form 10-K405**

154.    On or about December 30, 1996, the Company filed its Fiscal 1996 Form 10-K405 with the SEC.  The Fiscal 1996 Form 10-K405 was simultaneously distributed to shareholders and the public.  The Fiscal 1996 Form 10-K405 included Nabors' 1996  financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  Because options identified herein were backdated and mispriced to be "in-the-money" they constituted significant unreported non-cash compensation expense.  As a result, Nabors' compensation expense was understated and its income and net income were overstated.

155.    The Fiscal 1996 Report on Form 10-K405 was also false and misleading in that it stated:  "Options granted under the [Company's stock] plans generally are at prices equal to the fair market value of the stock on the date of the grant."  Fiscal 1996 Form 10-K405, at 50.  But in truth, options were backdated such that in most instances the stock price on the actual grant date was **_higher_** than the price on the falsely stated (backdated) grant date.

156.    The Fiscal 1996 Report on Form 10-K405 was signed by Defendants Isenberg, Petrello, Koch, McLachlin, Whitman, Schmidt, Sheinfeld and Wexler.

**The Fiscal 1997 Form 10-K405**

157.    On or about December 29, 1997, the Company filed its Fiscal 1997 Form 10-K405 with the SEC.  The Fiscal 1997 Form 10-K405 was simultaneously distributed to shareholders and

the public.  The Fiscal 1997 Form 10-K405 included Nabors' 1997 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  Because options identified herein were backdated and mispriced to be "in-the-money" they constituted significant unreported non-cash compensation expense.  As a result, Nabors compensation expense was understated and its income and net income were overstated.

158.    The Fiscal 1997 Report on Form 10-K405 was also false and misleading in that it stated: "Options granted under the [Company's stock] plans are at prices equal to the fair market value of the stock on the date of the grant."  Fiscal 1997 Form 10-K405, at 50.  But in truth, options were backdated such that in most instances the stock price on the actual grant date was *higher* than the price on the falsely stated (backdated) grant date.

159.    The Fiscal 1997 Report on Form 10-K405 was signed by Defendants Isenberg, Petrello, Whitman, Schmidt, Sheinfeld and Wexler.

**The Fiscal 1998 Form 10-K405**

160.    On or about March 31, 1999, the Company filed its Fiscal 1998 Form 10-K405 with the SEC.  The Fiscal 1998 Form 10-K405 was simultaneously distributed to shareholders and the public.  The Fiscal 1998 Form 10-K405 included Nabors' 1998 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  Because options identified herein were backdated and mispriced to be "in-the-money" they constituted significant unreported non-cash compensation expense.  As a result, Nabors' compensation expense was understated and its income and net income were overstated.

161.    The Fiscal 1998 Report on Form 10-K405 was also false and misleading in that it stated:  "Options granted under the [Company's stock] plans are at prices equal to the fair market value of the stock on the date of the grant."  Fiscal 1998 Form 10-K405, at 60.  But in truth, options

were backdated such that in most instances the stock price on the actual grant date was *higher* than the price on the falsely stated (backdated) grant date.

162.   The Fiscal 1998 Report on Form 10-K405 was signed by Defendants Isenberg, Petrello, Koch, Whitman, Schmidt, Sheinfeld and Wexler.

**The Fiscal 1999 Form 10-K405**

163.   On or about March 30, 2000, the Company filed its Fiscal 1999 Form 10-K405 with the SEC.  The Fiscal 1999 Form 10-K405 was simultaneously distributed to shareholders and the public.  The Fiscal 1999 Form 10-K405 included Nabors' 1999 financial statements, which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  Because options identified herein were backdated and mispriced to be "in-the-money" they constituted significant unreported non-cash compensation expense.  As a result, Nabors' compensation expense was understated and its income and net income were overstated.

164.   The Fiscal 1999 Report on Form 10-K405 was also false and misleading in that it stated:  "Options granted under the [Company's stock] plans are at prices equal to the fair market value of the stock on the date of the grant."  Fiscal 1999 Form 10-K405, at 66.  But in truth, options were backdated such that in most instances the stock price on the actual grant date was *higher* than the price on the falsely stated (backdated) grant date.  In addition, the Fiscal 1999 Report on Form 10-K405 stated that "on December 11, 1998," options had been "re-priced to the closing price of the Company's Shares on that date."  Fiscal 1999 Form 10-K405, at 67.  That statement was false and misleading for substantially the same reasons, as the options were not "re-priced" on December 11, 1998, but in fact were retroactively re-priced and backdated, as demonstrated herein.

165.   The Fiscal 1999 Report on Form 10-K405 was signed by Defendants Isenberg, Petrello, Koch, Whitman, Schmidt, Sheinfeld, Payne and Wexler.

**The Fiscal 2000 Form 10-K**

166.    On or about April 2, 2001, the Company filed its Fiscal 2000 Form 10-K with the SEC.  The Fiscal 2000 Form 10-K was simultaneously distributed to shareholders and the public. The Fiscal 2000 Form 10-K included Nabors' 2000 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  Because options identified herein were backdated and mispriced to be "in-the-money" they constituted significant unreported non-cash compensation expense.  As a result, Nabors' compensation expense was understated and its income and net income were overstated.

167.    The Fiscal 2000 Report on Form 10-K was also false and misleading in that the annual report contained therein stated:  "Options granted under the [Company's stock] plans are at prices equal to the fair market value of the stock on the date of the grant."  But in truth, options were backdated such that in most instances the stock price on the actual grant date was ***higher*** than the price on the falsely stated (backdated) grant date.  In addition, the annual report within the Fiscal 2000 Report on Form 10-K stated that "on December 11, 1998," options had been "re-priced to the closing price of Nabors' shares on that date."  Fiscal 2000 Form 10-K, at 84.  That statement was false and misleading for substantially the same reasons, as the options were not "re-priced" on December 11, 1998, but in fact were retroactively re-priced and backdated, as demonstrated herein.

168.    The Fiscal 2000 Report on Form 10-K was signed by Defendants Isenberg, Petrello, Koch, Whitman, Schmidt, Sheinfeld, Payne and Wexler.

**The Fiscal 2001 Form 10-K**

169.    On or about March 19, 2002, the Company filed its Fiscal 2001 Form 10-K with the SEC.  The Fiscal 2001 Form 10-K was simultaneously distributed to shareholders and the public. The Fiscal 2001 Form 10-K included Nabors' 2001 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated

stock options.  Because options identified herein were backdated and mispriced to be "in-the-money" they constituted significant unreported non-cash compensation expense.  As a result, Nabors' compensation expense was understated and its income and net income were overstated.

170.    The Fiscal 2001 Report on Form 10-K was also false and misleading in that the annual report contained therein stated:  "Options granted under the [Company's stock] plans are at prices equal to the fair market value of the stock on the date of the grant."  Fiscal 2001 Form 10-K, at 62-63.  But in truth, options were backdated such that in most instances the stock price on the actual grant date was *higher* than the price on the falsely stated (backdated) grant date.

171.    The Fiscal 2001 Report on Form 10-K was signed by Defendants Isenberg, Petrello, Koch, Whitman, Schmidt, Sheinfeld, Payne and Wexler.

**The Fiscal 2002 Form 10-K**

172.    On or about March 31, 2003, the Company filed its Fiscal 2002 Form 10-K with the SEC.  The Fiscal 2002 Form 10-K was simultaneously distributed to shareholders and the public.  The Fiscal 2002 Form 10-K included Nabors' 2002 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  Because options identified herein were backdated and mispriced to be "in-the-money" they constituted significant unreported non-cash compensation expense.  As a result, Nabors' compensation expense was understated and its income and net income were overstated.

173.    The Fiscal 2002 Report on Form 10-K was also false and misleading in that it stated:  "Options granted under the [Company's stock] plans are at prices equal to the fair market value of the stock on the date of the grant" (Fiscal 2002 Form 10-K, at 89); again with respect to stock plans "[t]he exercise price of options granted under the plan are set by the committee, but shall be no less than the fair market value per share of common stock on the date of the grant of the option" (Fiscal 2002 Form 10-K, at 26); and, similarly, "[w]e grant options at prices equal to the market price of our

stock on the date of grant and therefore do not record compensation costs related to these grants."
Fiscal 2002 Form 10-K, at 76.  But in truth, options were backdated such that in most instances the
stock price on the actual grant date was *higher* than the price on the falsely stated (backdated) grant
date.  Furthermore, compensation expense was not recorded because grants were backdated rather
than properly granted, and thus was *understated*.

174.    The Fiscal 2002 Report on Form 10-K was signed by Defendants Isenberg, Petrello,
Koch, Whitman, Schmidt, Sheinfeld, Payne and Wexler.  Isenberg and Koch signed Sarbanes-Oxley
Certifications associated with the Report.

**The Fiscal 2003 Form 10-K**

175.    On or about March 15, 2004, the Company filed its Fiscal 2003 Form 10-K with the
SEC.  The Fiscal 2003 Form 10-K was simultaneously distributed to shareholders and the public.
The Fiscal 2003 Form 10-K included Nabors' 2003 financial statements which were materially false
and misleading and presented in violation of GAAP, due to improper accounting for the backdated
stock options.  As a result, Nabors' compensation expense was understated and its income and net
income were overstated.

176.    The Fiscal 2003 Report on Form 10-K was also false and misleading in that it stated:
"Options granted under the [Company's stock] plans are at prices equal to the fair market value of
the shares on the date of the grant"; again with respect to stock plans "[t]he exercise price of options
granted under the plan are set by the committee, but shall be no less than 100% of the fair market
value per common share on the date of the grant of the option" (Fiscal 2003 Form 10-K, at 23); and,
similarly, "[w]e grant options at prices equal to the market price of our shares on the date of grant
and therefore do not record compensation expenses related to these grants."  But in truth, options
were backdated such that in most instances the stock price on the actual grant date was *higher* than

the price on the falsely stated (backdated) grant date.  Furthermore, compensation expense was not recorded because grants were backdated rather than properly granted, and thus was ***understated***.

177.    The Fiscal 2003 Report on Form 10-K was signed by Defendants Isenberg, Petrello, Koch, Whitman, Schmidt, Sheinfeld, Payne and Wexler.  Isenberg and Koch signed Sarbanes-Oxley certifications associated with the Report.

**The Fiscal 2004 Form 10-K**

178.    On or about March 7, 2005, the Company filed its Fiscal 2004 Form 10-K with the SEC.  The Fiscal 2004 Form 10-K was simultaneously distributed to shareholders and the public.  The Fiscal 2004 Form 10-K included Nabors' 2004 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Nabors' compensation expense was understated and its income and net income were overstated.  In addition, on or about May 2, 2005, the Company filed Form 10-K/A for fiscal year 2004, and was signed by Defendants Isenberg and Koch.

179.    The Fiscal 2004 Report on Form 10-K was also false and misleading in that it stated: "Options granted under the [Company's stock] plans are at prices equal to the fair market value of the shares on the date of the grant" (Fiscal 2004 Form 10-K, at 61); again with respect to stock plans "the exercise price of options granted under each plan shall be no less than 100% of the fair market value per common share on the date of the grant of the option" (Fiscal 2004 Form 10-K, at 83); and, similarly, "we grant options at prices equal to the market price of our shares on the date of grant we do not record compensation expense related to these grants."  Fiscal 2004 Form 10-K, at 25.  But in truth, options were backdated such that in most instances the stock price on the actual grant date was ***higher*** than the price on the falsely stated (backdated) grant date.  Furthermore, compensation expense was not recorded because grants were backdated rather than properly granted, and thus was ***understated***.

180.     The Fiscal 2004 Report on Form 10-K was signed by Defendants Isenberg, Petrello, Koch, Whitman, Schmidt, Sheinfeld, Payne and Knaster.  Isenberg and Koch signed Sarbanes-Oxley certifications associated with the Report.

**The Fiscal 2005 Form 10-K**

181.     On or about March 16, 2006, the Company filed its Fiscal 2005 Form 10-K with the SEC.  The Fiscal 2005 Form 10-K was simultaneously distributed to shareholders and the public. The Fiscal 2005 Form 10-K included Nabors' 2005 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Nabors' compensation expense was understated and its income and net income were overstated.

182.     The Fiscal 2005 Report on Form 10-K was also false and misleading in that it stated: "Options granted under the [Company's stock] plans are at prices equal to the fair market value of the shares on the date of the grant" (Fiscal 2005 Form 10-K, at 65); again with respect to stock plans "[w]e grant options at prices equal to the market price of our shares on the date of grant we do not record compensation costs related to these grants" (Fiscal 2005 Form 10-K, at 60); and, similarly, "because we grant options at prices equal to the market price of our shares on the date of grant, we do not record compensation expense related to these grants in our consolidated statements of income."  Fiscal 2005 Form 10-K, at 51.  But in truth, options were backdated such that in most instances the stock price on the actual grant date was ***higher*** than the price on the falsely stated (backdated) grant date.  Furthermore, compensation expense was not recorded because grants were backdated rather than properly granted, and thus was ***understated***.

183.     The Fiscal 2005 Report on Form 10-K was signed by Defendants Isenberg, Petrello, Koch, Whitman, Schmidt, Sheinfeld, Payne and Knaster.  Isenberg and Koch signed Sarbanes-Oxley certifications associated with the Report.

**Reports On Form 10-Q**

184.    Defendant Isenberg signed reports on Form 10-Q filed by Nabors on May 10, 2006, August 3, 2006, November 2, 2006, and May 9, 2007.  In addition, Isenberg signed a Form 10-Q/A filed by Nabors on October 11, 2002.  Isenberg also signed Sarbanes-Oxley certifications for the one report on Form 10-Q/A filed by Nabors on October 11, 2002, as well as those for the reports on Form 10-Q filed by Nabors on August 14, 2002, November 14, 2002, May 12, 2003, August 8, 2003, November 7, 2003, May 7, 2004, August 6, 2004, November 4, 2004, May 6, 2005, August 3, 2005, November 2, 2005, May 10, 2006, August 3, 2006, and November 2, 2006. The reports identified contained the Company's interim unaudited financial statements for current and previous reporting periods, which were false and misleading for *understating* compensation expense and *overstating* income, net income and earnings per share.  These reports and the certifications were false and misleading because (among other things) Defendants were backdating and mispricing stock options.  As Isenberg knew through receiving millions of backdated stock options and engaging in backdating stock options, option grants were being backdated to be "in-the-money" and thus constituted significant unreported non-cash compensation expense.

185.    Defendant Koch signed reports on Form 10-Q filed by Nabors on February 11, 2004, August 12, 2004, February 13, 1995, May 15, 1995, August 14, 1995, February 14, 1996, May 10, 1996, August 14, 1996, February 14, 1997, May 15, 1997, August 14, 1997, February 16, 1998, May 15, 1998, August 14, 1998, November 3, 1998, May 17, 1999, August 16, 1999, November 15, 1999, May 15, 2000, August 14, 2000, November 14, 2000, May 15, 2001, August 14, 2001, November 14, 2001, May 15, 2002, August 14, 2002, November 14, 2002, May 12, 2003, August 8, 2003, November 7, 2003, May 7, 2004, August 6, 2004, November 4, 2004, May 6, 2005, August 3, 2005, November 2, 2005, May 10, 2006, August 3, 2006, and November 2, 2006.  In addition, Koch signed a Form 10-Q/A filed by Nabors on October 11, 2002.  Koch  also signed Sarbanes-Oxley

certifications for the one report on Form 10-Q/A filed by Nabors on October 11, 2002, as well as those for the reports on Form 10-Q filed by Nabors on August 14, 2002, November 14, 2002, May 12, 2003, August 8, 2003, November 7, 2003, May 7, 2004, August 6, 2004, November 4, 2004, May 6, 2005, August 3, 2005, November 2, 2005, May 10, 2006, August 3, 2006, and November 2, 2006. The reports identified contained the Company's interim unaudited financial statements, which were false and misleading for **_understating_** compensation expense and **_overstating_** income, net income and earnings per share.  These reports and the certifications were false and misleading because (among other things) Defendants were backdating and mispricing stock options. As Koch knew through receiving hundreds of thousands of backdated stock options, option grants were being backdated to be "in-the-money" and thus constituted significant unreported non-cash compensation expense.

186.    Defendant Petrello signed reports on Form 10-Q filed by Nabors on February 11, 2004, August 12, 2004, February 13, 1995, May 15, 1995,  August 14, 1995, February 14, 1996, May 10, 1996, August 14, 1996, February 14, 1997, May 15, 1997, August 14, 1997,  February 16, 1998, May 15, 1998, August 14, 1998, November 3, 1998, May 17, 1999, August 16, 1999, November 15, 1999, May 15, 2000, August 14, 2000, November 14, 2000, May 15, 2001, August 14, 2001, November 14, 2001, May 15, 2002, August 14, 2002, November 14, 2002, May 12, 2003, August 8, 2003, November 7, 2003, May 7, 2004, August 6, 2004, November 4, 2004, May 6, 2005, August 3, 2005, and November 2, 2005. Petrello also signed a Form 10-Q/A filed by Nabors on October 11, 2002.  The reports identified contained the Company's interim unaudited financial statements, which were false and misleading for **_understating_** compensation expense and **_overstating_** income, net income and earnings per share.  These reports and the certifications were false and misleading because (among other things) Defendants were backdating and mispricing stock options. As Petrello knew through receiving millions of backdated stock options, option grants were being

backdated to be "in-the-money" and thus constituted significant unreported non-cash compensation expense.

## DEFENDANTS' SCHEME BEGINS TO UNRAVEL

187.    The 1995-2006 Proxy Statements concealed Defendants' option backdating scheme. Thus, the Company's shareholders remained unaware of Defendants' wrongdoing when voting on proxy proposals between 1995 and 2006.  In fact, it was not until December 2006 that shareholders learned that the Proxy Statements which they had relied upon for years were false and misleading. Defendants have been unjustly enriched at the expense of Nabors, which has received and will receive less money from the Defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated.

188.    For instance, if Isenberg's 1998 repricing of 4.5 million shares had not been backdated to the yearly low of $12.50 per share but had been granted at $15.20 per share (the average price for the fourth quarter of 1998, *Nabors would have received $68.4 million when Isenberg exercised those options instead of $56.25 million – a cost to Nabors of $12.15 million just for Isenberg's 1998 repricing*.

## SOME ADVERSE IMPACT OF DEFENDANTS' MISCONDUCT

189.    Unlike most companies which avoid such option backdating abuse by issuing stock option grants at the same time each year, which eliminates the potential for backdating, Defendants ensured that executives would not have any such restrictions.  Given the many times Nabors' grants were the low of the month in which options were granted, the date of their stock option grants was clearly more than merely coincidental.

190.    As a result of the backdating of options, Defendants have been unjustly enriched at the expense of Nabors, which has received and will receive less money from Defendants when they

exercise their options at prices substantially lower than they would have if the options had not been backdated.

## CONCEALMENT AND TOLLING OF THE STATUTE OF LIMITATIONS

191.    The Counts alleged herein are timely.  As an initial matter, Defendants wrongfully concealed their manipulation of the stock option plans, through strategic timing and fraudulent backdating, by issuing false and misleading Proxy Statements, by falsely reassuring Nabors' public investors that Nabors' option grants were being administered by a committee of independent directors, and by failing to disclose that backdated options were, in fact, actually issued on dates other than those disclosed, and that strategically timed option grants were issued based on the manipulation of insider information that ensured that the true fair market value of the Company's stock was, in fact, higher than the publicly traded price on the date of the option grant.

192.    Indeed, Defendants took affirmative steps to conceal the backdating at Nabors by authorizing or otherwise causing the Company to issue Proxies, Reports on Form 10-Q, Reports on Form 10-K, and other SEC filings and public statements that were false and misleading.  Defendants also signed or otherwise authorized Forms 3, 4, and 5 that were false and misleading.  These SEC filings omitted the true grant date and proper price for backdated options, and failed to disclose options were being backdated and mispriced.  Many of these SEC filings also contained affirmative misrepresentations that stock options were being priced at fair market value as of the date of the grant and were otherwise determined and granted in accordance with Nabors' stock option plans. These false and misleading SEC filings prevented plaintiffs and Nabors' other public shareholders from becoming aware of the backdating practices at the Company and the Company's false and misleading financial statements.

193.    Other earmarks of Defendants' concealment include the admitted lack of timely or adequate documentation in connection with stock option grants.  The Company has admitted that

"[i]n numerous instances, there was insufficient or inconclusive documentation to determine the date on which awards [were] made."  Fiscal 2006 Form 10-K, at 13.

194.    Nabors' public investors had no reason to know of the Defendants' breaches of their fiduciary duties until December 2006.  On December 27, 2006, *The Wall Street Journal* published an article entitled "Bosses' Pay:  How Stock Options Became Part of the Problem."  The article stated in part:

> Eugene Isenberg is the little-known chief executive of a modest-sized oil-services company in Houston. But he stands out in one way: He is among the highest-paid corporate executives in history. In the past 19 years, he has pocketed more than $450 million.
>
> The key to this wealth: stock options, in abundance. His employer, Nabors Industries Ltd., has lavished more than 25 million options on him over the years.
>
> They became lucrative partly because of Nabors' generally rising stock price, but also because of some controversial moves that gave the options more punch. When Nabors' stock fell below the price at which the options could be exercised, temporarily making them worthless, Nabors let him trade in some of his options for new ones with lower exercise prices. And when Mr. Isenberg cashed some options in, Nabors "reloaded" him, replacing those he'd exercised with the same number of new ones.
>
> *        *        *
>
> Nabors' Mr. Isenberg offers an example of the huge wealth CEOs have gained through stock options. Now, some of his option grants appear to raise questions about how they were dated. A number came on days when the stock hit its lowest close for the month or the quarter. At other companies, a series of low-price grants has been a pattern that has suggested possible dating problems. At the least, the favorable grant dates added to Mr. Isenberg's mammoth options gains.
>
> A spokesman for Nabors said its legal department did an internal review and found "no irregularities in its grant practices." Nabors showed internal documents to The Wall Street Journal that the company said provide evidence the grants were properly dated. Some of the documents bolster that assertion. The spokesman, citing Mr. Isenberg's record in lifting Nabors from a company in bankruptcy court to one with a market value of more than $9 billion today, also said that "Nabors strongly believes that Mr. Isenberg is appropriately compensated."
>
> *        *        *
>
> For a time, Nabors operated under an options "reload" plan. It was a generous one: Instead of replacing only a portion of options that were exercised, it replaced

them one-for-one. Mr. Isenberg could cash in options and take profits yet still have just as many options as before, though with higher exercise prices.

In another atypical feature, the replacement options sometimes had new terms of 10 years, making them even more valuable. Nabors says it stopped reloads before 2000. But in that year it gave Mr. Isenberg a "special award" of 2.4 million options, in lieu of a reload on 4.7 million options that he exercised for a $122 million gain. (Share figures in this article aren't adjusted for a recent two-for-one stock split.)

In 1998, amid an industry slump, Nabors' stock sank sharply. Some of Mr. Isenberg's options were "under water." The board repriced them. In exchange for giving up a fourth of his old options, he got new ones carrying a more favorable exercise price.

"The repricing was designed to restore incentive value to the option packages," said Nabors' Mr. Smith. He said repricing was widely available to employees. As it happened, Mr. Isenberg made less money by accepting the repricing deal and giving up some of his options than if he had held on, Mr. Smith said.

Following a single grant from its genesis shows how the various maneuvers can pile up profit.

Mr. Isenberg received a grant of 1.8 million options dated in Sept. 23, 1991. He exercised them in 1996 and 1997, pocketing about $24 million in profits.

Normally, that would have been the end of these options. But Nabors reloaded Mr. Isenberg, replacing his exercised options with a similar number – which had 10 more years to run.

Then in 1998, amid the stock downturn, Nabors repriced the reload options.

Mr. Isenberg cashed in most of them in 2000 and gave the rest to a family member in 2002. His total profit from a single grant – reloaded, extended and repriced: about $54 million, not including the gift.

The CEO's overall stock-option gains, both realized and not yet cashed in, came to $685 million at the end of last year, says S&P ExecuComp – putting him 8th on its list of big winners from 1992 to 2005.

Mr. Isenberg also has benefited from some good timing of his option grants. The Sept. 23, 1991, award was dated on the day Nabors' stock touched its lowest closing price of that month, $5.

But it isn't clear when the price was actually set. Company documents suggest the grant price may actually have been determined many months earlier, on another day when the stock closed at $5. Moreover, the grant was contingent on a new Isenberg employment contract – which other documents indicate wasn't signed until well after Sept. 23, when the stock was higher.

For a grant of a million options dated Dec. 4, 1995, another monthly low, Nabors produced no minutes of a compensation-committee meeting. Instead, a memo seven weeks later said there had been a discussion on Dec. 4 of Mr. Isenberg trading in part of his bonus for options. The memo said the idea first would be run by a consultant, suggesting the grant wasn't made final until weeks after the stated Dec. 4 award date.

In all, of 11 new option grants to Mr. Isenberg between 1991 and 2002, two were dated at quarterly lows in the Nabors stock price and five more at monthly lows. The odds against such a fortunate pattern occurring by chance are long.

Then, this same day, December 28, 2006, Nabors filed a Form 8-K with the SEC announcing that the Company had initiated an "internal review" of its stock option grant practices.  2006 Form 8-K, at Ex. 99.1.  The "review," now complete, was "overseen" by Sheinfeld, Whitman, Schmidt, Payne and Knaster – all of whom received tens of thousands of backdated stock options and three of whom engaged in backdating stock options.  Indeed, the "overseers" are interested disabled directors just as is Nabors' Board.

### Interested and Disabled "Overseers" of Nabors' "Internal Review"

| Defendant Director | Board Tenure | *Received and Exercised* Backdated Options | Engaged in Backdating Options | Signed and/or Approved False & Misleading SEC Filings in Relevant Period | Worked on Compensation and/or Audit Committee in Relevant Period | Insider Trading Proceeds |
|---|---|---|---|---|---|---|
| Sheinfeld | 1988-filing | √ | √ | √ (1991-2006) | Compensation: 1988-Filing Audit: 1988-Filing | $5.6 MM |
| Whitman | 1991-filing | √ | √ | √ (1991-2006) | Compensation: 2003-Filing Audit: 1991-Filing | $37.4 MM |
| Schmidt | 1993-filing | √ | √ | √ (1993-2006) | Compensation: 2004-Filing Audit:  2006 | $3.5 MM |
| Payne | 1999-filing | √ | | √ (1999-2006) | | $3.6 MM |
| Knaster | 2004-filing | √ (received) | | √ (2004-2006) | | |

195.    Finally, as fiduciaries of Nabors and its public shareholders, the Defendants cannot rely on any limitations defense where they withheld from Nabors' public shareholders the facts that give rise to the claims asserted herein, *i.e.,* that the Nabors' Board had abdicated its fiduciary responsibilities to oversee the Company's executive compensation practices, and that the option

grant dates had been manipulated to maximize the profit for the grant recipients and, accordingly, to maximize the costs for the Company.

## COUNT I

### Violations of §14(a) of the Exchange Act Against
### All Defendants

196.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

197.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

198.    The 1995-2006 Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that certain of the Defendants were causing Nabors to engage in an option backdating scheme, a fact that Defendants were aware of and participated in from at least 1995.

199.    In the exercise of reasonable care, Defendants should have known that the Proxy Statements were materially false and misleading.

200.    The misrepresentations and omissions in the Proxy Statements were material to plaintiff in voting on each Proxy Statement.  The Proxy Statements were an essential link in the accomplishment of the continuation of Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

201.    The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

## COUNT II

**Violations of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

202.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

203.    Between at least 1991 and the present, Defendants signed and/or otherwise approved SEC filings that were false and misleading and that did not disclose the backdating practices that were occurring at Nabors and the resulting affects of those practices on the Company's financial results.  Nabors' SEC filings, as identified above, included false and misleading financial statements that understated compensation expense and overstated income, net income and earnings per share.  The Company's SEC filings also otherwise made false and misleading statements concerning Nabors' stock option grants and granting practices.  Defendants knew or severely recklessly disregarded the fact that the Company's SEC filings were false and misleading – due to the backdating – in that the financial statements contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

204.    At the same time the price of the Company's common stock was inflated due to false and misleading statements and omissions concerning the Nabors' SEC filings, Defendants Isenberg, Koch, McLachlin, Payne, Petrello, Schmidt, Sheinfeld, Wexler and Whitman were insiders selling their stock into the market.  Defendants also caused Nabors to repurchase its own stock on the open market at inflated prices from at least 1994 to 1996.  During December 1994, the Company purchased 250,000 shares of its common stock in the open market at a cost of $1.7 million, or $6.80 per share.  During July 1998, the Company repurchased 100,000 shares in the open market at a cost

of $1.7 million, or at an average cost of $16.53 per share.  During 2001, Defendants who were then directors authorized the repurchase of up to $400 million of the Company's common stock, and Nabors purchased through a subsidiary 6.2 million shares of our common stock for approximately $248.0 million through year-end 2001.  On July 17, 2002, Defendants then directors authorized the continuation of the share repurchase program that had begun, and during 2002, Nabors also acquired, through a subsidiary, 91,000 of its common shares in the open market for $27.30 per share for an aggregate price of $2.5 million.  Further share repurchases were authorized during April 1, 2005 to June 30, 2005, when Nabors also purchased 1,500,000 shares of its common stock in the open market at an average purchase price per share of $53.71, and during October 1, 2005 to December 31, 2005, when Nabors purchased 289,100 shares at an average purchase price of $ 65.39.  And during 2006 the Company repurchased 17.9 million common shares in the open market for $627.4 million.  In the interim, during July 2006 Defendants then directors authorized another share repurchase program, under which Nabors purchased, through December 31, 2006, approximately $93.7 million of the total amount in common shares that had been purchased in 2006.  Defendants Sheinfeld, Whitman and Koch, exercised options and sold stock of theirs during at least one period in which the Company repurchased its stock.

205.    Throughout the relevant period, the Defendants identified herein individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, also engaged and participated in a continuous course of conduct which caused certain of the Company's officers and other employees and directors, including some of the Defendants, to receive improper option grants that improperly priced the common stock to be sold by the Company at prices lower than the fair market value as of the date of the grant.  Defendants and others subsequently exercised many of those options (some of which are identified herein) and

thereby purchased stock from the Company and then sold their stock into the market for a profit. Defendants knew their options were backdated and retroactively priced when they did this.

206.    Thus, Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Nabors and others in connection with their purchases of Nabors' common stock during the relevant period.

207.    As a result of the misconduct by the Defendants named in this Count, Nabors has suffered and will suffer damages in that it paid artificially inflated prices for the Company's common stock purchased on the open market.  Nabors would not have purchased its common stock at the prices it paid had the market previously been aware that the market prices of Nabors' stock was falsely inflated by Defendants' misleading statements.  As a direct and proximate result of these Defendants' wrongful conduct, Nabors suffered damages in connection with its purchases of the Company's common stock.  By reason of such conduct, the Defendants named in this Count are liable to the Company pursuant to §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Nabors also suffered damages as a direct and proximate result of Defendants' wrongful conduct by granting backdated and mispriced stock options and thereafter issuing low-priced stock upon Defendants' exercise of those options.

# COUNT III

## Accounting Against All Defendants

208.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

209.    At all relevant times, Defendants, as directors and/or officers of Nabors, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

210.    In breach of their fiduciary duties owed to Nabors and its shareholders, the Defendants caused Nabors, among other things, to grant backdated stock options to themselves and/or certain other officers and directors of Nabors and/or failed to properly investigate whether these grants had been improperly made.  By this wrongdoing, the Defendants breached their fiduciary duties owed to Nabors and its shareholders.

211.    The Defendants possess complete and unfettered control over the improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to certain of the Defendants.

212.    As a result of Defendants' misconduct, Nabors has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

213.    Plaintiff demands an accounting be made of all stock option grants made to any of the Defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted to any of the Defendants, as well as the disposition of any proceeds received by any of the Defendants via sale or other exercise of backdated stock option grants received by those Defendants.

## COUNT IV

### Breach of Fiduciary Duty and/or Aiding and Abetting
### Against All Defendants

214.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

215.    Each of the Defendants agreed to and did participate with Isenberg and Petrello and the other Defendants and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of fiduciary duties the Defendants owed to the Company.

216.    Defendants engaged in *ultra vires* acts by backdating stock options in violation of Nabors' stock plans, and (having backdated and/or received backdated stock options) and by causing Nabors to file false and misleading financial statements in violation of SEC rules and regulations and to violate the Internal Revenue Code with respect to the reporting of compensation and tax liabilities resulting therefrom.  This conduct could not have been ratified by a simple majority of shareholders. Furthermore, the Board, through its deceptive conduct pleaded herein, acquired *de facto* control of Nabors to accomplish and perpetuate its self dealing in backdated "in-the-money" options.

217.    The conduct of each Defendant constitutes actual omissions involving negligence, default, breach of duty or breach of trust.  Indeed, the Defendants have violated fiduciary duties of care, loyalty, candor and independence owed to Nabors and its public shareholders, have engaged in unlawful self dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of Nabors and its shareholders.

218.    As demonstrated by the allegations above, Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to Nabors and its public shareholders, and they failed to disclose material information and/or made material misrepresentations to shareholders regarding Defendants' option backdating scheme.

219.     By reason of the foregoing acts, practices and course of conduct, the Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Nabors and its public shareholders.

220.     As a proximate result of Defendants' conduct, in concert with Isenberg and Petrello, Nabors has been injured and is entitled to damages.

## COUNT V

### Abuse of Control Against All Defendants

221.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

222.     The Defendants employed the alleged scheme for the purpose of maintaining and entrenching themselves in their positions of power, prestige and profit at, and control over, Nabors, and to continue to receive the substantial benefits, salaries and emoluments associated with their positions at Nabors.  As a part of this scheme, Defendants actively made and/or participated in the making of or aided and abetted the making of, misrepresentations regarding Nabors.

223.     Defendants' conduct constituted an abuse of their ability to control and influence Nabors.

224.     By reason of the foregoing, Nabors has been damaged.

## COUNT VI

### Gross Mismanagement Against All Defendants

225.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

226.     Defendants had a duty to Nabors and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Nabors.

227.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Nabors in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Nabors' affairs and in the use and preservation of Nabors' assets.

228.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Nabors to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Nabors, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged Nabors.

229.    By reason of the foregoing, Nabors has been damaged.

## COUNT VII

### Constructive Fraud Against All Defendants

230.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

231.    As corporate fiduciaries, Defendants owed to Nabors and its shareholders a duty of candor and full accurate disclosure regarding the true state of Nabors' business and assets and their conduct with regard thereto.

232.    As a result of the conduct complained of, Defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from Nabors' shareholders despite their duties to, *inter alia,* disclose the true facts regarding their stewardship of Nabors.  Thus they have committed constructive fraud and violated their duty of candor.

233.    By reason of the foregoing, Nabors has been damaged.

## COUNT VIII

### Corporate Waste Against All Defendants

234.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

235.    By failing to properly consider the interests of the Company and its public shareholders, by failing to conduct proper supervision, and by giving away millions of dollars to Defendants via the option backdating scheme, Defendants have caused Nabors to waste valuable corporate assets.

236.    As a result of Defendants' corporate waste, they are liable to the Company.

## COUNT IX

### Unjust Enrichment Against All Defendants

237.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

238.    As a result of the conduct described above, Defendants will be and have been unjustly enriched at the expense of Nabors, in the form of unjustified salaries, benefits, bonuses, stock option grants and other emoluments of office.

239.    All the payments and benefits provided to the Defendants were at the expense of Nabors.  The Company received no benefit from these payments.  Nabors was damaged by such payments.

240.    Certain of the Defendants sold Nabors' stock for a profit during the period of deception, misusing confidential non-public corporate information.  These Defendants should be required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of Nabors.  A constructive trust for the benefit of the Company should be imposed thereon.

## COUNT X

### Rescission Against All Defendants

241.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

242.    As a result of the acts alleged herein, the stock option contracts between the Officer Defendants and Nabors entered into during the relevant period were obtained through Defendants' fraud, deceit, and abuse of control.  Further, the backdated stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the publicly filed contracts regarding the Officer Defendants' employment agreements and the Company's stock option plan which was also approved by Nabors' shareholders and filed with the SEC.

243.    All contracts which provide for stock option grants between the Officer Defendants and Nabors and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

## COUNT XI

### Breach of Fiduciary Duties for Insider Selling and
### Misappropriation of Information Against the Insider Selling Defendants

244.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

245.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Nabors' common stock on the basis of such information.

246.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Nabors' common stock.

- 123 -

247.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of Nabors' common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

248.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Awarding money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure Defendants do not participate therein or benefit thereby;

B.    Directing all Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and imposing a constructive trust thereon;

C.    Directing Nabors to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote adoption of the following Corporate Governance policies:

(i)    a proposal requiring that the office of CEO of Nabors and Chairman of the Nabors' Board of Directors be permanently held by separate individuals and that the Chairman of the Nabors' Board meets rigorous "independent" standards;

(ii)      a proposal to strengthen the Nabors Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(iii)     appropriately test and then strengthen the internal audit and control function;

(iv)     rotate independent auditing firms every five years;

(v)      control and limit insider stock selling and the terms and timing of stock option grants; and

(vi)     reform executive compensation.

Ordering the imposition of a constructive trust over Defendants' stock options and any proceeds derived therefrom;

Awarding punitive damages;

As to all improperly dated and/or improperly priced options that have been exercised, ordering Defendants to make a payment to the Company in an amount equal to the difference between the prices at which the options were exercised and the exercise prices the options should have carried if they were priced at fair market value on the actual date of grant;

As to all improperly dated and/or improperly priced options that have been granted but not yet exercised or expired, ordering the Company to rescind such options so they carry the exercise prices they should have carried if they were priced at fair market value on the actual date of grant;

Awarding costs and disbursements of this action, including reasonable attorneys', accountants' and experts' fees; and

Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  June 28, 2007

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
TRAVIS E. DOWNS III
KATHLEEN A. HERKENHOFF
JAMES I. JACONETTE
BENNY C. GOODMAN III
MARY LYNNE CALKINS


s/ James I. Jaconette
JAMES I. JACONETTE

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
JOHN K. GRANT
SHAWN A. WILLIAMS
MONIQUE C. WINKLER
AELISH M. BAIG
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
THOMAS G. WILHELM
9601 Wilshire Blvd., Suite 510
Los Angeles, CA  90210
Telephone:  310/859-3100
310/278-2148 (fax)

Co-Lead Counsel for Plaintiffs

CROWLEY DOUGLAS & NORMAN, LLP
TIMOTHY J. CROWLEY (05170700)
RICHARD E. NORMAN (00788128)
1301 McKinney Street, Suite 3500
Houston, TX  77010-3034
Telephone:  713/651-1771
713/651-1775 (fax)

Liaison Counsel

S:\CptDraft\Derivative\CPT Nabors consolidated.doc

<u>VERIFICATION</u>

I, JAMES I. JACONETTE, hereby declare as follows:

1.     I am a member of the law firm of Lerach Coughlin Stoia Geller Rudman & Robbins LLP, counsel for plaintiffs in the above-entitled action.  I have read the foregoing Consolidated Verified Shareholder Derivative Complaint and know the contents thereof.  I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.     I make this Verification because plaintiffs are absent from the County of San Diego where I maintain my office.

Executed this 28th day of June, 2007 at San Diego, California.

JAMES I. JACONETTE

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 28, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on June 28, 2007.

s/ James I. Jaconette
JAMES I. JACONETTE

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:jamesj@lerachlaw.com

# Mailing Information for a Case 4:07-cv-00509

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **David H Berg**
  dberg@bafirm.com

- **Jerome F Birn , Jr**
  jbirn@wsgr.com

- **Gidon M Caine**
  gcaine@jonesday.com

- **Mary Lynne Calkins**
  mcalkins@lerachlaw.com

- **Robin C Gibbs**
  sbishopbrown@gibbs-bruns.com

- **Harry Lee Godfrey**
  lgodfrey@susmangodfrey.com

- **James I Jaconette**
  james@lerachlaw.com,mcepeda@lerachlaw.com

- **Eric Julian Mayer**
  emayer@susmangodfrey.com

- **Richard Eugene Norman**
  rnorman@cdnlawfirm.com,cgillespie@cdnlawfirm.com

- **Gerard G Pecht**
  gpecht@fulbright.com,amorgan@fulbright.com,danderson@fulbright.com,dvansusteren@fulbrigh

- **Robert Sabre Safi**
  rsafi@susmangodfrey.com

- **Ashley Brooke Vinson**
  abvinson@wsgr.com,lbeltran@wsgr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

`Douglas J. Clark`

Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304

**Stephen E Kaufman**
Attorney at Law
277 Park Ave
47th Fl
New York, NY 10172

**Lewis J Liman**
Cleary Gottieb et al
One Liberty Plz
New York, NY 10006

**Brett Stecker**
The Weiser Law Firm, P.C.
121 N. Wayne Ave.
Suite 100
Wayne, PA 19087

**Gregory L. Watts**
Wilson Sonsini, et al
650 Page Mill Road
Palo Alto, CA 94304

**Robert B Weiser**
The Weiser Law Firm, P.C.
121 N. Wayne Ave.
Suite 100
Wayne, PA 19087